USDC SCAN INDEX SHEET

















SWD   6/9/04   14:32

3:04-CV-01147   PURE BIOSCIENCE V. FALKEN INDUST LTD

*1*

*M.*

1  WOLFGANG F. HAHN [SBN # 061385]      [SPACE BELOW PROVIDED FOR FILING STAMP ONLY]
   WOLFGANG F. HAHN & ASSOCIATES
2  7160 Caminito Pepino
   La Jolla, California  92037
3  Telephone :  858. 535. 1000
   Telecopier:  858. 456. 5080
4

5  CHARLES E. BRUMFIELD, ESQ. [SBN # 56636]
   c/o PURE BIOSCIENCE
   1725 Gillespie Way
6  El Cajon, California 92020

7  Attorneys for Petitioner PURE BIOSCIENCE
   fka INNOVATIVE MEDICAL SERVICES
8



```
FILED
JUN - 9 2004
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY              DEPUTY
```

9              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
10

11  PURE BIOSCIENCE                    Case No.
    fka INNOVATIVE MEDICAL SERVICES    '04 CV 1147 L    (NLS)
12
                                       PETITIONER PURE BIOSCIENCE'S MOTION
13                      Petitioner,    FOR ISSUANCE OF AN ORDER COMPELLING
                                       ARBITRATION; MEMORANDUM OF POINTS
14  vs.                                AND AUTHORITIES IN SUPPORT THEREOF;
                                       DECLARATION OF WOLFGANG F. HAHN
15

16  FALKEN INDUSTRIES, LTD.,           Date:
    a New Jersey corporation           Time:
17                                      Dept:

18                      Respondent.

19

20      Petitioner PURE BIOSCIENCE ["petitioner PURE-BIO"], by and

21  through its counsel, moves this Court for the Issuance of an Order

22  Compelling Arbitration with non-signatory Falken Industries,

23  Ltd. ["FALKEN"] in an arbitration matter presently pending before the

24  American Arbitration Association [International Centre for Dispute

25  Resolution/Case No. 50 T 1233 00528 03] by and between PURE-BIO

26  (Claimant) and signatory NVID International, Inc. ["NVID] and FALKEN,

27  as Respondents.

28  . . .



ORIGINAL

## TABLE OF CONTENTS                                          **Pages**

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.  FACTUAL AND HISTORICAL BACKGROUND. . . . . . . . . . . . . . . . . . . . .   2

    A.   STATEMENT OF THE CASE I.E. PENDING ARBITRATION . . . . . . . .   2

    B.   SUMMARY OF FALKEN'S CURRENT POSITION . . . . . . . . . . . . . . .   5

    C.   STATEMENT OF FACTS – UNDERLYING DISPUTE . . . . . . . . . . . . .   5

        1.   INNOVATIVE, NVID and INNOVATIVE's Acquisition Of
             Axenohl® Patent Rights, Axen® And Its Related Intellectual
             Property Under The Terms Of Into Core Settlement
             Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

        2.   Historical Background Between NICKEL, FALKEN's
             Predecessor And Its Principals Emile Gouiran and Helle
             Madso With Petitioner PURE-BIO And Their Prior
             Knowledge Of The Axenohl® Patent And The Terms Of The
             Core Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        3.   FALKEN Is Formed And Through Various Assignments,
             NICKEL Assigns All Of Its Assets, Including Its Rights
             Under The UA, to FALKEN And "Collapses" Itself Into
             FALKEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

        4.   FALKEN Acquires All Of NVID's Interest To The Axenohl®
             Technology And Patent Under The Core Settlement
             Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

        5.   FALKEN's Launch Of False, Misleading And Negative Media
             Campaign Blitz Against PURE-BIO, Touting FALKEN's
             Alleged "Ownership" Of Axenohl® Patent Rights, Axen®
             And Its Related Intellectual Property, PURE-BIO's "Default"
             And "Forfeiture" Of The Axenohl® Patent Rights Under The
             Core Settlement Agreement And The Resulting Reversion
             To FALKEN Thereof, "By Virtue Of (The) Assignment From
             NVID To FALKEN" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.

PAGE i

III.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    A.   THIS COURT HAS JURISDICTION UNDER THE FEDERAL
       ARBITRATION ACT ["FAA"], 9 U.S.C. §§ 1, , ET SEQ. AND UNDER
       "DIVERSITY", AS IT BEING ASKED TO INTERPRET A CONTRACT
       BY PARTIES THAT ARE CITIZENS OF SEPARATE STATES
       INVOLVING AN AMOUNT IN CONTROVERSY IN EXCESS OF
       $75,000.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

          1.   The Core Settlement Agreement Requires That All Disputes
              Arising Out Of The Agreement Shall Be Resolved By
              Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

          2.   Petitioner Pure-Bio, A California Corporation, Seeks
              Damages In Excess Of $100,000 As And Against FALKEN, A
              New Jersey Corporation. . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    B.   WHILE "ARBITRABILITY" IS TYPICALLY A QUESTION TO BE
       DETERMINED BY A COURT IN A JUDICIAL SETTING RATHER
       THAN AN ARBITRATOR, A PARTY WHO VOLUNTARILY SUBMITS
       AN ISSUE TO THE ARBITRATOR, SUCH AS FALKEN, LOSES ITS
       RIGHT TO A JUDICIAL COURT DETERMINATION ON THE ISSUE . .   12

          1.   It Is Well Settled That The Parties, If They Wish, May To
              Submit To Arbitration The Issue Of "Arbitrability" Itself. . . . .   12

    C.   IRRESPECTIVE OF THE ARBITRATION CLAUSE CONTAINED IN
       THE CORE SETTLEMENT AGREEMENT, FALKEN AND ITS
       COUNSEL FREELY,  WILLINGLY AND VOLUNTARILY SUBMITTED
       THE ISSUE OF "ARBITRABILITY" TO THE ARBITRATOR UNDER
       THE AAA'S COMMERCIAL RULES. . . . . . . . . . . . . . . . . . . . . . . .   13

          1.   As A Matter Of Law, Under Both The Ninth Circuit And
              California State Law, A Party That Decides To Submit
              "Jurisdiction To Decide Jurisdiction" To The Arbitrator Is
              Barred From Raising The Jurisdictional Issue To Attack The
              Arbitrator's Subsequent Award. . . . . . . . . . . . . . . . . . . . . . .   13

          2.   When Parties Voluntarily Submit Their "Arbitrability" Claim
              To Arbitration, Subsequent Judicial Review Is Narrowly
              Circumscribed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.

PAGE ii

D.  IT IS HORNBOOK LAW THAT A PARTY'S AGREEMENT TO
    ARBITRATE MAY BE IMPLIED FROM ITS CONDUCT AND ONCE
    COMMITTED HE IS SO BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

E.  A NON-SIGNATORY PARTY WHO CLAIMS THAT THE
    ARBITRATOR LACKS JURISDICTION IS NOT WITHOUT A REMEDY
    AND, IF NECESSARY, MUST AVAIL ITSELF OF ITS RIGHT TO
    JUDICIAL INTERVENTION TO STYMIE THE ARBITRATOR'S
    EXERCISE OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

F.  UNDER *TRIPLEFINE*, FALKEN'S "ARBITRABILITY" WAS A
    QUESTION FOR THE ARBITRATOR RATHER THAN THE COURT.
    BECAUSE THE ARBITRATION CLAUSE PROVIDED THAT ALL
    DISPUTES BETWEEN THE PARTIES BE REFERRED TO THE AAA
    AND BECAUSE ITS COMMERCIAL RULES EXPRESSLY PROVIDE
    FOR THE ARBITRATOR TO RESOLVE, IN THE FIRST INSTANCE,
    ANY DISPUTES ABOUT ITS OWN JURISDICTION . . . . . . . . . . . . . .  18

    1.  The Parties' "Clear And Unmistakable Intent" To Allow The
        Arbitrator To Determine The Issue Of Arbitrability Is
        Evidenced By The Agreement Itself . . . . . . . . . . . . . . . . . . . .  19

G.  AS A MATTER OF LAW, ARBITRATOR FITZMAURICE FOUND IN
    PETITIONER PURE-BIO'S FAVOR ON TWO (2) SEPARATE AND
    LEGALLY INDEPENDENT BASES AND, FACED WITH THE SAME
    FACTS AND ISSUES, THIS COURT WOULD HAVE REACHED THE
    SAME DECISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

    1.  The Omnibus Assignment Between FALKEN And NVID Was
        A "Full And Complete Assignment" Of The Core Settlement
        Agreement, Conveying Both Its Benefits And Its Burdens . . .  20

    2.  Under The Doctrine Of Equitable Estoppel, FALKEN's
        "Substantially Interdependent And Concerted Misconduct"
        Effectively Estopped FALKEN's Denial Of Jurisdiction And
        To Hold Otherwise Would Render The Arbitration Process
        Meaningless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.

PAGE iii

# TABLE OF AUTHORITIES

**Page(s)**

## STATE AND FEDERAL CASES

Allied-Bruce Terminix Companies v. Dobson (1995)                          11
513 U.S. 265


AMF, Inc. v. Brunswick Corp. (E.D.N.Y.1985)                               14
621 F. Supp. 456


American Builder's Ass'n. v. Au-Yang (1990)                               14
226 Cal.App.3d 170


Enterprise Leasing Corp. v. Shugart Corp. (1991)                          21
231 Cal.App.3d 737


Ficek v. Southern Pacific Company (9th Cir. 1964)                     13, 15,
388 F.2d 655                                                             16


Fidelity & Cas. Co. v. Dennis (1964)                                      18
229 Cal.App.2d 541


First Options of Chicago, Inc. v. Kaplan (1995)                           12
514 U.S. 938


Fortune, Alsweet & Eldridge, Inc. v. Daniel(9th Cir.1983)             15, 16
724 F.2d 1355


Francesco's B., Inc. v. Hotel & Restaurant Employees &                    15
Bartenders Union, Local 28 (9th Cir.1981)
659 F.2d 1383


George Day Constr. Co., Inc. v. United Bhd. of Carpenters &               15
Joiners, Local 351 (9th Cir.1984)
722 F.2d 1471


Grigson v. Creative Artists Agency (5th Cir.2000)                    23
210 F.3d 524


Gvozdenovic v. United Air Lines, Inc.                                     15
(C.A.2(N.Y.) 1991) 933 F.2d 1100


Horn v Guernitz (1968) 261 Cal.App.2d 255                                 17


International Brotherhood of Teamsters, Local 117 v.                       15
Washington Employers, Inc. (9th Cir.1977)
557 F.2d 1345

PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.

PAGE iv

*Jardine v. Superior Court (1931) 213 Cal. 301*                                  17

*John Wiley & Sons, Inc. v. Livingston (1964)*                                   15
*376 U.S. 543*

*Kemper v. Schardt (1983) 143 Cal.App.3d 557*                                    17

*Kustom Kraft Homes v. Leivenstein (1971)*                                       12
*14 Cal.App.3d 805*

*Lesser Towers, Inc. v. Roscoe-Ajax Constr. Co. (1969)*                          17
*271 Cal.App.675*

*Lovret v. Seyfarth (1972) 22 Cal.App.3d 841*                                    12, 13,
                                                                                 17

*McBro Planning & Develpmt. Co. v. Triangle Electronic*                          23
*Constr. Co. Inc. (C.A.11(Ala.)1984) 741 F.2d 342*

*Nghiem V. NEC Electronic, Inc.(C.A.9(Cal.)1994)*                                16
*25 F.3d 1437*

*O'Malley v. Petroleum Maintenance Co. (1957)*                                   12
*48 Cal.2d 107*

*Paine Webber Inc. v. Bybyk (2d Cir.1996)*                                       11
*81 F.3d 1193*

*Recorded Picture Company [Productions] Ltd. v. Nelson*                          21
*Entertainment, Inc. (1997) 53 Cal.App.4th 350*

*Sartor v. Sup. Ct. (1982) 136 Cal.App.3d 322*                                   17

*Sauter v. Superior Court (1969) 2 Cal.App.3d 25*                                17

*Shaw Group, Inc. v. Triplefine Intl. Corp.*                                     20
*(2nd Cir. 2002) 322 F.3d 115*

*Teamsters Local Union No. 764 v. J.H. Merritt and Co. (3d*                      15
*Cir.1985)770 F.2d 40*

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n.*                                    20
*(2d Cir. 1995) 64 F.3d 773*

*Unimart v. Superior Court (1969) 1 Cal.App.3d 1039*                             12

*United Steelworkers v. Warrior & Gulf Co.(1960)*                                15
*363 U.S. at 583 n. 7*

PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.

PAGE v

*Wiley & Sons v. Livingston (1964) 376 U.S. 547*     12

*Wolsey, Ltd. v. Foodmaker, Inc. (9<sup>th</sup>Cir.1998)*     14
*144 F.3d 1205*

## FEDERAL AND STATE STATUTES

*Civ. Code § 1589*     21

*Federal Arbitration Act ("FAA") 9 U.S.C. §§ 1, et seq.*     12

*28 U.S.C. § 1332*     11

## OTHER

*5 Am. Jur.2d Arbitration and Award, § 22 p. 537*     13

*6 C.J.S., Arbitration and Award, § 9, p. 157*     12

**PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION**
**PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.**

**PAGE vi**

## I.   INTRODUCTION.

While a party ordinarily cannot be compelled to arbitrate a dispute against its will or, in the absence of its signature on an agreement to arbitrate, a non-signatory, such as FALKEN, may be bound to arbitrate under a number of common law principles of contract and agency, including equitable estoppel and may be compelled to resolve its disputes in arbitration rather than a court, although it has never signed an arbitration agreement.

## II.   FACTUAL AND HISTORICAL BACKGROUND.

### A.   STATEMENT OF THE CASE I.E. PENDING ARBITRATION.

1.   On or about 27 October 2003, petitioner PURE-BIO submitted its Statement of Claims for arbitration against, *inter alios*, NVID International, Inc.["NVID] and Falken Industries, Ltd.["FALKEN"] to the American Arbitration Association ["AAA"] in San Diego. A true copy of the Statement of Claims is marked Exhibit A and attached to this Memorandum.

2.   In its Statement of Claims, petitioner PURE-BIO sought an award of damages in excess of $100,000 for various alleged breaches by both NVID and FALKEN under the terms of the Core Settlement Agreement [the "Agreement"]. *Exh. A, Statmt. of Claims.*

3.   On 2 December 2004, under the auspices of the AAA, arbitrator Jack F. Fitzmaurice ["arbitrator Fitzmaurice"] conducted a pre-arranged telephonic preliminary hearing, pursuant to Rule 20(a) of the Commercial Arbitration Rules. FALKEN appeared specially, by and through its Chicago-based counsel Michael J. Rovell, Esq. and clearly stated its position that it was appearing for the limited purpose of

1   objecting to AAA's jurisdiction over FALKEN, based on the fact that

2   FALKEN was not a signatory to the Agreement. Based upon FALKEN's

3   objection, arbitrator Fitzmaurice and the participants reached

4   agreement on a mutually satisfactory briefing schedule and hearing

5   date on the issue of FALKEN's arbitrability. It was further agreed

6   that

7          "(a)ll parties who are determined to be subject
           to the jurisdiction of the Association and/or the
           arbitrator as of January 26, 2004, shall file any
8          response and/or counterclaim they may have on
           that date."

9

10      The following day, arbitrator Fitzmaurice issued an Order

    acknowledging that

11

12         "Falken Industries (was) appearing specially for
           the limited purpose of contesting jurisdiction of
           the American Arbitration Association and/or the
13         arbitrator"

14      and that

15         "nothing in this Order No. One shall constitute a
           determination that Falken Industries, Ltd. has
16         submitted to the jurisdiction of the Association
           or the arbitrator in his capacity as compliance
17         monitor under the Core Settlement Agreement."

18      *See, Exh. B, Fitzmaurice Pre. Hrg. Order No. 1 d. 3 December*
        *2004, promulgated by the AAA to all parties.*
19

20      4.   Pursuant to the arbitrator's Preliminary Hearing Order, the

21   issue of the arbitrator's "jurisdiction of jurisdiction" was

22   extensively briefed by both petitioner PURE-BIO and FALKEN.[1] *See,*

23   *Exhibits C through F, attached hereto.*

24

25   _____

26   [1]      FALKEN filed its Memorandum in Support of its Objection to Jurisdiction on 12 December 2003 [Exh. C]; petitioner
     PURE-BIO filed its Memorandum in Opposition on 22 December 2003 [Exh. D]; FALKEN's Reply was filed on 12 January 2004
     [Exh. E] with petitioner PURE-BIO's Surreply on 16 January 2003 [Exh. F]. These briefing materials are filed without exhibits.
27   Exhibits can be made available at the court's request .

1    5.    After oral argument before arbitrator Jack F. Fitzmaurice

2    ["arbitrator Fitzmaurice"], at which FALKEN fully participated, on 28

3    January 2004, an opinion and order was issued by the arbitrator

4    Fitzmaurice, whereby, applying California law, the arbitrator

5    determined that FALKEN was subject to the arbitration clause on two

6    separate bases: (1) NVID's assignment, pursuant to the Omnibus

7    Assignment dated 12 September 2003, constituted a "full and complete

8    assignment" of all of NVID's right, title and interest in the Core

9    Settlement Agreement as well as all reversionary rights to "all

10   Axenohl® patent rights" from NVID to FALKEN; and (2) secondarily, even

11   if one should conclude that a full assignment had not taken place,

12   FALKEN is estopped from denying its submission to arbitration by its

13   own "substantially interdependent and concerted misconduct" under the

14   doctrine of equitable estoppel. FALKEN was ordered to "answer or

15   otherwise respond" to petitioner PURE-BIO's Demand "within ten (10)

16   days from the date of receipt of the (arbitrator's) decision." A true

17   copy of the Decision of Arbitrator issued by the AAA on 30 January

18   2004 is attached to this Memorandum as Exhibit G.

19   6.    On 10 February 2004, dissatisfied with this result and

20   fearing that the arbitrator would permit a default to be entered

21   against FALKEN, FALKEN filed its Complaint for Injunction in the

22   United States District Court, Southern District of New York, seeking

23   to enjoin both the AAA and petitioner PURE-BIO by precluding them from

24   proceeding with the arbitration against FALKEN. In so doing, FALKEN,

25   citing California law, maintained, that "the question of whether a

26   non-signatory is a party to an arbitration agreement is one for a

27

28

1  trial court" to determine and "may not be determined by an arbitrator"

2  as the arbitrator lacked such authority, as a matter of law – **an issue**

3  **FALKEN had never previously asserted.**

4      7.   On or about 18 March 2004, due to jurisdictional defect

5  issues and other considerations, the parties entered into a

6  Stipulation whereby it was agreed that "(n)o default judgment

7  (would)be entered . . . until after a court determination (had) been

8  made that Falken is a proper party" to the arbitration. *Exh. H.*

9      **B.   SUMMARY OF FALKEN'S CURRENT POSITION.**

10     Having lost on the actual merits of the "jurisdiction of

11 jurisdiction" issue, FALKEN and its agile counsel, have shifted their

12 focus and have now adopted the position that "the arbitrator did not

13 have authority to determine whether Falken, as a non-signatory to the

14 arbitration clause in the Core Settlement Agreement, is nonetheless

15 subject to the arbitration provision" because "(t)he question of

16 arbitrability 'is undeniably an issue for judicial determination'" [2].

17     **C.   STATEMENT OF FACTS – UNDERLYING DISPUTE.[3]**

18          **1.   INNOVATIVE, NVID and INNOVATIVE's Acquisition Of**
           **Axenohl® Patent Rights, Axen® And Its Related**
19          **Intellectual Property Under The Terms Of Into Core**
           **Settlement Agreement.**

20     On 15 November 2001, in full and complete resolution of various

21 disputes between the parties and various pending litigation and

22 arbitration matters, including both state and federal Florida court

23 actions, a federal action in California and a San Diego arbitration,

24

25 [2]      This position was first espoused by FALKEN in its application for a Temporary Restraining Order before the Second
       Circuit in March 2004 and it is anticipated that FALKEN will take this position in the present forum.
26 [3]      This Statement of Facts outlines the underlying fact pattern supporting petitioner PURE-BIO's claim of FALKEN's
       arbitrability and is included for the Court's review in the event that the Court determines a *de novo* review as to the Arbitrator's
27     Decision on the merits is required. *See. Legal Argument G 1 and 2.*

28

1   INNOVATIVE and NVID International, Inc. ["NVID"], *inter alios*, entered

2   into a Core Settlement Agreement [the "Agreement"]. *Exh. A to Stmt.*

3   *Claims.*

4       Pursuant to the Core Settlement Agreement, and "as a core

5   consideration of the global resolution" embarked upon by the parties,

6   in a separate, but attached document, the parties executed an

7   "Assignment of Patent and Related Intellectual Property" [the

8   "Assignment"], pursuant to which NVID, *inter alia*, warranted that it

9   was the sole and exclusive owner of "all Axenohl® patent rights" and,

10  as assignor, "sold, assigned, transferred and set over" to INNOVATIVE

11  its "entire right, title and interest in and to" all Axenohl® patent

12  rights that it possessed.

13      The Core Settlement Agreement was approved by each company's

14  respective Board of Directors and all transactions and transfers

15  contemplated by the Core Settlement Agreement were substantially

16  completed by December 2001.  As a direct result thereof, effective as

17  of 15 November, INNOVATIVE became the sole, exclusive and undisputed

18  owner of all Axenohl® patents, its diluted form Axen®, all related

19  technology and intellectual property, including all related

20  trademarks.

21              a.   **Arbitration As To Any "Determination Of**
                     **Responsibility And/or Liability" Under The Core**
22                   **Settlement Agreement And The Joint Appointment**
                     **Of Jack Fitzmaurice As "Compliance Monitor", Was**
23                   **Expressly Bargained For By All Of The Parties,**
                     **For Themselves And For Their Successors.**
24

25      Governance of all aspects of the Axenohl® patents and related

26  technology, all rights to manufacturing, distribution, sale and

27  marketing, including its patent's transfer and all reversionary rights

28

1   thereto, were strictly controlled by the terms of the Core Settlement

2   Agreement.  Due to the multiplicity of actions in which they had been

3   engaged prior to settlement and their costly nature, the parties to

4   the Agreement intentionally established this arbitration process with

5   the current arbitrator (in whom all parties were confident and reposed

6   great trust) as one of the benefits of the  Agreement since it

7   provided a concrete and readily discernible method and means by which

8   any and all future disputes or disagreements between the parties would

9   be resolved.

10          2.   **Historical Background Between NICKEL, FALKEN's
                  Predecessor And Its Principals Emile Gouiran and Helle**
11                **Madso With Petitioner PURE-BIO And Their Prior Knowledge
                  Of The Axenohl® Patent And The Terms Of The Core**
12                **Settlement Agreement.**

13        In January 2003, PURE-BIO and NICKEL, Ltd., "a privately held U.S.

14   company based in Paris, France" entered into a complex cross-marketing

15   and licensing agreement entitled Umbrella Agreement ("UA"),[4]  whereby

16   PURE-BIO granted NICKEL, allegedly a major manufacturer and distributor

17   of wet wipes in Europe, a license to utilize Axen® in Europe after

18   regulatory approval in developing a hard surface disinfectant spray and

19   hard surface disinfectant wet wipes for use in hospitals,

20   educational/childcare facilities, food processing and military market

21   segments.  In return, NICKEL granted PURE-BIO the exclusive right to

22   market and sell NICKEL's Clean Plus® janitorial/sanitation product line

23   and its to-be-developed Bac'Out®, line of disinfectant sprays and wipes

24   utilizing Axen® in the U.S. to suppliers and distributors.

25   _____

[4]
26        While the UA was negotiated between PURE-BIO's President and Chief executive Officer Michael Krall and its Chief
     Operating Officer Gene Auerbach and Emile Gouiran and Ms. Helle Madso on behalf of NICKEL, it was executed by Ms. Helle
     Madso, NICKEL's Vice President, as amended by correspondence dated 13 January 2003 from Mr. Emile Gouiran.

27

1    During the parties negotiations, which were handled by Mr. Emile

2    Gouiran and Ms. Helle Madso on behalf of NICKEL and President and Chief

3    Executive Officer Michael Krall and its Chief Operating Officer Gene

4    Auerbach on behalf of PURE-BIO, PURE-BIO's executives divulged their

5    extensive knowledge of Axenohl® patent, Axen® and related technology, as

6    well as the terms of the Core Settlement Agreement with NVID.

7        Due to multiple breaches, beginning with NICKEL's failure to pay a

8    $30,000 invoice for the initial Axen® shipment to NICKEL, the

9    relationship was irreparably damaged and severed.

10       **3.    FALKEN Is Formed And Through Various Assignments,
              NICKEL Assigns All Of Its Assets, Including Its
11            Rights Under The UA, to FALKEN And "Collapses" Itself
              Into FALKEN.**
12
         Having been advised by PURE-BIO' executives of NVID and the terms
13
     of the Core Settlement Agreement during their courtship, in late July-
14
     early August 2003, NVID principals were approached and courted by NICKEL
15
     principals and ultimately, visited NICKEL's offices in Paris and
16
     NICKEL's chemical plant in Rouen.  Shortly thereafter, on 6 August 2003,
17
     FALKEN was formed by Messrs. Emile Gouiran, Steven Gordon, Roy Janis,
18
     Keith Duffy and Ms. Helle Madso, and "on August 28, FALKEN acquired from
19
     Nickel, Ltd., the Clean Plus® branded products group", which product
20
     line "includes the Bac'Out® line of cleansing and disinfectant liquids
21
     and wet-wipes in which Axen, the Axenohl derivative will be
22
     incorporated." Like NICKEL, FALKEN was also a New Jersey corporation
23
     "based in Paris, France", controlled and managed by Mr. Emile Gouiran, a
24
     disbarred New Jersey attorney, and his live-in Norwegian girlfriend,
25
     Helle Madso.
26

27

28

**4.   FALKEN Acquires All Of NVID's Interest To The Axenohl® Technology And Patent Under The Core Settlement Agreement.**

On 12 September 2003, NVID and FALKEN entered into the Omnibus Assignment, whereby NVID "sold and assigned all of its interest in the Axenohl® technology and patent (Axen®) to Falken Industries, Ltd., a privately held company based in Paris, France."

**5.   FALKEN's Launch Of False, Misleading And Negative Media Campaign Blitz Against PURE-BIO, Touting FALKEN's Alleged "Ownership" Of Axenohl® Patent Rights, Axen® And Its Related Intellectual Property, PURE-BIO's "Default" And "Forfeiture" Of The Axenohl® Patent Rights Under The Core Settlement Agreement And The Resulting Reversion To FALKEN Thereof, "By Virtue Of (The) Assignment From NVID To FALKEN".**

With deliberate timing to coincide with its acquisition of all of NVID's rights, title and interest under the Core Settlement Agreement, FALKEN[5] initiated a continuous barrage numbering over 300 of publicly disseminated postings of intentionally false, misleading and disparaging statements, intended to cause damage to PURE-BIO's licensing and marketing efforts of its Axenohl® patent rights. Some examples of these libelous postings are:

    (a)   INNOVATIVE is "hovering on the threshold of bankruptcy";

    (b)   "FALKEN INDUSTRIES LTD. . . . also acquired from NVID International Ltd NVID:OTC all of its interest in the Axenohl® patent, concentrate for the Axen® product solution"; [Exh. D, 12 Oct. 2003 (Yahoo!Finance # 4181];

    (c)   "FALKEN . . . acquired contractual rights and exclusivities, non-competition agreements and other similar privileges as against IMS who is consequently

---

[5]    Without doubt, these postings were initiated by Emile Gouiran under either *nom de plume*: nickelinfo (Yahoo!Finance) or nickel-dispatches (Lycos/Raging Bull). This linkage can be readily established by reviewing the 6 October 2003 posting addressed to Miller and McCollum, PURE-BIO's auditors, who, as part of their annual audit contacted NICKEL to confirm an outstanding account balance due PURE-BIO in the amount of approximately $30,000.00 and comparing it to NICKEL's formal response dated 6 October 2003 from Harry S. Swanson, NICKEL's General Counsel, a copy of which is also attached as part of Exhibit D.

1
2

barred from marketing Axen® in Europe as a whole and in the United States, except as a component of Clean Plus®' Bac'Out® line of disinfectants";

(d)    "Now while the patent was assigned to IMS in the "Core Settlement Agreement", NVID reserved to itself substantial rights, including that of recovering the patent. IMS is in serious violation of a number of provisions in that contract" *[Exh. D, 24 Oct. 2003 (Lycos/Raging Bull # 9365)]*;

(e)    "Under the provisions of the Core Settlement Agreement, IMS has forfeited its rights to the patent, that patent subsequently reverts back to FALKEN under the Core Agreement. Hence as of this day[6], FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent and all derivatives (judicial determination is being prepared);" *[Exh. D, 24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(f)    "FALKEN owns the Axenohl® Patent and all Axen® derivatives. . ." *[Exh. D, 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(g)    "FALKEN has the unqualified absolute right to Axen® sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)"; *[Exh. D, 25 Sep. 2003 (Raging Bull Message Board Postings # 9374 & # 9392)]*;

(h)    "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl®/Axen® technology or products in the United States or in Europe, the two largest markets in the world . . . "; *[Exh. D, 21 Sep. 2003 (Raging Bull Message Board Posting # 9315)]*;

(i)    "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com; *[Exh.D, 24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374 & Posting # 9392)]*;

---

[6]    Statement was posted on "Raging Bull" PURE Message Board on 25 September 2003 @ 1:00 P.M. EDT.

(j)   "FALKEN will commence production of Axenohl® at its
      ROUEN (FRANCE) facility as early as January 2004 and
      intends to outsource productions locally for its US
      based sales. Test productions have been successfully
      analyzed by certifying laboratories"; *(Exh.D, 12 Oct.
      2003 (Raging Bull Message Board Posting # 9632)]; and*

(k)   "As a result of the transaction and as released, all
      NVID shareholders of record on October 10 will become
      shareholders of FALKEN INDUSTRIES, LTD. as at October 13
      and will receive shares and warrants to purchase a 4.5%
      preferred at $1,00 and more common at $1,50 per share".

      *See, Exh. D to PURE-BIO's Memo., Lodgmt of Exhbts.*

## III.  LEGAL ARGUMENT.

**A.   THIS COURT HAS JURISDICTION UNDER BOTH THE FEDERAL
      ARBITRATION ACT ["FAA"], 9 U.S.C. §§ 1, *ET SEQ*. AND UNDER
      "DIVERSITY", AS IT BEING ASKED TO INTERPRET A CONTRACT BY
      PARTIES THAT ARE CITIZENS OF SEPARATE STATES INVOLVING AN
      AMOUNT IN CONTROVERSY IN EXCESS OF $75,000.00.**

**1.   The Core Settlement Agreement Requires That All .
      Disputes Arising Out Of The Agreement Shall Be
      Resolved By Arbitration.**

Because the arbitration clause contained in the Core Settlement

Agreement is part of contract affecting interstate commerce, it is

governed by the Federal Arbitration Act ("FAA") 9 U.S.C. §§ 1, et

seq.. *Allied-Bruce Terminix Companies v. Dobson (1995) 513 U.S. 265,
273-281.* However, pursuant to the FAA, the Court's role is "limited

to determining two issues": (i) whether a valid agreement or

obligation to arbitrate exists, and (ii) whether one party to the

agreement has failed, neglected or refused to arbitrate." *Paine Webber
Inc. v. Bybyk (2d Cir.1996) 81 F.3d 1193, 1198.*

The FAA specifically outlines the circumstances under which a

party is subject to arbitration, providing:

> **Validity, irrevocability, and enforcement of
> agreements to arbitrate.** A written provision in
> any maritime transaction or *a contract evidencing*

1
2
3
4
5

> *a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract* or transaction, or the refusal to perform the whole or any part thereof, or *an agreement in writing to submit to arbitration an existing controversy arising out of such a contract*, transaction, or refusal, *shall be valid, irrevocable, and enforceable,* save upon such grounds as exist at law or in equity for the revocation of any contract.

6
7

    **2.    Petitioner Pure-Bio, A California Corporation, Seeks Damages In Excess Of $100,000 As And Against FALKEN, A New Jersey Corporation.**

8

    This Court also has "diversity" jurisdiction under 28 U.S.C. §

9

1332, as the parties are citizens of different states and the damages

10

sought by petitioner PURE-BIO exceed $75,000.00.

11
12
13

    **B.    WHILE "ARBITRABILITY" IS TYPICALLY A QUESTION TO BE DETERMINED BY A COURT IN A JUDICIAL SETTING RATHER THAN AN ARBITRATOR, A PARTY WHO VOLUNTARILY SUBMITS THIS ISSUE TO THE ARBITRATOR, SUCH AS FALKEN, LOSES ITS RIGHT TO A JUDICIAL COURT DETERMINATION ON THE ISSUE.**

14
15

    **1.    It Is Well Settled That The Parties, If They Wish, May To Submit To Arbitration The Issue Of "Arbitrability" Itself.**

16

    Typically, whether a particular person is a party to an

17

arbitration is a matter for a court to determine rather than an

18

arbitrator, but, depending upon the circumstances, it may be decided

19

by the arbitrator. *First Options of Chicago, Inc. v. Kaplan (1995) 514*

20

*U.S. 938; Lovret v. Seyfarth (1972) 22 Cal.App.3d 841, 859,* citing

21

*Unimart v. Superior Court (1969) 1 Cal.App.3d 1039, 1045; Wiley & Sons*

22

*v. Livingston (1964) 376 U.S. 547.* However, one who voluntarily joins

23

an arbitration becomes a party to it. *Kustom Kraft Homes v.*

24

*Leivenstein (1971) 14 Cal.App.3d 805, 809; O'Malley v. Petroleum*

25

*Maintenance Co. (1957) 48 Cal.2d 107; 6 C.J.S., Arbitration and Award,*

26

*§ 9, p. 157.* Furthermore, one may also lose his/her right to a

27
28

1   judicial determination of whether or not he is a party to an

2   arbitration by waiver or estoppel. *Lovret, supra, @ 859; 5 Am. Jur.2d*

3   *Arbitration and Award, § 22 p. 537.*

4           **"The basic rationale is that [a] claimant may not**
            **voluntarily submit his claim to arbitration,**
5           **await the outcome, and, if the decision is**
            **unfavorable, then challenge the authority of the**
6           **arbitrators to act."**

7       *Lovret, supra, @ 860; Ficek v. Southern Pacific Company (9th*
        *Cir. 1964) 388 F.2d 655, 657, cert. den. 380 U.S. 988.*
8

9       C.  **IRREVOCABLE OF THE ARBITRATION CLAUSE CONTAINED IN THE**
            **CORE SETTLEMENT AGREEMENT, FALKEN AND ITS COUNSEL FREELY,**
            **WILLINGLY AND VOLUNTARILY SUBMITTED THE ISSUE OF**
10          **"ARBITRABILITY" TO THE ARBITRATOR UNDER THE AAA'S**
            **COMMERCIAL RULES.**
11

12          1.  **As A Matter Of Law, Under Both The Ninth Circuit And**
                **California State Law, A Party That Decides To Submit**
13              **"Jurisdiction To Decide Jurisdiction" To The**
                **Arbitrator Is Barred From Raising The Jurisdictional**
14              **Issue To Attack The Arbitrator's Subsequent Award.**

15      In the present case, FALKEN voluntarily appeared (albeit

16  specially) and freely participated in the decision-making process with

17  the arbitrator and petitioner in arranging the timing and scheduling

18  of briefing on the issue of FALKEN's "arbitrability" under the Core

19  Settlement Agreement and certain ground rules were established and

20  later promulgated to all parties by the arbitrator Fitzmaurice in his

21  Preliminary Hearing Order No. 1. *See, Exh. B.*

22      Arbitrator Fitzmaurice's Order specifically stated that:

23          "(a)ll parties who are determined to be subject
            to the jurisdiction of the Association and/or the
24          arbitrator as of January 26, 2004, shall file any
            response and/or counterclaim they may have on
25          that date."

26  No objection to this language was voiced by FALKEN.

27

28

1    Based upon the mutually agreed-upon timelines, FALKEN then

2  submitted its initial Memorandum in Support of its Objection to

3  Jurisdiction and a Reply Memorandum to petitioner PURE-BIO's

4  Memorandum in Opposition. During the process, FALKEN, through its

5  counsel, requested and received several continuances and on 22 January

6  2004, FALKEN and its counsel actively participated in the telephonic

7  hearing on the issue and, at that time, did not make the argument that

8  only a trial court could make this determination

9    Only after the arbitrator issued his decision adverse to FALKEN

10  and in petitioner PURE-BIO's favor, and then for the first time,

11  FALKEN and its counsel adopted the argument that "the question of

12  whether a non-signatory is a party to an arbitration agreement is one

13  for a trial court" to determine and "may not be determined by an

14  arbitrator." [7]

15    A careful review of the facts and the parties' briefing papers

16  manifest a *clear and unmistakable intent* by FALKEN to allow

17  arbitrator Fitzmaurice to decide the "arbitrability" issue.[8]

18         2.    **When Parties Voluntarily Submit Their "Arbitrability"
                 Claim To Arbitration, Subsequent Judicial Review Is**
19               **Narrowly Circumscribed.**

20    Because an arbitrator's jurisdiction is rooted in the agreement

21  of the parties, the parties may agree to submit the question to the

22  _____

23  [7]    Citing *American Builder's Ass'n. v. Au-Yang* case (1990), in its Memorandum filed in support of its Application for a
      Temporary Restraining Order ["TRO"] in Southern District of New York, FALKEN maintained through its counsel Mr. Rovell that it
      had cited *Au-Yang* to the arbitrator for the proposition that "whether a non-signatory is a party to an arbitration agreement is one

24  for the trial court in the first instance and may not be determined by an arbitrator." The truth is otherwise. In his eighteen (18)
      pages of briefing, the *Au-Yang* case was cited only twice by Mr. Rovell and both times solely for the proposition that "the policy
      favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate". *FALKEN Memo. Object. To Jurisdiction,*

25  *p. 1; FALKEN Reply Memo., p. 2; Decl. M. Rovell, p. 1, ¶ 3; American Builder's Ass'n. v. Au-Yang* (1990) 226 *Cal.App.3d* 170.
      [8]    In *Wolsey-Foodmaker* case, borrowing from Third Circuit Judge Weinstein's analysis, the Ninth Circuit found that "the

26  essence of arbitration" occurs when "the parties agree to submit to arbitration under the FAA when they agree to submit a dispute
      for a decision by a third party." *Wolsey, Ltd. v. Foodmaker, Inc. (9th Cir.1998)* 144 *F.3d* 1205, citing *AMF Inc. v. Brunswick Corp.*
      *(E.D.N.Y.1985)* 621 *F.Supp.* 456, 460.

27

1    arbitrator and if they so chose, subsequent judicial review is

2    narrowly circumscribed. *George Day Constr. Co., Inc. v. United Bhd. of*

3    *Carpenters & Joiners, Local 351 (9th Cir.1984) 722 F.2d 1471, 1474-75,*

4    *citing Ficek v. Southern Pacific Co.(9th Cir.1964) 338 F.2d 655, 657;*

5    *United Steelworkers v. Warrior & Gulf Co.(1960) 363 U.S. at 583 n. 7;*

6    *International Brotherhood of Teamsters, Local 117 v. Washington*

7    *Employers, Inc. (9th Cir.1977) 557 F.2d 1345, 1349; John Wiley & Sons,*

8    *Inc. v. Livingston (1964) 376 U.S. 543, 557; Francesco's B., Inc. v.*

9    *Hotel & Restaurant Employees & Bartenders Union, Local 28 (9th*

10   *Cir.1981) 659 F.2d 1383, 1387.*

11   **D.    IT IS HORNBOOK LAW THAT A PARTY'S AGREEMENT TO ARBITRATE**
     **MAY BE IMPLIED FROM ITS CONDUCT AND ONCE COMMITTED THE**
12   **PARTY IS SO BOUND.**

13        "An agreement to arbitrate an issue need not be express; ... it

14   may be implied from the conduct of the parties" in the arbitration

15   setting. *Gvozdenovic v. United Air Lines, Inc. (C.A.2(N.Y.) 1991) 933*

16   *F.2d 1100; Fortune, Alsweet & Eldridge, Inc. v. Daniel(9th Cir.1983)*

17   *724 F.2d 1355, 1356; Teamsters Local Union No. 764 v. J.H. Merritt and*

18   *Co. (3d Cir.1985)770 F.2d 40, 42 (citing Daniel); International*

19   *Brotherhood of Teamsters, Local 117 v. Washington Employers, Inc.,*

20   *supra @ 1350; Ficek v. Southern Pacific Co., supra @ 656-57.*

21        In *Daniel*, the Ninth Circuit court reasoned that appellant's

22   (Daniel) conduct manifested an intent to arbitrate his dispute with

23   his union because he sent a representative to the arbitration who

24   listened to the union's evidence, presented limited evidence himself,

25   and requested a second continuance. Two weeks later, Daniel's

26   representative sent a letter to the arbitration board, claiming Daniel

27

28

1   had no obligation to arbitrate and refusing to attend future hearings.

2   The arbitrator issued a decision adverse to Daniel who appealed,

3   arguing that the arbitrator had no such authority. The Ninth Circuit

4   confirmed the arbitration award, holding that "[w]e have long

5   recognized a rule that a party may not submit a claim to arbitration

6   and then challenge the authority of the arbitrator to act after

7   receiving an unfavorable result." *Daniel, 724 F.2d at 1357*. In *Daniel*,

8   the court went so far as to say that even though appellant Daniel

9   attempted to deny the arbitrator's authority before a decision was

10   issued, "[i]t would be unreasonable and unjust to allow Daniel to

11   challenge the legitimacy of the arbitration process, in which he had

12   *voluntarily participated* over a period of several months, shortly

13   before the arbitrator announced her decision." *Id.(emp.add.)*

14       In short, once a claimant submits to the authority of the

15   arbitrator and pursues arbitration, he cannot suddenly change his mind

16   and assert lack of authority. *Nghiem V. NEC Electronic,*

17   *Inc.(C.A.9(Cal.)1994) 25 F.3d 1437, 1440.*

18       Analogous to the present case, in *Ficek* (a labor dispute

19   matter), the Ninth Circuit observed that the employer's submission of

20   the merits of the dispute to arbitration ***without reserving the***

21   ***question of arbitrability*** constituted an implied consent to allow the

22   arbitrator to determine the controversy, reasoning that "[a] claimant

23   may not voluntarily submit his claim to arbitration, await the

24   outcome, and, if the decision is unfavorable, then challenge the

25   authority of the arbitrator to act." *Ficek, supra, 338 F.2d @ 656,*

26   *657.*

27

28

**E. A NON-SIGNATORY PARTY WHO CLAIMS THAT THE ARBITRATOR LACKS JURISDICTION IS NOT WITHOUT A REMEDY AND, IF NECESSARY, MUST AVAIL ITSELF OF ITS RIGHT TO JUDICIAL INTERVENTION TO STYMIE THE ARBITRATOR'S EXERCISE OF JURISDICTION.**

The appropriate course of action for a non-signatory party who claims that the arbitrator lacks jurisdiction over him/her is to apply to the appropriate court for an order enjoining the arbitrator from exercising jurisdiction over him/her. *Kemper v. Schardt (1983) 143 Cal.App.3d 557; Sartor v. Sup. Ct. (1982) 136 Cal.App.3d 322; Horn v Guernitz (1968) 261 Cal.App.2d 255; Lovret(1972), supra, @ 860, citing Lesser Towers, Inc. v. Roscoe-Ajax Constr. Co. (1969) 271 Cal.App.675, 692-693; Jardine v. Superior Court (1931) 213 Cal. 301, 305, app. dism. 284 U.S. 592.* FALKEN chose not to do so.

Nothing in the record before this Court indicates any objection by FALKEN to the arbitrator's authority to act in the matter. Had FALKEN desired to do so, FALKEN, after claimant PURE-BIO's demand for arbitration, could have readily have sought to restrain any arbitration proceedings by filing a petition in the appropriate court. *Sauter v. Superior Court (1969) 2 Cal.App.3d 25, 27.* In subjecting FALKEN to the arbitration and in participating in the arbitration process, FALKEN, in effect, submitted to the arbitrator's authority to decide "arbitrability" in the first instance and ultimately, the merits of PURE-Bio's claims.

Moreover, having submitted the issue of "arbitrability" to the arbitrator and having lost on it, FALKEN may not now again try its same case in another forum with the hope of a result different from that which it received in the first forum (the arbitration) to which it willingly submitted. Admittedly, parties cannot confer jurisdiction

1    upon a court; but unlike a court of law, an arbitrator may herein

2    decide any issue which the parties willingly present to it. It is too

3    late for FALKEN to now complain that the arbitrator was without

4    jurisdiction to determine the issue. *Fidelity & Cas. Co. v. Dennis*

5    *(1964) 229 Cal.App.2d 541, 544.*

6       F.   **UNDER *TRIPLEFINE*, FALKEN'S "ARBITRABILITY" WAS A QUESTION
             FOR THE ARBITRATOR RATHER THAN THE COURT. BECAUSE THE**
7            **ARBITRATION CLAUSE PROVIDED THAT ALL DISPUTES BETWEEN THE
             PARTIES BE REFERRED TO THE AAA AND BECAUSE ITS COMMERCIAL**
8            **RULES EXPRESSLY PROVIDE FOR THE ARBITRATOR TO RESOLVE, IN
             THE FIRST INSTANCE, ANY DISPUTES ABOUT ITS OWN**
9            **JURISDICTION.**

10   Article 18.1 of the Core Settlement Agreement, entitled Dispute

11   Resolution, unequivocally states that

12           "the (p)arties agree that American Arbitration
             Association of San Diego, California (in the
13           person of the Arbitrator) shall maintain
             **exclusive  jurisdiction  over  any  questions**
14           **concerning the interpretation or enforcement of**
             **this  Agreement** and  all  of  its  component
15           exhibits".

16   and

17           "(h)aving  completed  an  arbitration  proceeding
             under the auspices of the American Arbitration
18           Association",

19   the Core Settlement Agreement between the parties envisioned

20   and mandated a

21           **"continuing  relationship  calling  for  varying**
             **species  of  performance,  obligations  and**
22           **liabilities".**

23   and to this end, the parties wisely appointed a mutually acceptable

24   arbitrator, Jack F. Fitzmaurice (an appointment he accepted),

25           "to  serve  as  compliance  monitor  in  connection
             with any determination of responsibility and/or
26

27

28

1    liability among Stakeholders[9] with regard to **the
      performance of any obligation arising out of the
2     Core Settlement Agreement** or its attachments".

3      *(emp. add.) Exh. A, Core Settlmt. Agmt., ¶ 18.1, p. 24*

4      **1.    The Parties' "Clear And Unmistakable Intent" To
              Allow The Arbitrator To Determine The Issue Of
5             Arbitrability Is Evidenced By The Agreement Itself.**

6    The Agreement plainly states the parties' intent to submit "**any**

7   **questions concerning the interpretation or enforcement of this**

8   **Agreement**" to the AAA "(in the person of the Arbitrator)".    Typically,

9    courts have held that a "broad grant of power to the arbitrators" as

10   to evidence the parties' clear intent to arbitrate issue of

11   arbitrability".

12   Secondly, the parties' intent to "arbitrate arbitrability" is

13   further evidenced by their agreement to refer "any questions

14   concerning the interpretation or enforcement of this Agreement" to the

15   AAA.    While no specific set of rules are delineated, at a minimum the

16   parties understood that submission of a matter to the AAA would be

17   governed and administered by the rules of the AAA itself. Rule 7(a)

18   entitled "Jurisdiction" of the AAA's Commercial Arbitration Rules

19   specifically provides that:

20        **"(t)he arbitrator shall have the power to rule on
          his   or   her   own   jurisdiction,   including   any
21        objections with respect to the existence, scope
          or validity of the arbitration agreement."**

22   In a New York case, the Federal appellate court, faced with a

23   similar set of facts, held that because the parties' arbitration

24   agreement was broadly worded, requiring submission of "all disputes"

25
      _____
      [9]
26        The parties identified as "Stakeholders" in the Escrow Agreement are as follows: Innovative Medical Services, ETIH20,
      NVID International, Inc., Watertronics International, Inc., Aqua Bio Technologies, Inc., Aqua Bio Technologies S. A. de C.V.,
27    Sistecam, S.A., David Larsen, Andrew B. Arata, Michael Redden, Stephen Gordon, George L. Duren and Charles Lewis. Each of
      these Stakeholders was a signatory to the Core Settlement Agreement  and  the Escrow Agreement

28

1   concerning their agreement to arbitrate, and because it provided for

2   arbitration to be conducted under the rules of the dispute resolution

3   body similar to the AAA, which also assigned the arbitrator initial

4   responsibility to determine issues of arbitrability, that, as a matter

5   of law, the agreement itself clearly and unmistakably evidenced the

6   parties' intent to arbitrate questions of arbitrability. *Shaw Group,*

7   *Inc. v. Triplefine Intl. Corp. (2nd Cir. 2002) 322 F.3d 115.*

8   **G.   AS A MATTER OF LAW, ARBITRATOR FITZMAURICE FOUND IN**
       **PETITIONER PURE-BIO'S FAVOR ON TWO (2) SEPARATE AND LEGALLY**
9       **INDEPENDENT BASES AND, FACED WITH THE SAME FACTS AND**
       **ISSUES, THIS COURT WOULD HAVE REACHED THE SAME DECISION.**
10

        Historically, courts have recognized a number of theories
11
    arising out of common law principles of contract and agency law under
12
    which non-signatories may be bound to the arbitration agreements of
13
    others. The five (5) theories "for binding non-signatories to
14
    arbitration agreements are: (1) incorporation by reference; (2)
15
    assumption; (3) agency; (4) veil-piercing/alter ego; and (5)
16
    *estoppel*", of which the arbitrator found in favor of petitioner PURE-
17
    BIO on two (2) bases, namely assumption and estoppel.[10] *Thomson-CSF,*
18
    *S.A. v. Am. Arbitration Ass'n. (2d Cir. 1995) 64 F.3d 773, 776.*
19

20           **1.   The Omnibus Assignment Between FALKEN And NVID Was A**
                  **"Full And Complete Assignment" Of The Core Settlement**
21                **Agreement, Conveying Both Its Benefits And Its**
                  **Burdens.**

22           At the arbitration hearing, petitioner PURE-BIO contended that

23   FALKEN was properly named as a party to the arbitration because NVID

24   had "assigned all of its right, title and interest in the Core

25   Settlement Agreement as well as the Axenohl® patent itself to FALKEN".

26   _____

     [10]    Petitioner PURE-BIO remains firmly convinced that , if provided with proper discovery, it could also successfully show an
27   "alter ego" basis for liability.

1    *Exh. H, Dec. of Arb., p. 2.* In support of its position, petitioner

2    PURE-BIO submitted the Omnibus Assignment dated 12 September 2003.

3    *Exh. J.* On the other hand, FALKEN maintained that "the Omnibus

4    Assignment (did) little more than assign NVID's Axenohl® patent

5    royalty stream to Falken and that it (did) not assign the Core

6    Settlement Agreement arbitration clause. Moreover, after the

7    arbitration had been initiated, and perhaps concerned that the Omnibus

8    Assignment would be viewed in a fashion more expansive than FALKEN and

9    NVID would prefer, FALKEN and NVID entered into a certain Covenant To

10   Stand Seized dated 8 December 2004, which they argued constituted a

11   rescission of the Omnibus Assignment and therefore clarified their

12   position that FALKEN was not "an assignee of the Core Settlement

13   Agreement and cannot possibly be bound by it." *Exh. H, Dec. of Arb.,*

14   *p. 3.*

15       The general rule is that the mere assignment of rights under an

16   executory contract does not cast upon the assignee the obligations

17   imposed by the contract upon the assignor.... The rule is otherwise,

18   however, where the assignee assumes such obligations.... '[W]hether

19   there has been an assumption of the obligations is to be determined by

20   the intent of the parties as indicated by their acts, the subject

21   matter of the contract or their words.' ... Assumption of obligations

22   may be implied from acceptance of benefits under the contract. *(Civ.*

23   *Code § 1589....)" Recorded Picture Company [Productions] Ltd. v.*

24   *Nelson Entertainment, Inc. (1997) 53 Cal.App.4[th] 350, 362, citing*

25   *Enterprise Leasing Corp. v. Shugart Corp. (1991) 231 Cal.App.3d 737,*

26   *745.*

27

28

1    Throughout the briefing period, FALKEN, through its counsel,

2    maintained the position that, under the Omnibus Assignment[11] between

3    NVID and FALKEN dated 12 September 2003, no "full and complete"

4    assignment took place. Instead, FALKEN tenuously maintained that NVID

5    only assigned to FALKEN its "right to potential future royalties" -

6    a claim that was originally rejected by the arbitrator, in his 26

7    November 2003 correspondence to Agnieszka Kusmierska, AAA's New York

8    case coordinator[12] and ultimately and finally rejected in his 30

9    January 2004  Decision of Arbitrator.

10              2.    **Under The Doctrine Of Equitable Estoppel, FALKEN's**
                      **"Substantially Interdependent And Concerted**
11                    **Misconduct" Effectively Estopped FALKEN's Denial Of**
                      **Jurisdiction And To Hold Otherwise Would Render The**
12                    **Arbitration Process Meaningless.**

13    In addition, at the arbitration hearing, petitioner PURE-BIO

14    further contended that non-signatory FALKEN was properly named as a

15    party to the arbitration because it had engaged in an extensive

16    pattern of interdependent and concerted misconduct with signatory

17    NVID, including FALKEN's open boast that it had the right to

18    manufacture and sell products based upon the Axenohl® patent

19    technology.

20    As pointed out by arbitrator Fitzmaurice in his Decision,

21    existing law allows a signatory to compel arbitration against a non-

22    signatory to an agreement that contains an arbitration clause in two

23    (2) different circumstances:

24    _____

25    [11]   The full title to the Agreement is:
          OMNIBUS ASSIGNMENT OF THE CLAIMS, CONTRACT, ACCOUNT, RIGHTS, EXPECTANCY , MONIES DUE OR
          TO BECOME DUE, OPTION(S), INVENTION, PATENT(S), CLAIMS FOR PAST INFRINGEMENT, LICENSES,
26        TRADEMARKS RELATING TO AXENOHL® AND AXEN® AND ALL DERIVATIVES THEREOF
      [12]   In his 26 November 2003 correspondence to AAA's case coordinator, the arbitrator pointed out that "it is beyond cavil
27        that the item  (Omnibus Assignment) is broader than an assignment of rights to future royalties."

28    PETITIONER PURE BIOSCIENCE'S MOTION FOR ISSUANCE OF AN ORDER COMPELLING ARBITRATION
          PURE BIOSCIENCE vs. FALKEN INDUSTRIES, LTD., ET AL.
                                                       PAGE 22

1

"First, equitable estoppel applies when the
signatory to a written contract containing an
arbitration clause must rely on the terms of the
written agreement in asserting its claims against
the non-signatory. When the signatory's claims
against the non-signatory make reference to or
presumes the existence of the written agreement,
the signatory's claims arise out of and relate
directly to the written agreement and arbitration
is appropriate. Second, the application of
equitable estoppel is warranted when the
signatory to the contract containing an
arbitration clause raises allegations of
substantially interdependent and concerted
misconduct by both the non-signatory and one or
more of the signatories to the contract.
Otherwise, the arbitration proceedings between
the two signatories would be rendered meaningless
and the federal policy in favor of arbitration
effectively thwarted."

2

3

4

5

6

7

8

9

10

11

*Grigson v. Creative Artists Agency (5th Cir.2000) 210 F.3d 524,
527. See, Exh. H, Dec. Arbitrator, p. 5.*

12

13      Petitioner PURE's claims arose out of and are directly related

14   to the Core Settlement Agreement and the application of the doctrine

15   of equitable estoppel is appropriate because the allegations of

16   interdependent and concerted misconduct of signatory NVID and non-

17   signatory FALKEN are "inextricably intertwined" and "inherently

18   inseparable". *McBro Planning & Develpmt. Co. v. Triangle Electronic*

19   *Constr. Co. Inc. (C.A.11(Ala.)1984) 741 F.2d 342.*

20   **IV.   CONCLUSION.**

21      Arbitrator Fitzmaurice had authority over FALKEN's

22   "arbitrability" claim because FALKEN (a) voluntarily submitted this

23   claim to binding arbitration and consented to his authority to decide

24   the "jurisdiction of jurisdiction" issue; (b) waived its right to

25   insist upon a judicial determination of the "arbitrability" issue by

26   virtue of its conduct in submitting the issue to arbitrator

27

28

1    Fitzmaurice's review and accordingly FALKEN is bound by the

2    arbitrator's decision under both California law and the Ninth

3    Circuit's independent interpretation thereof. However, even if for

4    some reason this Court found this argument uncompelling, the Court,

5    upon its independent review, would ultimately concur with arbitrator

6    Fitzmaurice's decision and independently determine that FALKEN, as a

7    non-signatory, was a proper party to the arbitration and obligated to

8    arbitrate these disputes with PURE-BIO, because (a) it has assumed all

9    of the assets of NVID under the Core Settlement Agreement; and (b) it

10   is equitably estopped from denying its submission to arbitration as a

11   result of its own conduct.

12       For the foregoing reasons, petitioner PURE-BIO hereby

13   respectfully requests that the Court confirm the arbitrator's Decision

14   and grant this motion to compel arbitration.

15                            WOLFGANG F. HAHN & ASSOCIATES

16

17

     Dated:  1 June 2004          By: _____
18                                     WOLFGANG F. HAHN
                                       Attorney for Petitioner
19                                     PURE-BIO

20

21

22

23

24

25

26

27

28

# AMERICAN ARBITRATION ASSOCIATION
# SAN DIEGO

PURE BIOSCIENCE
(formerly known as
INNOVATIVE MEDICAL SERVICES)[1],

                        Claimant,            CIVIL MATTER NO. _____

v.

NVID INTERNATIONAL, INC.,
FALKEN INDUSTRIES, LTD., STEVEN GORDON,

                       Respondents.

---

ARBITRATOR:     JACK F. FITZMAURICE
Appointed Pursuant To Rule R-12(a), Commercial Arbitration Rules [A.A.A.]

---

# STATEMENT OF CLAIMS

Claimant PURE BIOSCIENCE (formerly known as "INNOVATIVE MEDICAL SERVICES"), a California corporation, for claims as and against the named Respondents, and each of them, asserts the following Claims:

**A.**       **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.**

1.      Claimant PURE BIOSCIENCES (referred to hereinafter alternatively as "INNOVATIVE", or "PURE-BIO") is a publicly-traded company, whose publicly-held shares trade on the NASDAQ Small Cap under the stock symbol "PURE", subject to Securities Act of 1933 (15 U.S.C. § 77a, et seq.) and the Securities Exchange Act (15 U.S.C. § 78a, et seq.), both of which are administered and enforced by the Securities and Exchange Commission ("S.E.C.").

---

[1]   On 6 October 2003, by its filing of a Certificate of Amendment in the office of the California Secretary of State, INNOVATIVE MEDICAL SERVICES formally changed its name to "Pure Bioscience".

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ,, FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 1

1.    Historical Background  -  INNOVATIVE, NVID and
Axenohl® Patent Rights, Axen®  and Its Related Intellectual Property.

2.    On 15 November 2001, in full and complete resolution of various disputes between

the parties and various pending litigation and arbitration matters, including both State and Federal

Florida court actions, a federal action in California and a San Diego arbitration, INNOVATIVE and

NVID International, Inc. ["NVID"], *inter alios*, entered into a Core Settlement Agreement, a copy of

which is marked Exhibit 1, attached hereto and by this reference is incorporated herein.

3.    Pursuant to the Core Settlement Agreement, and "as a core consideration of the

global resolution" embarked upon by the parties, in a separate, but attached document, the

parties executed an "Assignment of Patent and Related Intellectual Property" (the "Assignment"),

pursuant to which NVID, *inter alia*, warranted that it was the sole and exclusive owner of "all

Axenohl® patent rights" and, as assignor, "sold, assigned, transferred and set over" to

INNOVATIVE its "entire right, title and interest in and to" all Axenohl® patent rights that it

possessed. *Exh. A to Exh. 1, Core Settlmt. Agmt.*

4.    Since Article 1 of the Core Settlement Agreement provided that all "transactions

contemplated" under the Agreement were to be effectuated "through an escrow maintained with

either the Arbitrator or at Computer Share Trust Company of Lakewood, Colorado", the parties

opted to utilize the services of their arbitrator Mr. Jack F. Fitzmaurice.  With his assistance and

direction, an escrow was opened and the parties entered into an Escrow Agreement dated 12

December 2001, a copy of which is marked Exhibit 2, attached hereto and by this reference is

incorporated herein.

5.    The Core Settlement Agreement was approved by each company's respective

Board of Directors and all transactions and transfers contemplated by the Core Settlement

Agreement were substantially completed by December 2001.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  2

6.      As a direct result thereof, effective as of 15 November, INNOVATIVE became the

sole, exclusive and undisputed owner of all Axenohl® patents, its diluted form Axen®, all related

technology and intellectual property, including all related trademarks.

2.      **Limited Nature of NVID's Retained "Interest" in**
        **Axenohl® Patent and Technology [Post-Core Settlement].**

7.      In return for its transfer and assignment of the Axenohl® patents and related

technology under the Core Settlement Agreement, NVID was granted certain royalty rights,

including a Minimum Royalty of "not less than $1,000,000", payment of which commences "on or

before 31 July 2004 and (ii) each fiscal year thereafter beginning on 1 August 2004 and

continuing through 6 March 2018", but INNOVATIVE sagely retained the option to " to either (x)

pay NVID the Minimum Royalty in cash or in (INNOVATIVE) common stock subject to the

restrictions of Rule 144. . . or (y) transfer the Patent to NVID within 30 days of the end of the year

for which the Minimum Royalty is due", in the event that the Axenohl® Patent and its related

technology do not "earn their keep" in the marketplace. *Exh. 1, Core Settlmt. Agmt., ¶ 4.3, p. 7-8.*

8.      Furthermore, as an alternative, "in the event that (INNOVATIVE) transfers, sells or

assigns its ownership of the Patent", NVID's royalty rights result in "complete cancellation". . . ,

subject to NVID's right to receive only "a percentage of the gross transfer proceeds of the Patent",

which, after 15 November 2003, will be limited to only five percent (5.0%) of the "Patent Transfer

Fee".

3.      **Nature of NVID's Ongoing Duties, Obligations and Responsibilities**
        **Under The Terms of The Core Settlement Agreement.**

9.      Article 18.5 of the Core Settlement Agreement assigned post-closing duties to all of

its signatory parties by expressly providing that "(a)ll of the(se) representations, warranties,

covenants and agreements made as of the date of this Agreement and as of Closing, shall survive

the closing of this transaction." Exh. 1, *Core Settlmt. Agmt., ¶ 18.5, p. 23.*

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **3**

10.    As such, the Core Settlement Agreement contains various provisions requiring a "continuing relationship calling for varying species of performance, obligations and liabilities". *Exh. 2, Escrow Agmt., ¶ 4, p. 2.*

11.    Included among NVID's ongoing duties, obligations and responsibilities are the following:

(a)    Ongoing full and complete cooperation with INNOVATIVE in "enforcing and defending" the Axenohl® Patent and its related intellectual property *(¶ 3.8);*

(b)    Ongoing full and complete indemnification re Axenohl® patent ownership *(¶ 3.11);*

(c)    Continued corporate existence in "good standing" with the State of Delaware and its payment of its taxes on a current basis *(¶ 11.1);*

(d)    Continued maintenance of minimum asset base *(¶ 11.5);*

(e)    Continued conduct of business "in the normal course". *(¶ 15.2);*

(f)    Full and complete indemnification re damages, claims or losses "arising from or in any way related to (i) the breach by (NVID) of any of its obligations or performance required by the Agreement and (ii) the failure of the Indemnifying Party's representations and warranties to be true and correct when made, as of the date of Closing , or thereafter." *(¶ 17.1);* and

(g)    Binding effect upon and voluntary assumption by "successors and assigns" of "all representations, warranties, covenants and agreements" contained in the Core Settlement Agreement" in the event of a sale or transfer of its remaining interest in Axenohl® technology and patent (¶ 18.6).

### 4.    NVID's Sale and Assignment Of "Its Interest in the Axenohl® Technology and Patent (Axen®) to FALKEN.

12.    Recently, in a series of press releases issued by NVID on 23 September 2003 and again on 1 October 2003, INNOVATIVE learned that NVID "sold and assigned all of its interest in the Axenohl® technology and patent (Axen®) to Falken Industries, Ltd. ("Falken"), a privately held company based in Paris, France." Other than through the electronic media, INNOVATIVE has not been provided any information whatsoever by NVID with regard to its "sale and assignment to FALKEN of its (retained) interest in the Axenohl® technology and patent (Axen®)". A copy of

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 4

NVID's 23 September 2003 and 1 October 2003 press releases are marked Exhibit 3 and attached hereto for ease of reference.

13.     In addition to these press releases, INNOVATIVE has been the subject of a veritable blizzard of false, misleading and disparaging statements on Yahoo!-maintained Internet bulletin boards and on a Website known as "Raging Bull", disseminated by NVID and FALKEN employees, agents and representatives, intended to damage INNOVATIVE's business reputation and cause maximum economic harm possible to INNOVATIVE and its ongoing efforts to actively license and market  its Axenohl® and Axen®  technology and patent.

14.     Included in these false, misleading and disparaging statements are the following:

(a)     INNOVATIVE is "hovering on the threshold of bankruptcy";

(b)     "FALKEN INDUSTRIES LTD. . . also acquired from NVID International Ltd NVID:OTC all of its interest in the Axenohl® patent, concentrate for the Axen product solution";

(c)     "FALKEN . . . acquired contractual rights and exclusivities, non-competition agreements and other similar privileges as against IMS who is consequently barred from marketing Axen in Europe as a whole and in the United States, except as a component of Clean Plus®' Bac'Out® line of disinfectants";

(d)     "Now while the patent was assigned to IMS in the "Core Settlement Agreement", NVID reserved to itself substantial rights, including that of recovering the patent. IMS is in serious violation of a number of provisions in that contract";

(e)     "Under the provisions of the Core Settlement Agreement, IMS has forfeited its rights to the patent, that patent subsequently reverts back to FALKEN under the Core Agreement. Hence as of this day[2], FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent and all derivatives (judicial determination is being prepared)";

(f)     "FALKEN owns the Axenohl® Patent and all Axen derivatives. . .";

(g)     "FALKEN has the unqualified absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)";

---

[2]     Statement  was posted on "Raging Bull" PURE Message Board on 25 September 2003 @ 1:00PM EDT.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 5

(h)   "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world (grant of European Exclusivity including other countries under the Umbrella Agreement and non-competition agreement under the Super Distribution Agreement)";

(i)   "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com"

(j)   "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories"; and

(k)   "As a result of the transaction and as released, all NVID shareholders of record on October 10 will become shareholders of FALKEN INDUSTRIES, LTD. as at October 13 and will receive shares and warrants to purchase a 4.5% preferred at $1,00 and more common at $1,50 per share".

B.   **CLAIMS AS AND AGAINST NVID INTERNATIONAL, INC. , STEVEN GORDON, MICHAEL REDDEN, PHIL LEWIS, KEITH DUFFY, ROBERT EDELSON AND ROY JANIS, EACH INDIVIDUALLY AND IN THEIR VARYING REPRESENTATIVE CAPACITIES AS OFFICERS AND DIRECTORS OF NVID ["NVID"][3]**

CLAIM   1   **FAILURE TO MAINTAIN ONGOING CORPORATE EXISTENCE**

NVID's CONTINUED MAINTENANCE OF ITS CORPORATE EXISTENCE "IN "GOOD STANDING" IS A *SINE QUA NON*[4] OF ITS ONGOING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT AND IS EXPRESSLY REQUIRED BY THE TERMS OF THE CORE SETTLEMENT AGREEMENT. AS A RESULT OF ITS LACK OF CORPORATE EXISTENCE, NVID IS PRECLUDED FROM FULFILLING ITS VARIOUS ONGOING AND CONTINUING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT. BY FAILING TO DO SO, NVID IS IN MATERIAL BREACH OF THE CORE SETTLEMENT AGREEMENT BETWEEN THE PARTIES

*See, Exh. 1, ¶¶ 11.1, 18.5, Core Settlmt. Agmt.*

**SUPPORTING FACTS AND DOCUMENTATION**

A.   NVID'S CORPORATE STATUS WAS SUSPENDED AND "IS NO LONGER IN EXISTENCE UNDER THE LAWS OF THE STATE OF DELAWARE, HAVING BECOME INOPERATIVE AND VOID THE FIRST DAY OF MARCH, A.D. 2003 FOR THE NON-PAYMENT OF

---

[3]   Collectively referred to as "NVID".

[4]   An essential condition or element; an indispensable thing; an absolute prerequisite.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 6

AXES." *See, Exhibit 4, Status Report, ...arriet Smith Windsor, Secretary of State, Delaware dated 15 October 2003;*

B.   THROUGH TAX YEAR 2002, NVID OWES THE STATE OF DELAWARE IN EXCESS OF $340,000.00. *See, Exhibit 5, State of Delaware, Annual Franchise Tax Report [Tax Years 2001, 2002].*

C.   DUE TO ITS SUSPENSION AND LACK OF EXISTENCE, NVID IS DISQUALIFIED AND LEGALLY INCAPABLE FROM EXERCISING ANY RIGHT, POWER OR PRIVILEGE.[5]

<u>AMOUNT IN CONTROVERSY</u>      MONETARY AND NON-MONETARY DAMAGES; EXACT AMOUNT UNDER CURRENT REVIEW AND ASSESSMENT; UNDETERMINED AT THIS TIME, BUT IN A MINIMUM AMOUNT OF $100,000.00.

CLAIM      2      FAILURE TO MAINTAIN SUFFICIENT ASSET BASE

FAILING TO MAINTAIN SUFFICIENT NET WORTH AND ASSET BASE, NVID HAS BREACHED ITS EXPRESS WARRANTY AND ONGOING SURVIVING DUTY AND OBLIGATION TO "CONTINUE TO OWN SUCH ASSETS AFTER CLOSING . . . THE FAIR MARKET VALUE OF WHICH EQUAL OR EXCEED FAIR MARKET VALUE OF THE PATENT", AS EXPRESSLY REQUIRED BY THE CORE SETTLEMENT AGREEMENT. BY FAILING TO DO SO, NVID IS IN MATERIAL BREACH OF THE CORE SETTLEMENT AGREEMENT BETWEEN THE PARTIES . *See, Exh. 1, ¶ 11.5, p. 17, Core Settlmt. Agmt.*

<u>SUPPORTING FACTS AND DOCUMENTATION</u>

A.   NVID HAS "SOLD AND ASSIGNED ALL OF ITS INTEREST IN THE AXENOHL® TECHNOLOGY AND PATENT (AXEN®) TO FALKEN INDUSTRIES, LTD. ["FALKEN"], A PRIVATELY HELD COMPANY BASED IN PARIS, FRANCE." A COPY OF NVID'S ON PRESS RELEASES". See, *Exhibit 3, NVID Press Releases dated 23 September 2003 and 1 October 2003*

B.   THE "SALE AND ASSIGNMENT" TO FALKEN OF "ALL OF ITS INTEREST IN THE AXENOHL® TECHNOLOGY AND PATENT (AXEN) IN RETURN FOR THE VALUELESS AND WORTHLESS FALKEN COMMON STOCK AND WARRANTS AND BY DISTRIBUTING SUCH STOCK AND WARRANTS, WHEN COUPLED WITH NVID'S TAX LIABILITY IS IN EXCESS OF $340,000.00 TO THE STATE OF DELAWARE, LEAVES NVID IN A VIRTUALLY "ASSET-LESS" FINANCIAL CONDITION IN DIRECT BREACH OF ITS WRITTEN PROMISE AND ONGOING DUTY TO MAINTAIN A STABLE ASSET BASE EQUAL TO, OR IN EXCESS

---

[5]   in California, any  person who attempts to exercise corporate powers during suspension is subject to fine and imprisonment . *Cal. Rev. & Tax Code § 25962.1*

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC .., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 7

OF THE "FAIR MARKET VALUE OF THE PATENT". See, ¶ 11.5, *Core Settlmt. Agmt; Exhibit 5, State of Delaware, Annual Franchise Tax Report [Tax Years 2001, 2002].*

<u>AMOUNT IN CONTROVERSY</u>        MONETARY AND NON-MONETARY DAMAGES; EXACT AMOUNT UNDER CURRENT REVIEW AND ASSESSMENT; UNDETERMINED AT THIS TIME BUT IN A MINIMUM AMOUNT OF $100,000.00.

CLAIM NO.  3        **FAILURE TO MAINTAIN SUFFICIENT ASSETS AND CAPITALIZATION TO MEET ITS ONGOING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT**

BY TRANSFERRING ITS SOLE ASSET I.E. ALL OF ITS INTEREST IN THE AXENOHL® TECHNOLOGY AND PATENT (AXEN®) TO FALKEN AND BY FAILING TO PAY ITS TAXES, NVID HAS BECOME A "MERE SHELL" WITHOUT SUFFICIENT ASSETS AND CAPITALIZATION TO MEET ITS ONGOING AND SURVIVING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT AND IS THEREBY IN MATERIAL BREACH OF THE CORE SETTLEMENT AGREEMENT BETWEEN THE PARTIES .

<u>SUPPORTING FACTS AND DOCUMENTATION</u>

A.        IN ITS STRIPPED, "ASSET-LESS" FINANCIAL CONDITION, SADDLED ONLY WITH THE "VALUELESS" AND "WORTHLESS" STOCK OF A RECENTLY-FORMED "PRIVATELY HELD" NEW JERSEY CORPORATION, "BASED IN PARIS, FRANCE", NVID IS INCAPABLE OF PERFORMING ANY OF THE FOLLOWING, ONGOING AND SURVIVING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT:

[1]        ABILITY TO ASSIST IN "ENFORCING AND DEFENDING" THE AXENOHL® PATENT, THE TRADEMARKS AND ANY REGULATORY APPROVALS", AS EXPRESSLY REQUIRED UNDER ARTICLE 3.8 OF THE CORE SETTLEMENT AGREEMENT.

[2]        ABILITY TO "INDEMNIFY" INNOVATIVE " WITH RESPECT OF ANY CLAIMS, LOSSES, DAMAGES AND EXPENSES WHICH MAY BE INCURRED. . . AS A RESULT OF OR ARISING OUT OF ANY CLAIMS OF OWNERSHIP OR INTEREST IN THE PATENT. . . BY ANY PARTY", AS EXPRESSLY REQUIRED UNDER ARTICLE 3.11 OF THE CORE SETTLEMENT AGREEMENT.

[3]        ABILITY TO "MAINTAIN" OF ITS CORPORATE EXISTENCE "IN GOOD STANDING", AS EXPRESSLY REQUIRED UNDER ARTICLE 11.1 OF THE CORE SETTLEMENT AGREEMENT.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 8

[4]    ABILITY TO "MAINTAIN" A MINIMUM ASSET BASE WHICH WAS TO "EQUAL OR EXCEED FAIR MARKET VALUE OF THE PATENT", AS EXPRESSLY REQUIRED UNDER ARTICLE 11.5 OF THE CORE SETTLEMENT AGREEMENT.

[5]    ABILITY TO CONTINUE TO "CONDUCT (ITS) BUSINESS IN THE NORMAL COURSE", AS EXPRESSLY REQUIRED UNDER ARTICLE 15.2 OF THE CORE SETTLEMENT AGREEMENT.

[6]    ABILITY "TO DEFEND, INDEMNIFY AND HOLD (INNOVATIVE, ITS RESPECTIVE OWNERS, SHAREHOLDERS, CONTROLLING PERSONS, PARENT AND SUBSIDIARIES, AFFILIATES, OFFICERS, DIRECTORS, ATTORNEYS, AGENTS AND EMPLOYEES) HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEFENSE COSTS, INCLUDING ATTORNEYS' FEES, DAMAGES AND OTHER LIABILITIES, TO THE EXTENT ARISING FROM OR IN ANY WAY RELATED TO (I) THE BREACH BY THE INDEMNIFYING PARTY OF ANY OF ITS OBLIGATIONS OR PERFORMANCE REQUIRED BY THE AGREEMENT AND (II) THE FAILURE OF THE INDEMNIFYING PARTY'S REPRESENTATIONS AND WARRANTIES TO BE TRUE AND CORRECT WHEN MADE, AS OF THE DATE OF CLOSING , OR THEREAFTER", AS EXPRESSLY REQUIRED UNDER ARTICLE 17.1 OF THE CORE SETTLEMENT AGREEMENT.

[7]    ABILITY TO ENFORCE THE SURVIVABILITY OF "(A)LL OF THE REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS" CONTAINED IN THE AGREEMENT, AS EXPRESSLY REQUIRED UNDER ARTICLE 18.5 OF THE CORE SETTLEMENT AGREEMENT.

*See, Exh. 1, Core Settlmt. Agmt., ¶¶ 3.8, 3.11, 11.1, 11.5, 15.2, 17.1, 18.5, 18.6,.; Exhibit 3, NVID Press Releases dated 23 September 2003 and 1 October 2003*

**AMOUNT IN CONTROVERSY**    MONETARY AND NON-MONETARY DAMAGES; EXACT AMOUNT UNDER CURRENT REVIEW AND ASSESSMENT; UNDETERMINED AT THIS TIME, BUT IN A MINIMUM AMOUNT OF $100,000.00.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 9

C.    CLAIMS AS AND AGAINST NVID INTERNATIONAL, INC. ["NVID"], FALKEN
      INDUSTRIES, LTD. ["FALKEN"], STEVEN GORDON[6], HELLE A. MADSO, MICHAEL
      REDDEN, PHIL LEWIS, KEITH DUFFY, ROBERT EDELSON AND ROY JANIS, EACH
      INDIVIDUALLY AND IN THEIR VARYING REPRESENTATIVE CAPACITIES AS OFFICERS
      <u>AND DIRECTORS OF EITHER NVID, FALKEN OR BOTH.</u>

CLAIM NO.   4      DECLARATORY RELIEF ASSESSING JOINT AND SEVERAL LIABILITY
                   TO BOTH NVID AND FALKEN AS TO ANY ADJUDICATED DAMAGES,
                   LOSSES AND/OR COSTS SUFFERED BY INNOVATIVE UNDER CLAIM
                   NOS. 1 THROUGH 3.

                   <u>REQUESTED RULING NO. 1</u>

                   DUE TO THE "SALE AND ASSIGNMENT" TO FALKEN OF "ALL ITS
                   INTERESTS IN THE AXENOHL® TECHNOLOGY AND PATENT
                   [AXEN®]", AND BY OPERATION OF THE TERMS OF THE CORE
                   SETTLEMENT AGREEMENT,  ALL SURVIVING "REPRESENTATIONS,
                   WARRANTIES, COVENANTS AND AGREEMENTS IN THE (CORE
                   SETTLEMENT) AGREEMENT" ARE "BINDING UPON"  FALKEN, AS
                   NVID'S SUCCESSOR AND ASSIGN.

                   <u>REQUESTED RULING NO. 2</u>

                   FALKEN IS JOINTLY AND SEVERALLY RESPONSIBLE FOR THE
                   CONTINUED PERFORMANCE AND ONGOING FULFILLMENT OF THE
                   REMAINING ONGOING DUTIES AND RESPONSIBILITIES ORIGINALLY
                   INCUMBENT UPON  NVID UNDER THE TERMS OF THE CORE
                   SETTLEMENT AGREEMENT.

                   <u>REQUESTED RULING NO. 3</u>

                   ACCORDINGLY, AS TO INNOVATIVE, FALKEN IS JOINTLY AND
                   SEVERALLY LIABLE FOR ANY DAMAGES CAUSED BY NVID'S
                   MATERIAL BREACHES, ADJUDICATED IN THIS ARBITRATION UNDER
                   CLAIM NOS. 1 THROUGH 3.

                   *See, Exh. 1, Core Settlmt Agmt.*, ¶¶ *18.5, 18.6.*

      <u>AMOUNT IN CONTROVERSY</u>      MONETARY AND NON-MONETARY DAMAGES;
                                        EXACT AMOUNT UNDER CURRENT REVIEW AND
                                        ASSESSMENT; UNDETERMINED AT THIS TIME,
                                        BUT IN A MINIMUM AMOUNT OF $100,000.00.

---

[6]   Steven Gordon is named both individually and in his dual  representative capacities as President  and CEO of both NVID
      and FALKEN.

                    STATEMENT OF CLAIMS
                    PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
                    v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
                    AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
                    BEFORE JACK F. FITZMAURICE, ARBITRATOR
                    PAGE  10

CLAIM NO.   5        TRADE LIBEL: DISSEMINATION OF FALSE AND MISLEADING
INFORMATION AND STATEMENTS DISPARAGING INNOVATIVE'S
OWNERSHIP OF THE AXENOHL® PATENTS AND TECHNOLOGY.

AS PART OF ITS "SALE AND ASSIGNMENT" TO FALKEN OF ITS
REMAINING INTEREST IN THE AXENOHL® PATENTS, NVID HAS
JOINED AND COLLABORATED WITH FALKEN IN THE DISSEMINATION
OF FALSE AND MISLEADING INFORMATION AND STATEMENTS
DISPARAGING INNOVATIVE'S SOLE OWNERSHIP OF AXENOHL®
PATENTS, TRADEMARKS "AXENOHL®" AND "AXEN" AND RELATED
INTELLECTUAL PROPERTY AND ITS SOLE AND EXCLUSIVE RIGHT
AND ABILITY TO LICENSE, MANUFACTURE, SELL, MARKET AND
PRODUCE AXENOHL® AND AXEN®.

## SUPPORTING FACTS AND DOCUMENTATION

EXAMPLES OF THESE PUBLICLY DISSEMINATED FALSE,
MISLEADING AND DISPARAGING STATEMENTS ARE:

(a)    INNOVATIVE is "hovering on the threshold of bankruptcy";

(b)    "FALKEN INDUSTRIES LTD. . . also acquired from NVID
International Ltd NVID:OTC all of its interest in the Axenohl® patent,
concentrate for the Axen product solution";

(c)    "FALKEN . . . acquired contractual rights and exclusivities, non-
competition agreements and other similar privileges as against IMS
who is consequently barred from marketing Axen in Europe as a
whole and in the United States, except as a component of Clean
Plus®' Bac'Out® line of disinfectants";

(d)    "Now while the patent was assigned to IMS in the "Core Settlement
Agreement", NVID reserved to itself substantial rights, including that
of recovering the patent. IMS is in serious violation of a number of
provisions in that contract";

(e)    "Under the provisions of the Core Settlement Agreement, IMS has
forfeited its rights to the patent, that patent subsequently reverts
back to FALKEN under the Core Agreement. Hence as of this day[7],
FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent
and all derivatives (judicial determination is being prepared)";

(f)    "FALKEN owns the Axenohl® Patent and all Axen derivatives. . .";

(g)    "FALKEN has the unqualified absolute right to Axen sales anywhere
in Europe (and in other countries) and in the United States This
under contracts with IMS (PURE)";

---

[7]      Statement was posted on "Raging Bull" PURE Message Board on 25 September 2003 @ 1:00PM EDT.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 11

(h)    IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world (grant of European Exclusivity including other countries under the Umbrella Agreement and non-competition agreement under the Super Distribution Agreement)";

(i)    "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com"

(j)    "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories"; and

(k)    "As a result of the transaction and as released, all NVID shareholders of record on October 10 will become shareholders of FALKEN INDUSTRIES, LTD. as at October 13 and will receive shares and warrants to purchase a 4.5% preferred at $1,00 and more common at $1,50 per share".

NONE OF THESE STATEMENTS ARE TRUE.

**AMOUNT IN CONTROVERSY**        MONETARY AND NON-MONETARY DAMAGES; EXACT AMOUNT UNDER CURRENT REVIEW AND ASSESSMENT; UNDETERMINED AT THIS TIME, BUT IN A MINIMUM AMOUNT OF $100,000.00. BUT AT LEAST  $100,000.00.

CLAIM NO.   6        **REQUEST FOR IMMEDIATE EMERGENCY RELIEF**

A.    PROHIBITORY INJUNCTIVE RELIEF REQUIRING NVID AND FALKEN TO "CEASE AND DESIST", FROM THE CONTINUED CONCERTED AND FURTHER DISSEMINATION BY NVID, FALKEN, THEIR OFFICERS, AGENTS, EMPLOYEES AND REPRESENTATIVES OF ANY FALSE AND MISLEADING INFORMATION IN RELATION TO THE "TRUE" OWNERSHIP OF THE AXENOHL® TECHNOLOGY AND PATENTS, THE TRADEMARKS "AXENOHL®" AND "AXEN®" AND ALL RELATED INTELLECTUAL PROPERTY.

B.    MANDATORY AFFIRMATIVE INJUNCTIVE RELIEF ORDERING NVID AND FALKEN TO ISSUE PRESS RELEASE(S) STATING THAT [1] INNOVATIVE IS THE SOLE AND EXCLUSIVE OWNER OF THE AXENOHL® TECHNOLOGY, ITS PATENTS, THE RELATED TRADEMARKS "AXENOHL®" AND "AXEN®" AND ALL OTHER RELATED INTELLECTUAL PROPERTY; AND [2] RECANTING ALL PREVIOUS FALSE AND MISLEADING

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 12

STATEMENTS MADE IN RELATION TO (A) "SALE AND ASSIGNMENT" TRANSACTION BETWEEN NVID AND FALKEN; (b) THE LIMITED NATURE OF NVID'S RESIDUAL INTEREST IN THE AXENOHL® TECHNOLOGY AND ITS PATENTS [POST-CORE SETTLEMENT WITH INNOVATIVE]; [3] NVID AND FALKEN'S INABILITY TO "MAKE, USE, OFFER TO SELL OR SELL" ANY PRODUCT OR PRODUCTS CONTAINING OR UTILIZING AXENOHL® TECHNOLOGY, ITS PATENTS OR THE RELATED TRADEMARKS "AXENOHL®" AND "AXEN®" WITHOUT THE EXPRESS UNFETTERED CONSENT AND INVOLVEMENT OF INNOVATIVE; AND [3] NVID AND FALKEN'S KNOWLEDGE OF INNOVATIVE'S STATED UNWILLINGNESS TO PROVIDE THE AXENOHL® TECHNOLOGY, ANY PRODUCTS CONTAINING AXEN®, OR ANY OF ITS DERIVATIVES TO EITHER NVID OR FALKEN.

## REMEDIES SOUGHT AS AND AGAINST NVID, GORDON AS TO CLAIMS 1, 2 AND 3

### A.  DETERMINATIONS BY ARBITRATOR.

1.  RULING BY ARBITRATOR THAT, AS A RESULT OF ITS LACK OF CORPORATE EXISTENCE, NVID IS IN MATERIAL BREACH OF THE CORE SETTLEMENT AGREEMENT;

2.  RULING BY ARBITRATOR THAT NVID'S "SALE AND ASSIGNMENT" HAS SUBSTANTIALLY IMPAIRED NVID'S FINANCIAL CONDITION AND NVID IS IN MATERIAL BREACH OF ITS EXPRESS WARRANTY AND ONGOING SURVIVING DUTY AND OBLIGATION TO MAINTAIN SUFFICIENT NET WORTH AND ASSET, AS REQUIRED BY ARTICLE 11.5 OF THE CORE SETTLEMENT AGREEMENT;

3.  RULING BY ARBITRATOR THAT DUE NVID'S FAILURE TO MAINTAIN ITS CORPORATE EXISTENCE, ITS "SALE AND ASSIGNMENT" FO VIRTUALLY ALL OF ITS ASSETS,  NVID IS INCAPABLE OF PERFORMING ANY OF THE FOLLOWING, ONGOING AND SURVIVING DUTIES AND RESPONSIBILITIES IMPOSED BY THE CORE SETTLEMENT AGREEMENT:

    (a)  ABILITY TO ASSIST IN "ENFORCING AND DEFENDING" THE AXENOHL® PATENT, THE TRADEMARKS AND ANY REGULATORY APPROVALS", AS EXPRESSLY REQUIRED UNDER ARTICLE 3.8 OF THE CORE SETTLEMENT AGREEMENT.

    (b)  ABILITY TO "INDEMNIFY" INNOVATIVE " WITH RESPECT OF ANY CLAIMS, LOSSES, DAMAGES AND EXPENSES WHICH MAY BE INCURRED. . . AS A RESULT OF OR ARISING OUT OF ANY CLAIMS OF OWNERSHIP OR INTEREST IN THE PATENT. . . BY ANY PARTY", AS EXPRESSLY REQUIRED UNDER ARTICLE 3.11 OF THE CORE SETTLEMENT AGREEMENT.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 13

(c) ABILITY TO "MAINTAIN" OF ITS CORPORATE EXISTENCE "IN GOOD STANDING", AS EXPRESSLY REQUIRED UNDER ARTICLE 11.1 OF THE CORE SETTLEMENT AGREEMENT.

(d) ABILITY TO "MAINTAIN" A MINIMUM ASSET BASE WHICH WAS TO "EQUAL OR EXCEED FAIR MARKET VALUE OF THE PATENT", AS EXPRESSLY REQUIRED UNDER ARTICLE 11.5 OF THE CORE SETTLEMENT AGREEMENT.

(e) ABILITY TO CONTINUE TO "CONDUCT (ITS) BUSINESS IN THE NORMAL COURSE", AS EXPRESSLY REQUIRED UNDER ARTICLE 15.2 OF THE CORE SETTLEMENT AGREEMENT.

(f) ABILITY "TO DEFEND, INDEMNIFY AND HOLD (INNOVATIVE, ITS RESPECTIVE OWNERS, SHAREHOLDERS, CONTROLLING PERSONS, PARENT AND SUBSIDIARIES, AFFILIATES, OFFICERS, DIRECTORS, ATTORNEYS, AGENTS AND EMPLOYEES) HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEFENSE COSTS, INCLUDING ATTORNEYS' FEES, DAMAGES AND OTHER LIABILITIES, TO THE EXTENT ARISING FROM OR IN ANY WAY RELATED TO (I) THE BREACH BY THE INDEMNIFYING PARTY OF ANY OF ITS OBLIGATIONS OR PERFORMANCE REQUIRED BY THE AGREEMENT AND (II) THE FAILURE OF THE INDEMNIFYING PARTY'S REPRESENTATIONS AND WARRANTIES TO BE TRUE AND CORRECT WHEN MADE, AS OF THE DATE OF CLOSING , OR THEREAFTER", AS EXPRESSLY REQUIRED UNDER ARTICLE 17.1 OF THE CORE SETTLEMENT AGREEMENT.

(g) ABILITY TO ENFORCE THE SURVIVABILITY OF "(A)LL OF THE REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS" CONTAINED IN THE AGREEMENT, AS EXPRESSLY REQUIRED UNDER ARTICLE 18.5 OF THE CORE SETTLEMENT AGREEMENT.

4. RULING BY ARBITRATOR THAT, DUE TO THE VARIOUS BREACHES ENUMERATED, ALL ROYALTY PAYMENTS PAYABLE TO NVID, UNDER ARTICLE 4.2 OF THE CORE SETTLEMENT AGREEMENT ARE SUSPENDED UNTIL SUCH TIME AS ALL OF THE ENUMERATED BREACHES ARE CURED.

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 14

B.    **AWARD OF DAMAGES.**

    5.    COMPENSATORY DAMAGES IN THE AMOUNT OF $47,023.18, ACCORDING TO PROOF AT THE TIME OF ARBITRATION, TOGETHER WITH INTEREST THEREON, AS PERMITTED BY LAW;

**REMEDIES SOUGHT AS AND AGAINST NVID, FALKEN, GORDON AS TO CLAIMS 4, 5 AND 6**

A.    **IMMEDIATE EMERGENCY RELIEF.**

    6.    PROHIBITORY INJUNCTIVE RELIEF

    7.    MANDATORY INJUNCTIVE RELIEF

B.    **DETERMINATIONS BY ARBITRATOR.**

    8.    RULING BY ARBITRATOR THAT AS A DIRECT RESULT OF FALKEN'S PURCHASE OF NVID'S INTERESTS IN THE AXENOHL® TECHNOLOGY AND PATENT [AXEN®]", AND BY OPERATION OF THE TERMS OF THE CORE SETTLEMENT AGREEMENT, FALKEN IS A SUCCESSOR TO, AND ASSIGNEE OF "ALL SURVIVING "REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS IN THE (CORE SETTLEMENT) AGREEMENT", WHICH ARE NOW "BINDING UPON" AND ENFORCEABLE UPON FALKEN.

    9.    RULING BY ARBITRATOR THAT FALKEN IS JOINTLY AND SEVERALLY RESPONSIBLE FOR THE CONTINUED PERFORMANCE AND ONGOING FULFILLMENT OF THE REMAINING ONGOING DUTIES AND RESPONSIBILITIES ORIGINALLY INCUMBENT UPON NVID UNDER THE TERMS OF THE CORE SETTLEMENT AGREEMENT.

    10.    RULING BY ARBITRATOR THAT FALKEN IS JOINTLY AND SEVERALLY LIABLE FOR ANY DAMAGES CAUSED BY NVID'S MATERIAL BREACHES, ADJUDICATED IN THIS ARBITRATION UNDER CLAIM NOS. 1 THROUGH 3.

C.    **AWARD OF DAMAGES.**

    11.    COMPENSATORY DAMAGES IN THE AMOUNT OF $47,023.18, ACCORDING TO PROOF AT THE TIME OF ARBITRATION, TOGETHER WITH INTEREST THEREON, AS PERMITTED BY LAW;

**REMEDIES SOUGHT AS AND AGAINST ALL PARTIES ON ALL CLAIMS**

    12.    .PREJUDGMENT INTEREST ON ALL DAMAGES AS PERMITTED BY LAW;

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **15**

13. REASONABLE ATTORNEYS' FEES AND COSTS OF ARBITRATION, AS PERMITTED BY THE TERMS OF THE CORE SETTLEMENT AGREEMENT;

14. COSTS OF SUIT HEREIN; AND

15. SUCH OTHER AND FURTHER RELIEF AS THE ARBITRATOR DEEMS JUST AND PROPER.

Respectfully submitted,

WOLFGANG F. HAHN & ASSOCIATES

DATED:  27 October 2003

By:_____
    WOLFGANG F. HAHN
    Attorney for Claimant
    PURE BIOSCIENCE

STATEMENT OF CLAIMS
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [SAN DIEGO]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 16

Exhibit 1

# ORIGINAL

## CORE SETTLEMENT AGREEMENT

This Core Settlement Agreement (or "Agreement") is effective as of November 15, 2001 (the "Effective Date"), by and among Innovative Medical Services, Inc. a California corporation ("IMS"), ETIH20 Corporation, a Nevada corporation ("ETI"), NVID International, Inc., a Delaware corporation ("NVID"), Watertronics Ltd., an entity organized under the laws of the United Kingdom ("Watertronics"), Aqua Bio Technologies, S. A. de C.V., a Mexican corporation ("Aquabiotech Mexico"), Andrew B. Arata, ("Arata") individually, Sistecam S.A., a Costa Rican corporation ("Sistecam"), David Larson, the President of NVID, individually ("Larson"), Aqua Bio Technologies Inc., a Delaware Corporation, ("Aquabiotech") , Michael Redden, the Secretary and Treasurer of NVID, individually ("Redden"), Steve Gordon, individually ("Gordon"), George L. Duren ("Duren") and Dr. Charles Lewis ("Lewis") (the foregoing parties, individually a "Party" and collectively, the "Parties") with regard to the following:

A.     Axenohl and its diluted form, "Axen" (hereinafter "Axenohl"), is a silver ion product with marketable disinfectant properties, invented by Arata.  Arata assigned the rights to Axenohl to NVID and it is the subject of U.S. Patent No. 6,197,814; WIPO App. No. WO 99 / 18790, together with all trade secrets as defined in California Civil Code section 3426.1 and the case law interpreting such section, unpatented inventions, all patents pending, filed, or granted in the United States and in all other countries, know-how and other rights, related to Axenohl and all rights and incidents of ownership of NVID related thereto, including, but not limited to the issued and/or applied for patents listed on Attachment "A" to Exhibit "A," hereto (the "Patent").

B.     NVID has entered into various marketing and/or manufacturing agreements related to Axenohl with IMS and ETI that have become the subject of dispute (the "Dispute").

C.     As part of the Dispute, NVID claims that Watertronics and Aquabiotech Mexico have certain license and/or manufacturing rights regarding Axenohl, which are contested by IMS and ETI.

D.     NVID has caused to be filed a state court action in Florida against IMS and ETI seeking declaratory and other relief regarding the Dispute (Sixth Judicial Circuit in and for Pinellas County, Case No. 01-2867-CI-21) ("Florida Action").

E.     IMS and ETI have caused the Florida Action to be removed to the United States District Court for the Middle District of Florida (Tampa Division), Case No. 8:01-cv-950-T-23MSS, and have applied to that federal court for an order "staying" said action, or alternatively dismissing or transferring pursuant to asserted dispute resolution agreement(s) of the Parties.

F.     IMS and ETI have filed a claim regarding the Dispute before the American Arbitration Association in San Diego County, California, and when NVID declined to voluntarily participate in such arbitration, filed a "Petition for an Order Compelling Arbitration" before Chief Judge Marilyn L. Huff in the United States District Court for the Southern District of California (Case No. 01-CV-778H (JAH)), which requested order to compel has been granted.

ORIGINAL

G.    IMS, ETI and NVID have stipulated to Jack F. Fitzmaurice, and his successors, as a neutral arbitrator (the "Arbitrator") in the now pending American Arbitration Association arbitration in San Diego, civil matter no. 73 1990018601 LJP (the "San Diego Arbitration").

H.    The Parties hereto have reached a global resolution of the Dispute, and wish such agreement to be memorialized pursuant to this Agreement, as a final and binding arbitration award subject to the continuing jurisdiction and administration of the Arbitrator, and thereafter if necessary, and without the further consent of the Parties, to be confirmed as a non-contestable and non-appealable stipulated judgment by the United States District Court for the Southern District of California, or of the Superior Court of the State of California in and for the County of San Diego.

I.    As a core consideration of the global resolution, NVID is to transfer all Axenohl patent rights to IMS. IMS, upon receipt of such rights intends to use its best efforts to promote and market Axenohl worldwide.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## ESCROW AND CLOSING

The transactions contemplated by this Agreement shall be closed as set forth in this Article 1.

1.1    Deposit of Documents; Review Period. Within five (5) days after the Effective Date, the Parties shall deposit all ancillary agreements, opinions and other documents (the "Transaction Documents") with the Arbitrator and provide copies of each to all other Parties to this transaction (the "Deposit Date"). The Parties shall have an additional period of five (5) days subsequent to the Deposit Date (the "Review Period"), to review the Transaction Documents. In the event a Party asserts that the Transaction Documents are materially deficient, or do not conform with the requirements of this Agreement, the Party discovering such deficiency (the "Objecting Party") shall give written notice to all Parties including the effected Party (the "Responding Party") not later than the end of the Review Period. The Responding Party shall have five (5) days subsequent to the date the notice is received to cure such deficiency. In the event the Responding Party is unable or unwilling to cure the deficiency, the Objecting Party may elect to terminate this Agreement and hold the Responding Party or Parties responsible for damages under the terms of this Agreement.

1.2    Closing. The Dispute and related matters will be settled among the Parties and various documents evidencing the Parties' obligations as described herein will be delivered to and filed with certain third parties or agencies on such date as may be agreed upon by the Parties, but no later than November 30, 2001, at the offices of the Arbitrator, or at such other time and location as the Parties may mutually agree (the "Closing"). The date on which the Closing occurs is referred to herein as the "Closing Date."

1.3    Opening of Escrow. The transfer of the IMS Shares (as defined in section 4.1) and confirmation of the transfer of the Patent shall be effected through an escrow maintained

2

ORIGINAL

either with the Arbitrator or at Computer Share Trust Company of Lakewood, Colorado ("Escrow Holder"), which shall be opened at Closing, or soon thereafter as practicable. For purposes of this Agreement, the Escrow shall be deemed opened on the date ("Escrow Opening Date") upon which Escrow Holder shall have received executed counterparts of this Agreement from the Parties and the documents set forth in section 1.2.1 below. Escrow Holder shall notify the Parties, in writing, of the date Escrow is opened. In addition, the Parties each agree to execute, deliver and be bound by any reasonable or customary supplemental escrow instructions of Escrow Holder or other instruments as may reasonably be required by Escrow Holder in order to consummate the transactions contemplated by this Agreement. Any such supplemental instructions shall not conflict with, amend or supersede any portion of this Agreement. If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall control.

    1.3.1   Deposits to Escrow.

    (a)   IMS shall deliver certificates for the IMS Shares (as defined in section 4.1), executed by the officers of IMS to the Arbitrator by November 26, 2001.

    (b)   NVID shall execute a notarized Assignment of Patent in the form attached hereto as Exhibit "A," contemporaneously with the execution of this Agreement, and deliver the original to IMS with a copy to the Arbitrator. IMS shall forthwith file for the purpose of recording the Assignment of Patent with the United States Patent and Trademark Office.

    1.4   Release Date. Provided all conditions of this Agreement have been satisfied, including but not limited to the execution by Larson, Redden and Gordon of the Guaranty enumerated in Exhibit "G" hereof, the IMS Shares shall be released to NVID, Arata, Duren, and Lewis on a date that is not more than five (5) business days subsequent to the Closing Date (i.e., the "Release Date").

    1.5   Costs and Expenses. The escrow fee of Escrow Holder and the Escrow Holder's customary charges shall be divided equally, and promptly paid by IMS and NVID. If, as a result of no fault of the Parties, Escrow fails to close, IMS and NVID shall share equally all of Escrow Holder's fees and charges.

    1.6   Closing Deliveries. At the Closing, each of the respective Parties hereto shall execute, acknowledge, and deliver (or shall cause to be executed, acknowledged, and delivered) any agreements, resolutions, or other instruments required by this Agreement to be so delivered at or prior to the Closing, together with such other items as may be reasonably requested by the Parties hereto and their respective legal counsel in order to effectuate or evidence the transactions contemplated hereby.

## ARTICLE 2
### TERMINATION OF CONTRACTS

    2.1   The tripartite agreement entitled "Manufacturing, Licensing and Distribution Agreement" dated March 26, 2001 among IMS, NVID and ETI shall be terminated and have no further force effect as of the Closing Date.

ORIGINAL

2.2    All previous agreements among the Parties (including the NVID-Sistecam *contract*) related to the manufacturing and distribution of products covered by the Patent, including but not limited to the agreements that NVID claims exist between NVID and Watertronics and NVID and Aquabiotech Mexico regarding the distribution of Axenohl shall be terminated as of the Closing Date.

2.3    All Parties shall bear their own expenses in connection with the termination of the contracts as set forth in this Article.  Each of the Parties waives any right to receive any damages or compensation as a result of any contract terminated pursuant to this Article, except as provided for herein.  Except as specifically referenced herein to the contrary, all prior payments made by any Party under any contract terminated pursuant to this Article shall remain the rightful property of the receiving party.

## ARTICLE 3
## OBLIGATIONS OF NVID

·   NVID shall deliver the documents and perform the obligations as set forth in this Article 3 effective as of Closing.

3.1    Transfer of Patent.  NVID shall deliver to IMS upon full execution hereunder all right, title and interest in and to the Patent by executing and delivering to IMS the Assignment of Patent.

3.2    Ownership of Trademarks and Regulatory Approval(s).  The Parties agree that the trademarks "Axenohl " and "Axen" are owned by IMS.  NVID assigns and transfers to IMS, effective upon full execution hereunder, all of NVID's right, title and interest in and to any other marks used in connection with the Patent, together with the goodwill of the business symbolized by the marks.  NVID will cooperate in transferring any and all regulatory approvals to IMS, including but not limited to USDA approval.

3.3    Dismissal of Florida Action.  NVID shall file the Dismissal with Prejudice with regard to the Florida Action upon full execution hereunder, in the form attached hereto as Exhibit "B."

3.4    Resolutions of NVID Board.  NVID shall deliver to IMS the following resolutions of the NVID board of directors (the "NVID Board"), certified by the Secretary of NVID:

3.4.1    Resolutions approving this Agreement, the transactions contemplated hereby and all of the obligations of NVID set forth herein.

3.4.2    Resolutions authorizing David Larson, President and Michael Redden, Secretary, to execute this Agreement and all documents referred to herein on behalf of NVID.

3.4.3    Resolutions authorizing David Larson, President or Michael Redden, Secretary to take any and all actions, execute any documents or instruments to implement the intent of this Agreement, without further approval of the NVID Board.

ORIGINAL

      3.4.4   Resolutions effective on or before the Closing Date evidencing that the NVID Board is comprised of the following individuals:

| David Larson | Director | Phil Lewis | Director |
| Michael Redden | Director | Robert Edelson | Director |
| Steven Gordon | Director | Keith Duffy | Director |

    3.5   <u>Costs of Arbitration</u>. Any amounts charged by AAA from the inception of the claim, and/or arbitration fees of the Arbitrator necessary to obtain the final, binding arbitration award hereunder or to monitor compliance therewith shall be divided equally and paid promptly by IMS and NVID.

      3.5.1   Pursuant to payment requirements contained in the asserted Tripartite Agreement of March 26, 2000, IMS has tendered certain checks to NVID, those being checks nos. 6702, 6705, 6837, and 7015 in the aggregate amount of $30,204.62.

      3.5.2   IMS has taken the legal position that an acceptance of these checks would be a "retention of benefits" under said disputed contract. Pursuant to advice of counsel, NVID has maintained custody of the referenced presented checks, but has declined to cash them. NVID is desirous of negotiating these checks upon full execution. Concurrently, NVID would like IMS to enter into a stipulated concession that IMS will forgo any such "retention of benefits" legal argument (as to the referenced checks) in the event that the arbitration should for whatever reason continue "on the merits." IMS is willing to forego that legal argument, and the parties agree on this point as follows:

      a)  Upon full execution, NVID may cash the referenced checks;

      b)  At Closing (on or about November 30, 2001), IMS will issue to NVID a further $10,000 payment, which may be negotiated by NVID immediately thereafter;

      c)  In the event that the escrow hereunder fails to close for any reason such that the San Diego AAA arbitration proceeds "on the merits," IMS shall receive a credit in the full amount of the $40,204.62 aggregate check amount, applied to any payments otherwise found to be due from IMS to NVID under the contractual relationship between the parties as determined by the Arbitrator. IMS shall receive an additional agreed upon credit in the amount of $30,000, for a full cumulative credit of $70,204.62.

      d)  IMS agrees to forego as it relates to these checks only, any legal argument as to "retention of benefits." IMS reserves the right to assert its "retention of benefits" argument as to any other consideration directly or indirectly received by NVID.

    3.5   <u>Termination of Existing Axenohl Contracts</u>. NVID to cooperate in terminating all Axenohl contract rights between or among ETI, IMS and NVID, and those contracts between NVID and Aquabiotech Mexico, Sistecam, and Watertronics such that this Core Settlement Agreement shall become the operable contractual relationship among the Parties.

ORIGINAL

3.6     Claims of Lewis, Andrew Arata and George Duren. NVID authorizes IMS to set-off from the IMS stock or sums due NVID under this Agreement and to pay therefrom the agreed upon claims of Arata, Duren and Lewis against NVID, as follows: to Lewis 14,000 of the 700,000 shares of IMS stock otherwise due NVID pursuant to this Agreement and an amount equal to 1% of any sums due NVID from IMS hereafter; 17,500 shares each to Arata and Duren of the 700,000 shares of IMS stock otherwise due NVID pursuant to this Agreement; and, an amount equal to 2.5% each of the sums due NVID from IMS hereafter to Arata and Duren. NVID shall hold IMS and ETI harmless for any obligation to Lewis, Arata and/or Duren, arising out of revenue related to Axenohl flowing from IMS to NVID. Arata, Duren and Lewis shall hold NVID harmless for all lawful payments received from IMS under this Article. Arata, Duren and Lewis will and hereby do forever disclaim any legal, equitable of otherwise right regarding Axenohl or the patents and trademarks referenced herein, except as hereinafter specified in Exhibit "C," hereto.

3.7     Claim of Attorney Frijouf. NVID authorizes IMS to negotiate on its behalf with and shall cooperate with IMS in negotiating for a discount or a payment schedule with Attorney Frijouf, NVID's patent counsel. IMS shall be responsible for the payment of the negotiated settlement amount with Attorney Frijouf, and shall use best efforts to cause Attorney Frijouf to hold NVID harmless.

3.8     Cooperation with IMS in Enforcing Patent. The Parties, including but not limited to NVID and Arata, shall cooperate fully with IMS in enforcing and defending the Patent, the Trademark(s) and any regulatory approvals. Upon written request, Arata shall promptly execute any and all documentation required of "the inventor" by any foreign or domestic patent or regulatory office in conjunction with Axenohl related filings of IMS.

3.9     Release. NVID to execute and deliver the release in the form attached hereto as Exhibit "C," fully and forever releasing IMS and ETI and remaining parties from any and all liability (except for the requirements hereunder) as set forth therein (the "Release").

3.10    Attorneys' Fees and Costs. NVID to bear all of its own attorneys' fees and costs regarding the Florida Action, the San Diego Arbitration (and the Petition to Compel procedure incident thereto), and the joint drafting and/or implementation of this Agreement.

3.11    Specific Grant of Indemnity. NVID hereby agrees to indemnify IMS and its successors and assigns in respect of any and all claims, losses, damages and expenses which may be incurred by it as a result of or arising out of any claims of ownership or interest in the Patent (including but not limited to claims of license, assignment or security interest(s)) by any party, except as expressly addressed in this Core Settlement Agreement. This Specific Grant of Indemnity is to be personally guaranteed on a joint and several basis by individuals Larson, Redden, and Gordon pursuant to the terms and conditions of the Guaranty attached hereto as Exhibit "G."

## ARTICLE 4
## OBLIGATIONS OF IMS

IMS shall deliver the documents and perform the obligations as set forth in this Article 4 effective as of Closing, or with respect to the Transfer of the IMS Shares, at the Release Date.

4.1    Transfer of IMS Shares.  In exchange for the transfer of the Patent and other NVID consideration described herein, IMS shall, in accordance with the procedure set forth in Article 1, at the Release Date, cooperate with the custodian Arbitrator and/or Escrow Holder in the transfer of a total of 700,000 shares of its common stock to NVID or its assignees, Arata, Duren and Lewis (the "IMS Shares").  The IMS Shares shall be validly issued, fully paid and non-assessable and, except as to those shares to be transferred directly to Arata, Duren and Lewis hereunder, shall be evidenced by certificates registered in the name of NVID.  NVID, Arata, Duren and Lewis acknowledge and agree that the IMS Shares shall be subject to restrictions on transfer or sale under Rule 144 of the Securities Act of 1933, as amended, and shall bear a legend to that effect as set forth in section 9.14 hereof.  NVID, Arata, Duren and Lewis acknowledge that the IMS Shares shall not be subject to any anti-dilution feature, and that (i) the number of IMS Shares shall not be increased because IMS has issued additional shares of its common stock (or any securities) as of the Closing Date or as of the Release Date; and (ii) NVID is not entitled to receive a certain percentage of the total IMS common stock outstanding.  Provided however, if any change is made in the IMS Shares prior to Closing or the Release Date through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or other transaction not involving the receipt of consideration by IMS, the IMS Shares will be appropriately adjusted in the type(s) and number of securities.

4.2    Royalty.  IMS to pay to NVID a royalty (the "Royalty") of 5% of the gross product sales revenues received by IMS in respect of the Patent, but shall not include any charges for shipping, handling, or returns, credits and applicable taxes ("Adjusted Gross Patent Revenues").  Unless the Royalty obligation is terminated as hereinafter specified, the Royalty shall be payable per this Agreement until March 6, 2018 ("Royalty Payment Term").  In the event that customer(s) return or request a refund regarding Axenohl for which a royalty has already been paid to NVID, the royalty for that sale will be deducted from NVID's next royalty payment, or at IMS's election, upon notice, NVID shall repay any such amounts to IMS within 30 days of written request therefore.  In the event that NVID is in breach of any material provision of this Agreement, which breach shall continue uncured for a period of ten (10) days after written notice to NVID by IMS, then IMS shall not be obligated to continue to pay the Royalty unless and until such breach is cured, and IMS, in addition to any and all other remedies allowed under law and/or equity, shall be entitled to offset against any amounts otherwise owing NVID any damages which have been proximately caused by such NVID breach(es).

4.3    Minimum Royalty.  IMS guaranties to NVID that the Royalty shall not be less than $1,000,000 for each of the periods (i) beginning on the date of this Agreement and ending on July 31, 2004 and (ii) each fiscal year thereafter (beginning on August 1, 2004) for the Term of the Royalty Payment (the "Minimum Royalty").  If the Minimum Royalty for any period set forth in the preceding sentence is less than $1,000,000, IMS shall have the right, in its sole and

absolute discretion, to either (x) pay NVID the Minimum Royalty in cash or IMS common stock subject to the restrictions of Rule 144 (potentially piggybacked under those circumstances referenced hereinafter section 10.6) equivalent to prevailing market price when the Minimum Royalty is due, or (y) transfer the Patent to NVID within 30 days of the end of the year for which the Minimum Royalty is due. If IMS elects to transfer the Patent to NVID, IMS shall be released of further obligation to pay the Royalty and Minimum Royalty. NVID shall thereafter grant to IMS a license to manufacture and distribute products covered by the Patent worldwide, reserving the non-exclusive right of NVID to sell Axen™ products covered by the Patent worldwide. NVID will receive a commission payment from IMS calculated at 5% of Adjusted Gross Sales.

4.4    Payment of Royalty. IMS shall pay NVID the Royalty on a quarterly basis, such payments to be made within 30 days of the end of each IMS fiscal quarter during the Royalty Payment Term. On the date(s) of such quarterly payments, IMS shall concurrently provide NVID with a written statement evidencing the Adjusted Gross Patent Revenues, and the calculation of the Royalty. Commencing with the end of calendar 2004, and at the end of each subsequent calendar year for the Term of the Royalty Payment, IMS shall true up with NVID, such that NVID's royalty receipts for the applicable annual periods equal at least the Minimum Royalty of $1,000,000.00.

4.5    Audit Rights. The following audit provision shall continue through the term of this Agreement and shall survive the termination of this Agreement insofar as applicable to royalty payment obligations accrued prior to such termination. NVID shall have the right once every twelve months, to audit the records and accounts of IMS for the limited purpose of establishing the amount of the Royalty payable hereunder. A certified public accounting firm and paid for solely by NVID shall conduct such audit. Any accounting firm retained for this purpose shall be adequately bound to keep confidential all information of IMS obtained during the course of or pursuant to the audit. In the event that any underpayment shall be determined, such underpayment shall be corrected by appropriate adjustment in payment that shall be due and payable within 30 days of the date of the completion of the audit. In the event an audit reveals a discrepancy in the amount owed to NVID and paid by IMS of at least 10%, the discrepancy shall be corrected within thirty days and the reasonable expenses of said audit shall be paid for by IMS.

4.6    Improvements. NVID, Larson, Redden, and Arata represent and warrant that no known improvements in Axenohl exist as of the date hereunder. Should NVID and/or Arata later engage in the development of an improvement in Axenohl or the Patent (or the technology related in any way to either), NVID and/or Arata shall promptly notify IMS in writing, and shall keep IMS completely informed on a go-forward basis. Should NVID and/or Arata develop any Improvement to Axenohl, which Improvement cannot legally be utilized without the consent of the Holder of the Axenohl Patent, then NVID and/or Arata shall not attempt to utilize the Improvement except on terms and conditions acceptable to IMS, and with prior written permission. In the event the Improvement is "outside the Patent," the parties will use best efforts to reach a joint venture agreement regarding its use. If the Parties cannot agree on appropriate terms and conditions, then the Arbitrator shall be empowered to select fair and binding terms governing same. In no event shall NVID and/or Arata attempt to sell, assign, license or market the Improvement without affording IMS a first right of refusal.

ORIGINAL

4.7     Confidentiality. NVID will hold all IMS Confidential Information (as defined below) in the strictest confidence, using such measures as it uses to protect the confidentiality of similar information belonging to it, but in no event shall use less than reasonable measures. All written (or otherwise recorded) originals and copies of confidential information must be returned to IMS or destroyed upon a written request (made at any time) by IMS. The Parties will use Confidential Information solely to perform the activities under this Agreement and will disclose Confidential Information only to their employees or contractors with a need to know such information.

4.7.1   IMS Confidential Information. IMS Confidential Information shall include all proprietary and confidential information such as marketing and pricing information, supplier lists, and similar information disclosed by IMS to NVID, or known by NVID related to the Patent prior to the date of this Agreement. Notwithstanding the other provisions of this Agreement, nothing received by NVID shall be considered IMS Confidential Information which (i) is now available or becomes available to the public without breach of this Agreement, (ii) is released in writing by IMS, or (iii) is lawfully obtained from a Third Party or Parties.

, 4.8    Arbitration Claim and Award. IMS shall amend its San Diego Arbitration claim against NVID such as to allow the entry of an arbitration award on terms and conditions listed herein (the "Settlement"). Said arbitration award shall be binding and subject if necessary to being confirmed as an enforceable judgment by the United States District Court for the Southern District of California, or by the Superior Court of the State of California in and for the County of San Diego. The Parties agree that the Arbitrator shall retain exclusive jurisdiction to monitor the compliance of all Parties with the terms and conditions of this Core Settlement Agreement, and shall be empowered to rule on any dispute regarding the interpretation and enforcement thereof, and make any subsequent arbitral rulings which themselves will be binding and enforceable.

4.9     Termination of Contracts. IMS to cooperate in terminating all Axenohl contract rights between or among ETI, IMS and NVID, such that this settlement agreement shall become the operable contractual relationship among the Parties.

4.10    License. IMS shall grant Manufacturer's Representative Agreements and/or license agreements to, Watertronics, Aquabiotech Mexico and Sistecam, on the terms and conditions expressly stated in Exhibits "D," "E," and "F," hereto.

A.      **Aquabiotech Mexico:**

Territory: Mexico, non-exclusive (except as to Rotoplas):

Term: Beginning 01-01-02, and continuing for three years with a cancellation clause at each year-end for failure of Aquabiotech Mexico to meet any of the following sales minimums of IMS' Axen products:

    Year One:      $150,000;

    Year Two:      $300,000 Sales in that Year;

    Year Three:    $500,000 Sales in that Year;

ORIGINAL

Renewable three-year option, yearly minimums of $1,000,000;

Regular Commission rate of 20% on adjusted gross;

Rotoplas commission rate 30%;

Aquabiotech Mexico shall cooperate with IMS by relinquishing designated markets (e.g., dental) within the Territory if necessary for IMS to complete an exclusivity agreement with a third party in a multinational transaction. Consideration to be negotiated between IMS and Aquabiotech, and if agreement cannot be reached, both parties agree to allow the Arbitrator to decide appropriate terms and conditions under the circumstances.

B.   **Watertronics**

Territory:  UK (Britain, Wales, Scotland and N. Ireland)

Term:  Beginning 01-01-02, and continuing for three years with a cancellation clause at each year-end for failure of Watertronics to meet any of the following sales minimums of IMS' Axen products:

   Year One:       $50,000;

   Year Two:       $300,000 Sales in that Year;

   Year Three:     $500,000 Sales in that Year;

   Renewable three-year option, yearly minimums of $1,000,000

   Commission rate of 20% on adjusted gross;

Watertronics shall cooperate with IMS by relinquishing designated markets (e.g., dental) within the Territory if necessary for IMS to complete an exclusivity agreement with a third party in a multinational transaction. Consideration to be negotiated between IMS and Watertronics, and if agreement cannot be reached, both parties agree to allow the Arbitrator decide appropriate terms and conditions under the circumstances.

C.   **Sistecam**

IMS, ETI, NVID and Sistecam to cooperate in canceling the existing NVID/ETI/Sistecam contract. IMS to issue new contract to Sistecam on equivalent terms and conditions. Sistecam shall cooperate with IMS by relinquishing designated markets (e.g., dental) within the Territory if necessary for IMS to complete an exclusivity agreement with a third party in a multinational transaction. Consideration to be negotiated between IMS and Sistecam, and if agreement cannot be reached, both parties agree to allow the Arbitrator to decide appropriate terms and conditions under the circumstances.

   4.11   *Negotiations with Patent Counsel.* Upon full execution hereunder, or as soon thereafter as practicable, IMS shall enter into negotiations with NVID's patent attorney, Robert

*Frijouf for the payment of fees due by NVID, and use best efforts to obtain a release of NVID from attorney Frijouf by the Release Date. A payment schedule will be negotiated and IMS and Attorney Frijouf will hold NVID harmless for payment on expected discounted amount(s).*

4.12    Resolutions of IMS Board. IMS shall deliver to NVID the following resolutions of the IMS board of directors (the "IMS Board"), certified by the Secretary of IMS:

4.12.1 Resolutions approving this Agreement, the transactions contemplated hereby and all of the obligations of IMS set forth herein.

4.12.2 Resolutions authorizing Michael Krall, President and Dennis Atchley, Secretary, to execute this Agreement and all documents referred to herein on behalf of IMS.

4.13    Resolutions authorizing either Michael Krall, President or Dennis Atchley, Secretary, to take any and all actions, execute any documents or instruments to implement the intent of this Agreement, without further approval of the IMS Board.

4.14    Subsequent Transfer of Patent. In the event that IMS transfers, sells or assigns its ownership of the Patent, IMS shall in lieu of any Royalty and in complete cancellation of any and all Royalty obligations hereunder, pay NVID as received a percentage of the gross transfer proceeds from the Patent ("Patent Transfer Fee"), as follows:

| For Proceeds received in Year One of this Agreement | 15% |
|---|---|
| For Proceeds received in Year Two of this Agreement | 10% |
| For Proceeds received in Subsequent Years during the effective Term of this Agreement | 5% |

4.15    Release. IMS to fully and forever release NVID, Larson, Gordon, Lewis, Edelson, Duffy and Redden from any and all liability (except for the requirements hereunder) as more fully set forth in the Release.

4.16    Attorneys' Fees and Costs. IMS to bear its own attorneys' fees and costs regarding the Florida Action, and unless otherwise specifically indicated herein, the San Diego Arbitration (and the Petition to Compel procedure incident thereto), and the joint drafting and/or implementation of this Agreement.

## ARTICLE 5
## OBLIGATIONS OF ETI

*ETI shall deliver the documents and perform the obligations as set forth in this Article 5 effective as of Closing.*

ORIGINAL

5.1     <u>Arbitration Award</u>. ETI shall amend its San Diego Arbitration claim against NVID such as to allow the entry of a binding arbitration award on terms and conditions listed herein.

5.2     <u>Attorneys' Fees and Costs</u>. ETI shall bear its own attorneys' fees incurred in the Florida Action, in the San Diego Arbitration (and in the Petition to Compel procedure incident thereto), and in the joint drafting and/or implementation of this Core Settlement Agreement.

5.3     <u>Termination of Contracts</u>. ETI to cooperate in terminating all Axenohl contract rights between or among ETI, IMS, Sistecam and/or NVID, such that this Agreement shall constitute the sole operable contract regarding the subject matter hereof among the Parties hereto.

5.4     <u>Release</u>. ETI to fully and forever release IMS and NVID, Watertronics, Aquabiotech Mexico, Larson, Gordon, Lewis, Edelson, Duffy and Redden from any and all liability (except for the requirements hereunder) as set forth in the Release (Exhibit "C").

## ARTICLE 6
## OBLIGATIONS OF WATERTRONICS

Watertronics shall deliver the documents and perform the obligations as set forth in this Article 6 effective as of Closing.

6.1     <u>Arbitration Award</u>. Watertronics shall cooperate with all Parties hereto in the entry of a binding arbitration award, such that it becomes if necessary a binding, final judgment entered by the United States District Court for the Southern District of California, or by the Superior Court of the State of California in and for the County of San Diego. In so doing, Watertronics voluntarily accedes to the subject matter and in personam jurisdiction of the American Arbitration Association (in the person of Arbitrator Jack Fitzmaurice, or his duly appointed successor-in-interest) in San Diego, California, and of the two referenced courts and submits to continuing jurisdiction of the Arbitrator and/or the courts to monitor compliance hereunder.

6.2     <u>Attorneys' Fees and Costs</u>. Watertronics shall bear its own attorneys' fees, if any, incurred in the Florida Action, in the San Diego Arbitration (and in the Petition to Compel procedure incident thereto), and in the joint drafting and/or implementation of this Core Settlement Agreement.

6.3     <u>Termination of Contracts</u>. Watertronics to cooperate with NVID to terminate any rights Watertronics may have under any prior Axenohl license agreement and will, and hereby does accept a superceding license agreement from IMS on the stated terms and conditions of Exhibit "D," hereto.

6.4     <u>Release</u>. Watertronics to fully and forever release IMS, Sistecam, Arata, Duren, Lewis, and ETI from any and all liability (except for the requirements hereunder) as more fully set forth in the Release.

## ARTICLE 7
## OBLIGATIONS OF AQUABIOTECH MEXICO

Aquabiotech Mexico shall deliver the documents and perform the obligations as set forth in this Article 6 effective as of Closing.

7.1     <u>Arbitration Award</u>.  Aquabiotech Mexico shall cooperate with all Parties hereto in the entry of a binding Arbitration Award, such that it becomes if necessary a binding, final judgment entered by the United States District Court for the Southern District of California, or by the Superior Court of the State of California in and for the County of San Diego.  In so doing, Aquabiotech Mexico voluntarily accedes to the subject matter and in personam jurisdiction of the American Arbitration Association (in the person of Arbitrator Jack Fitzmaurice, or his duly appointed successor-in-interest) in San Diego, California, and of the two referenced courts, and submits to the continuing jurisdiction of the Arbitrator and/or the court(s) to monitor compliance hereunder.

7.2     <u>Attorneys' Fees and Costs</u>.  Aquabiotech Mexico shall bear any attorneys' fees incurred by it in this Dispute, or in the joint drafting and/or implementation of this Core Settlement Agreement.

7.3     <u>Termination of Contracts</u>.  Aquabiotech Mexico to cooperate with NVID to terminate any rights Aquabiotech Mexico may have under any prior Axenohl license agreement and will, and hereby does, accept a superceding license agreement from IMS on the terms and conditions set forth in Exhibit "E," hereto.

7.4     <u>Release</u>.  Aquabiotech Mexico to fully and forever release IMS, Sistecam, Arata, Duren, Lewis, and ETI from any and all liability (except for the requirements hereunder), as more fully set forth in the Release (Exhibit "C.")

## ARTICLE 8
## OBLIGATIONS OF SISTECAM

Sistecam shall deliver the documents and perform the obligations as set forth in this Article 6 effective as of Closing.

8.1     <u>Arbitration Award</u>.  Sistecam shall cooperate with all Parties hereto in the entry of a binding Arbitration Award, such that it becomes if necessary a binding, final judgment entered by the United States District Court for the Southern District of California, or by the Superior Court of the State of California in and for the County of San Diego.  In so doing, Sistecam voluntarily accedes to the subject matter and in personam jurisdiction of the American Arbitration Association (in the person of Arbitrator Jack Fitzmaurice, or his duly appointed successor-in-interest) in San Diego, California, and of the two referenced courts, and submits to the continuing jurisdiction of Arbitrator and/or the court(s) to monitor compliance hereunder.

8.2     <u>Attorneys' Fees and Costs</u>.  Sistecam shall bear any attorneys' fees incurred by it in this Dispute, or in the joint drafting and/or implementation of this Core Settlement Agreement.

ORIGINAL

8.3    Termination of Contracts.  Sistecam to cooperate with NVID to terminate any rights Sistecam may have under any prior Axenohl license agreement and will, and hereby does, accept a superceding license agreement from IMS on the terms and conditions in the License Agreement set forth in Exhibit "F," attached hereto.

8.4    Release.  Sistecam to fully and forever release IMS, ETI, Larson, Redden, Lewis, Watertronics, Aquabiotech Mexico, and NVID from any and all liability (except for the requirements hereunder), as more fully set forth in the Release (Exhibit "C.")

## ARTICLE 9
## OBLIGATIONS OF INDIVIDUALS

9.1    Release.  The individual Parties to this Agreement shall perform the following obligations and deliver the following documents upon full execution:

9.1.1    Arata and Duren to fully and forever release NVID, Larson, Gordon, Redden, IMS and ETI from any and all liability (except for the requirements hereunder) as more fully as more fully set forth in the Release. Arata and Duren to expressly disclaim any rights to the Axenohl patent(s) except as otherwise enumerated herein.

9.1.2    NVID and each of its officers and Board of Director members to fully and forever release Arata, Duren, Lewis, IMS and ETI from any and all liability (except for the requirements hereunder) as more fully set forth in the Release.

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES OF IMS

IMS represents and warrants to all other Parties that the following are true and correct as of the date hereof and as of the Closing Date.

10.1    Organization, Good Standing, Power, etc.  IMS (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of California; (ii) is qualified or authorized to do business as a corporation and is in good standing in all jurisdictions in which qualification or authorization may be required; and (iii) has all requisite corporate power and authority, licenses and permits to own or lease and operate its properties and carry on its business as presently being conducted and to execute, deliver and perform this Agreement and consummate the transactions contemplated hereby.

10.2    Articles of Incorporation and Bylaws.  Prior to execution of this Agreement by the Parties hereto, IMS has furnished to NVID's representatives, if requested, complete and correct copies of (i) its Articles of Incorporation, as amended to date, and (ii) its Bylaws, as amended to date.  IMS' Articles of Incorporation and Bylaws are in full force and effect, and they are not in violation of any of the provisions thereof.

10.3    Capitalization.  The authorized capital stock of IMS consists solely of 20,000,000 shares of Common Stock, no par value, (the "IMS Common Stock"), of which, on the date hereof 6,416,939 shares are issued and outstanding.  In addition the Company has 5,000,000 shares of Preferred Stock authorized, none of which are presently outstanding.  At the Release Date

700,000 shares of IMS Rule 144 Common Stock will have been lawfully and validly issued collectively to NVID, Arata, Duren, and Lewis. All of such issued and outstanding shares of the IMS Common Stock have been duly authorized and validly issued and are fully paid and non-assessable with no personal liability attaching to the ownership thereof, and were not issued in violation of the preemptive or other rights of any person.

10.4    Authorization of Agreement. This Agreement and each of the documents that IMS will deliver or file as required by this Agreement (the "IMS Documents") has been or will be at Closing, duly and validly authorized, executed and delivered by IMS.

10.5    No Adverse Changes. Since the date of IMS' most recent financial statements, there has been no material adverse change in IMS' financial condition, assets, liabilities, or business.

10.6    Piggyback Registration Rights. If at any time or from time to time within six months from the date of this Agreement, IMS shall determine to register securities for its own account for a public offering or the account of any of its stockholders to publicly sell their securities, other than a registration on Form S-1 or S-8 relating solely to employee stock option or purchase plans, IMS will promptly notify NVID of such registration and if NVID notifies IMS of its desire to be included in such registration within five business days of IMS's notice to NVID, IMS shall include the IMS shares issued to NVID in such registration. In the event no such registration statement is filed within six months from the date of this Agreement, IMS shall file a registration statement for the shares issued to NVID to allow the public sale thereof on or before the 180th day from the date of this Agreement. IMS reserves the right to include securities for its own account for a public offering or the account of any other of its stockholders to publicly sell their securities in such registration statement. IMS at its expense will keep such registration effective for a period of 180 days or until NVID has completed the distribution described in the registration statement relating thereto, whichever first occurs; and furnish such number of prospectuses and other documents incident thereto as NVID from time to time may reasonably request.

10.6.1    Underwriting Conditions. If the registration is for a public offering involving an underwriting in excess of $2,500,000, IMS shall so advise NVID. In such event the right of NVID to registration pursuant to this Section 10.6 shall be conditioned upon NVID's entering into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by IMS. Notwithstanding any other provision of this Section 10.6 except the affirmative obligation to file a separate registration for the NVID shares on or before the 180th day from the date of this Agreement, if the underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, , the underwriter may limit the number of IMS Shares issued to NVID to be included in the registration and underwriting, or may exclude the IMS Shares issued to NVID entirely from such registration and underwriting.

10.6.2    Expenses of Registration  All expenses incurred in connection with any registration pursuant to this Section 10.6 shall be borne by the Company except IMS shall not be required to pay fees of legal counsel of NVID acting on behalf of NVID as a selling securities holder.

## ARTICLE 11
## REPRESENTATIONS AND WARRANTIES OF NVID

NVID represents and warrants to all other Parties that the following are true and correct as of the date hereof and as of the Closing Date:

11.1   Organization, Good Standing, Power, etc.  NVID (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and (ii) has all requisite corporate power and authority, licenses, permits and franchises to own or lease and operate its properties and carry on its business as presently being conducted and to execute, deliver and perform this Agreement and consummate the transactions contemplated hereby.

11.2   Authorization.  This Agreement, the Assignment of Patent and each of the documents that NVID will deliver or file as required by this Agreement (the "NVID Documents") have been or will be at Closing duly and validly authorized, executed and delivered by NVID.  No authorizations or approvals of the shareholders, board of directors, or officers, other than those taken as set forth in the resolutions set forth in Section 3.4 hereof are required in order for NVID to execute and deliver the NVID Documents and consummate the transactions contemplated thereby.  The NVID Documents are enforceable against NVID in accordance with the respective terms thereof.

11.3   Litigation.  With the exception of the existing litigation against IMS now pending before the U.S. District Court in the Middle District of Florida and the pending San Diego Arbitration, there is no material claim, action, suit, proceeding, arbitration, investigation or inquiry pending before any federal, state, municipal, foreign or other court or governmental or administrative body or agency, or any private arbitration tribunal, or to the knowledge of NVID threatened, against, relating to or affecting NVID or any of their properties or business, or the transactions contemplated by this Agreement; nor to the knowledge of NVID is there any basis for any such material claim, action, suit, proceeding, arbitration, investigation or inquiry which may have any adverse effect upon the assets, properties or business of NVID, or the transactions contemplated by this Agreement.  Neither NVID nor any officer, director, partner or employee of NVID, has been permanently or temporarily enjoined by order, judgment or decree of any court or other tribunal or any agency from engaging in or continuing any conduct or practice in connection with the business engaged in by NVID.  There is not in existence at present any order, judgment or decree of any court or other tribunal or any agency enjoining or requiring NVID to take any material action of any kind or to NVID and their respective business, properties or assets are subject or bound.  NVID is not in default under any order, license, regulation or demand of any federal, state or municipal or other governmental agency or with respect to any order, writ, injunction or decree of any court which would have a materially adverse impact upon NVID's operations or affairs as they relate to NVID's obligations hereunder.

11.4   Ownership of Patent.  As of the date hereof, and as of the date of effective Assignment of the Patent to IMS, NVID shall own the Patent, free and clear of any liens, encumbrances, escrows, licenses, conflicting or undisclosed prior art, charges, pledges, options, mortgages, assignments, security interests, claims, indentures, licenses, security agreements, restrictions (whether on sale, transfer, disposition, or otherwise), defects of title, irregularities of

16                    ORIGINAL

title or other imperfection of title of every type and description, whether imposed by law, agreement, understanding, or otherwise ("Encumbrance"). Upon delivery to IMS of the Assignment of Patent, IMS will acquire good and indefeasible title to the Patent, free and clear of any Encumbrances except as stated herein.

11.5    Other Assets. NVID owns other assets, the fair market value of which equal or exceed the fair market value of the Patent, and will continue to own such other assets after Closing.

11.6    Investment Representation. NVID, Arata, Duren and Lewis are acquiring shares of IMS Common Stock issuable hereunder for their own respective accounts and agree not to distribute any shares issuable thereunder within the meaning of the Securities Act of 1933 (the 1933 Act), except as otherwise provided herein, unless an appropriate registration statement has been filed with the SEC or unless an exemption from registration under the 1933 Act is available according to an acceptable opinion(s) of counsel for, as applicable, NVID, Arata, Duren and/or Lewis provided to IMS. Each certificate for shares issued shall be stamped or otherwise imprinted with the following or a substantially similar legend:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act") nor any state securities laws. These shares may not be offered for sale, sold or otherwise transferred except pursuant to an effective registration statement under the Act or pursuant to an opinion of counsel acceptable to IMS that an exemption from such registration is available."

The foregoing restriction on transfer shall remain in existence for the applicable period, as set forth in Rule 144 after the expiration of which all shares then owned or thereafter acquired pursuant to this Agreement shall be registered on the books of IMS without any further restraint of alienation. Any shares issued containing the foregoing Restrictive Legend may, subject to the requirements of Rule 144 and applicable state and federal law, be exchanged for shares without Restrictive Legend at any time after the expiration of two (2) year from the date of The Release Date at the option of the holder, provided the holder is not an "affiliate" of IMS at the time of such request. By execution of this Agreement, NVID, Arata, Duren and Lewis represent and warrant that they each have sufficient investment sophistication and ability to take the financial risks associated with this transaction.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES OF AQUABIOTECH MEXICO

Aquabiotech Mexico represents and warrants to all other Parties that the following are true and correct as of the date hereof and as of the Closing Date:

12.1    Organization, Good Standing, Power, etc. Aquabiotech Mexico (i) is a corporation duly organized, validly existing and in good standing under the laws of the Republic of Mexico and (ii) has all requisite corporate power and authority, licenses, permits and franchises to own or lease and operate its properties and carry on its business as presently being

conducted and to execute, deliver and perform this Agreement and consummate the transactions contemplated hereby.

     12.2   Authorization. This Agreement, and each of the documents that Aquabiotech Mexico will deliver or file as required by this Agreement (the "Aquabiotech Mexico Documents") have been or will be at Closing duly and validly authorized, executed and delivered by Aquabiotech Mexico. No authorizations or approvals of the shareholders, board of directors, or officers, other than those taken are required in order for Aquabiotech Mexico to execute and deliver the Aquabiotech Mexico Documents and consummate the transactions contemplated thereby. The Aquabiotech Mexico Documents are enforceable against Aquabiotech Mexico in accordance with the respective terms thereof, and shall be executed by authorized representative, Director General Federico Rodriquez.

### ARTICLE 13
### REPRESENTATIONS AND WARRANTIES OF WATERTRONICS

    Watertronics represents and warrants to all other Parties that the following are true and correct as of the date hereof and as of the Closing Date:

     13.1   Organization, Good Standing, Power, etc. Watertronics (i) is a corporation duly organized, validly existing and in good standing under the laws of The United Kingdom and (ii) has all requisite corporate power and authority, licenses, permits and franchises to own or lease and operate its properties and carry on its business as presently being conducted and to execute, deliver and perform this Agreement and consummate the transactions contemplated hereby.

     13.2   Authorization. This Agreement, and each of the documents that Watertronics will deliver or file as required by this Agreement (the " Watertronics Documents") have been or will be at Closing duly and validly authorized, executed and delivered by Watertronics. No authorizations or approvals of the shareholders, board of directors, or officers, other than those taken are required in order for Watertronics to execute and deliver the Watertronics Documents and consummate the transactions contemplated thereby. The Watertronics Documents are enforceable against Watertronics in accordance with the respective terms thereof, and shall be executed by authorized representative, Managing Director Richard M. Goodall.

### ARTICLE 14
### REPRESENTATIONS AND WARRANTIES OF INDIVIDUALS

    Arata, Duren, Gordon, Larson, Lewis and Redden (the "Individual Parties") each represents and warrants to all other Parties that the following are true and correct as of the date hereof and as of the Closing Date:

     14.1   This Agreement, and each of the documents that each of the Individual Parties, will respectively deliver or file as required by this Agreement (the "Individual Party Documents") have been or will be at Closing duly and validly authorized, executed and delivered by the respective Individual Parties. No authorizations, approvals or other actions, other than those taken are required in order for the Individual Parties to execute and deliver the Individual Party Documents and consummate the transactions contemplated thereby. The Individual Party

                 18



Documents are enforceable against the Individual Parties, respectively, in accordance with the respective terms thereof.

## ARTICLE 15
## SPECIAL COVENANTS

15.1    Exchange of Information. Each Party shall cooperate fully by exchanging information requested by the other Party in a timely manner. Without in any manner reducing or otherwise mitigating the representations contained herein, each Party and/or its attorneys shall have the opportunity to meet with the accountants and attorneys of the other Party to discuss its respective legal and financial condition and this transaction. If this transaction is not completed, all documents received by each Party and/or his or its attorney shall be returned to the other Party and all such information so received shall be treated as confidential.

15.2    Conduct of Business. Upon full execution hereunder, IMS and NVID shall each conduct their business in the normal course, and in accord with the terms and conditions of this Core Settlement Agreement and its appended Exhibits.

## ARTICLE 16
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PARTIES

16.1    Conditions Precedent to Obligations of NVID. The obligations of NVID hereunder are subject to fulfillment, or waiver thereof by NVID, prior to or at the Closing of each of the following conditions:

(a)    Closing Date. The documents are approved and accepted by all Parties as of the scheduled date of November 30, 2001.

(b)    Representations and Warranties. The representations and warranties of IMS shall be true and accurate in all material respects as of the Closing Date.

(c)    Performance. IMS and ETI shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(d)    No Adverse Changes. There shall not have been, since the date of the latest audited financial statements of IMS, any "Material Adverse Change," as defined below, in IMS' financial condition, assets, liabilities or business. A "Material Adverse Change" shall mean any change, effect or circumstance that (i) is materially adverse to the financial condition or results of operations of the business of IMS (provided, however, that for purposes of determining whether there has been a "Material Adverse Change" with respect to IMS (A) any adverse change resulting from or relating to general business or economic conditions affecting the economy as a whole shall be disregarded, (B) any adverse change resulting from or relating to conditions generally affecting the industries in which IMS or its customers or suppliers compete or participate shall be disregarded and (C) any adverse change resulting from or relating to the announcement, disclosure or pendency of the transactions contemplated by this Agreement shall be disregarded), or (ii) would prevent IMS or NVID, as the case may be, from carrying out its obligations under this Agreement.

ORIGINAL

(e) <u>Opinion of IMS' Counsel</u>. IMS shall have delivered to NVID an opinion of IMS' counsel, Dennis Brovarone, Attorney at Law, dated the Closing Date to the effect that: (i) IMS is a corporation duly organized, validly existing and in good standing under the laws of the State of California, has all requisite power to carry on its business as now being conducted and to execute, deliver and perform this Agreement and to perform its obligations thereunder; (ii) IMS is duly qualified to do business as a corporation and is in good standing in each jurisdiction in which the nature of the business conducted by it or the property owned, operated or leased by it makes such qualification necessary; (iii) this Agreement and each of the IMS Documents have been duly authorized by all necessary corporate action on the part of IMS, have been duly executed and delivered by IMS and constitute the legal, valid and binding obligations of IMS enforceable in accordance with the respective terms thereof, except as enforceability thereof may be limited by the insolvency or other laws affecting the rights of creditors and the enforcement of remedies; (iv) IMS has prepared and filed with the SEC all periodic reports required of it under the 1934 Act; (v) the Shares issuable hereunder have been duly authorized and will be validly issued; fully paid and non-assessable with no personal liability attaching to the ownership thereof; (vi) neither the execution, delivery and performance by IMS of this Agreement, the IMS Documents, nor compliance by IMS with the terms and provisions hereof, will conflict with, or result in a breach of the terms, conditions or provisions of, or will constitute a default under, the Articles of Incorporation or Bylaws of IMS or any agreement or instrument known to such counsel to which IMS is a Party or by which IMS or any of its properties or assets are bound; (vii) there are no actions, suits or proceedings pending or, to the knowledge of such counsel, threatened against IMS before any court or administrative agency, which have, in the opinion of such counsel, if adversely decided, will have any material adverse effect on the business or financial condition of IMS or which questions the validity of this Agreement or the Shares issuable hereunder. In rendering his opinion, counsel shall be allowed to rely on written representations of officers and directors of the Company as to factual matters.

(f) <u>Current Status with Securities and Exchange Commission</u>. IMS shall have prepared and filed with the SEC all periodic reports required under the 1934 Act pursuant to Section 12(g) thereof.

(g) <u>Due Diligence</u>. NVID shall have completed and be satisfied with its due diligence investigation of the representations and warranties of IMS.

16.2 <u>Conditions Precedent to Obligations of IMS</u>. The obligations of IMS hereunder are subject to fulfillment, or waiver thereof by IMS, prior to or at the Closing of each of the following conditions:

(a) <u>Closing Date.</u> The documents are approved and accepted by all Parties as of the scheduled date of November 30, 2001.

(b) <u>Representations and Warranties</u>. The representations and warranties of NVID made pursuant to Article 11 above, shall be true and accurate in all material respects as of the Closing Date.

ORIGINAL

(c)   Performance.   NVID shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing including but not limited to:

(d)   No Adverse Changes.   There shall not have been, since the date of the latest audited financial statements of NVID, any Material Adverse Change (as defined below) in its financial condition, assets, including the Patent, liabilities or business. A "Material Adverse Change" shall mean any change, effect or circumstance that (i) is materially adverse to the financial condition or results of operations of the business of NVID (provided, however, that for purposes of determining whether there has been a "Material Adverse Change" with respect to NVID (A) any adverse change resulting from or relating to general business or economic conditions affecting the economy as a whole shall be disregarded, (B) any adverse change resulting from or relating to conditions generally affecting the industries in which NVID or its customers or suppliers compete or participate shall be disregarded and (C) any adverse change resulting from or relating to the announcement, disclosure or pendency of the transactions contemplated by this Agreement shall be disregarded), or (ii) would prevent NVID, as the case may be, from carrying out its obligations under this Agreement.

(e)   Opinion of NVID's Counsel.   NVID shall have delivered to IMS, an opinion of their counsel, Thomas P. McNamara, Attorney at Law, dated the Closing Date to the effect that:  (i) NVID is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, have all requisite power to carry on  its business as now being conducted and to execute, deliver and perform this Agreement and to perform their obligations thereunder; (iii) this Agreement and each of the NVID Documents have been duly authorized by all necessary corporate action on the part of NVID, have been duly executed and delivered by NVID and constitute the legal, valid and binding obligations of NVID, enforceable in accordance with the respective terms thereof, except as enforceability thereof may be limited by the insolvency or other laws affecting the rights of creditors and the enforcement of remedies;  (iv) neither the execution, delivery and performance by NVID of this Agreement, the NVID Documents, nor compliance by NVID with the terms and provisions thereof, will conflict with, or result in a conflict with the Certificate of Incorporation or Bylaws of NVID.  In rendering their opinion, counsel shall be allowed to rely on written representations of officers and directors of the Company as to factual matters.

(f)   Due Diligence.   IMS shall have completed and be satisfied with its due diligence investigation of the representations and warranties of NVID.

16.3   Conditions Precedent to the Release Date.   IMS shall, prior to the Release Date, have received fully executed original signatures from all Parties, and the Arbitrator shall have issued a binding arbitration award consistent with the terms and conditions of the Core Settlement Agreement and its Exhibits.

ORIGINAL

## ARTICLE 17
## INDEMNIFICATION

The Parties shall indemnify each other as provided in this Article.

17.1 <u>Indemnity Obligations</u>. To the fullest extent permitted by law, each Party (the "<u>Indemnifying Party</u>") agrees to defend, indemnify and hold harmless all other Parties, and their respective owners, shareholders, controlling persons, parent and subsidiaries, affiliates, officers, directors, attorneys, agents and employees (the "<u>Indemnified Parties</u>") from and against any and all claims, defense costs, including attorneys' fees, damages, and other liabilities, to the extent arising from or in any way related to (i) the breach by the Indemnifying Party of any of its obligations or performance required by this Agreement and (ii) the failure of the Indemnifying Party's representations and warranties to be true and correct either when made, as of the date of Closing, or thereafter.

## ARTICLE 18
## MISCELLANEOUS

18.1 <u>Dispute Resolution</u>. The Parties agree that the American Arbitration Association of San Diego California (in the person of the Arbitrator) shall maintain exclusive jurisdiction over any questions concerning the interpretation or enforcement of this Agreement and all of its component exhibits. Should legal action to enforce this Agreement, or any portion hereof, be commenced, the prevailing party to such binding arbitration shall be entitled to recover, in addition to any award by the arbitrator, its attorney fees incurred in such action.

18.2 <u>Notices</u>. Unless otherwise specifically provided in this Agreement, all notices or other communications required or permitted under this Agreement shall be in writing, and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile, provided that the fax cover sheet contains a notation of the date and time of transmission, and shall be deemed received: (i) if personally delivered, upon the date of delivery to the address of the person to receive such notice, (ii) if mailed in accordance with the provisions of this paragraph, two (2) business days after the date placed in the United States mail, and (iii) if mailed other than in accordance with the provisions of this paragraph or mailed from outside the United States, upon the date of delivery to the address of the person to receive such notice, or (iv) if given by facsimile, when sent. Notices shall be given at the following addresses:

| | |
|---|---|
| If to IMS or ETI: | 1725 Gillespie Way<br>El Cajon, CA 92020<br>Attention: Michael Krall<br>Fax No.: 619-596-8790 |
| If to NVID, Aqua Bio Technologies Inc., Gordon, Larson, Lewis, Duffy, Edelson or Redden: | 28163 U.S. 19 N., Suite 302<br>Clearwater, FL 33761<br>Attention: David Larson<br>Fax No.: 727-669-4701 |

ORIGINAL

| | |
|---|---|
| If to Aqua Bio Technologies S.A. de C.V.: | Creston 357<br>Pedregal de San Angel<br>Mexico, D.F. 01900<br>Attention: Federico Rodriguez<br>Fax No.: 011-525-568-9813 |
| If to Watertronics: | Well Cottage High Street<br>Wargrave Berks, RG10800<br>England<br>Attention: Dick Goodall<br>Fax No.: 011-44-118-940-3615 |
| If to Sistecam S.A. or Arata: | Del Triangulo en Rohrmoser<br>Costado Este de la Farmacia, Rohrmoser<br>Pavas, San Jose<br>Costa Rica<br>Attention: Andrew Arata<br>Fax No.: 775-640-1658 |
| If to Duren: | George L. Duren<br>2531 216 street<br>Lake City, FL 32024 |
| If to Lewis: | Charles Lewis<br>5135 New Ranch Rd.<br>El Cajon, CA 92020 |

The relevant Party may change the address for delivery of notices by giving notice of such change in accordance with this paragraph.

18.3   Interpretation.  All Parties have participated in the negotiation and preparation of this Agreement, and the construction of this Agreement shall not be interpreted in favor of or against any particular Party as result of the respective contributions of the Parties to the drafting of this Agreement.

18.4   Expenses and Further Assurances.  The Parties hereto shall each bear their respective costs and expenses incurred in connection with the transactions contemplated by this Agreement.  Each Party hereto will use its best efforts provide any and all additional information, execute and deliver any and all documents or other written material and perform any and all acts necessary to carryout the intent of this Agreement.

18.5   Survival of Representations, Warranties and Covenants. All of the representations, warranties and covenants made as of the date of this Agreement and as of Closing, shall survive the closing of this transaction.

ORIGINAL

18.6   Successors and Assigns.  All representations, warranties, covenants and agreements in this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, representatives, successors and assigns whether so expressed or not.

18.7   Governing Law.  This Agreement is to be governed by and interpreted under the laws of the State of California, without giving effect to the principles of conflicts of laws thereof. In addition, the Parties agree to exclusive jurisdiction to confirm and/or vacate or modify the arbitral award(s) of the Arbitrator, in the State or Federal Courts of the State of California sitting in the County of San Diego.

18.8   Section and Other Headings.  The section and other headings herein contained are for convenience only and shall not be construed as part of this Agreement.

18.9   Counterparts.  This Agreement may be executed in the original or by fax, in any number of counterparts and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute but one and the same instrument.

18.10   Entire Agreement.  This Agreement constitutes the entire agreement between the Parties hereto and supersedes all prior agreements, understandings and arrangements, oral or written, between the Parties hereto with respect to the subject matter hereof.  This Agreement may not be amended or modified, except by a written agreement signed by all Parties.

18.11   Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffectual to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

18.12   Confidentiality. Each Party hereto agrees with the other Parties that, unless and until this Agreement has been consummated, or for a period of one (1) year from the date of this Agreement if the transaction contemplated by this Agreement is not consummated it and its representatives will hold in strict confidence all data and information obtained with respect to the other Party from any representative, Officer, Director or employee, or from any books or records or from personal inspection, of such other Party, and shall not use such data or information or disclose the same to others, except:  (i) to the extent such data or information has theretofore been publicly disclosed, is a matter of public knowledge or is required by law to be publicly disclosed; and (ii) to the extent that such data or information must be used or disclosed in order to consummate the transactions contemplated by this Agreement.  The foregoing notwithstanding, IMS and NVID shall be authorized to publicly announce the execution and closing of this Agreement, using a mutually acceptable press release.

**ORIGINAL**

Core Settlement Agreement 11.15.01

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

By: _____
    David Larson, President

By: _____
    Michael Redden, Secretary/Treasurer

ETIH2O CORPORATION

By: _____
    Andrew B. Arata, President

WATERTRONICS LTD.

By: _____
    Richard M. Goodall, Managing Director

INNOVATIVE MEDICAL SERVICES

By: _____
    Michael L. Krall, President

By: _____
    Dennis Atchley, Secretary

AQUA BIO TECHNOLOGIES, S. A. DE C. V.

By: _____
    Federico Rodriguez, Director General

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION

By: _____
    Andrew B. Arata

//

//

//

//

//

//

//

//

ORIGINAL

Core Settlement Agreement 11.15.01

25



IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

By: _____
    David Larson, President


By: _____
    Michael Redden, Secretary/Treasurer

ETIH20 CORPORATION


By: _____
    Andrew B. Arata, President

WATERTRONICS LTD.


By: _____
    Richard M. Goodall, Managing Director

INNOVATIVE MEDICAL SERVICES


By: _____
    Michael L. Krall, President


By: _____
    Dennis Atchley, Secretary

AQUA BIO TECHNOLOGIES, S. A. DE C. V.


By: _____
    Federico Rodriguez, Director General

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION


By: _____
    Andrew B. Arata

//

//

//

//

//

//

//

//

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

INNOVATIVE MEDICAL SERVICES

By: _____
    David Larson, President

By: _____
    Michael L. Krall, President

By: _____
    Michael Redden, Secretary/Treasurer

By: _____
    Dennis Atchley, Secretary

ETIH20 CORPORATION

AQUA BIO TECHNOLOGIES, S. A. DE C. V.

By: _____
    Andrew B. Arata, President

By: _____
    Federico Rodriguez, Director General

WATERTRONICS LTD.

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION

By: _____
    Richard M. Goodall, Managing Director

By: _____
    Andrew B. Arata

//

//

//

//

//

//

//

//

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

INNOVATIVE MEDICAL SERVICES

By: _____
    David Larson, President

By: _____
    Michael L. Krall, President

By: _____
    Michael Redden, Secretary/Treasurer

By: _____
    Dennis Atchley, Secretary

ETIH2O CORPORATION

AQUA BIO TECHNOLOGIES, S. A. DE C. V.

By: _____
    Andrew B. Arata, President

By: _____
    Federico Rodriguez, Director General

WATERTRONICS LTD.

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION

By: _____
    Richard M. Goodall, Managing Director

By: _____
    Andrew B. Arata

// 

// 

// 

// 

// 

// 

// 

// 

25

Core Settlement Agreement 11.15.01.doc

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

By: _____
David Larson, President

By: _____
Michael Redden, Secretary/Treasurer

ETIH2O CORPORATION

By: _____
Andrew B. Arata, President

WATERTRONICS LTD.

By: _____
Richard M. Goodell, Managing Director
ALAN C. AllDAY

//

//

//

//

//

//

//

//

INNOVATIVE MEDICAL SERVICES

By: _____
Michael L. Krall, President

By: _____
Dennis Atchley, Secretary

AQUA BIO TECHNOLOGIES, S. A. DE C. V.

By: _____
Federico Rodriguez, Director General

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION

By: _____
Andrew B. Arata

25

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be
executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua           INNOVATIVE MEDICAL SERVICES
Bio Technologies Inc., its wholly owned
subsidiary

By: _____          By: _____
    David Larson, President                Michael L. Krall, President


By: _____          By: _____
    Michael Redden, Secretary/Treasurer     Dennis Atchley, Secretary

ETIH20 CORPORATION                   AQUA BIO TECHNOLOGIES, S. A. DE C. V.


By: _____          By: _____
    Andrew B. Arata, President             Federico Rodriguez, Director General

                     INTERNATIONAL
WATERTRONICS LTD.                    ANDREW B. ARATA, INDIVIDUALLY AND
                                     ON BEHALF OF SISTECAM, S.A., A COSTA
                                     RICAN CORPORATION

By: _____          By: _____
    Richard M. Goodell, Managing Director    Andrew B. Arata
    ALAN C. ALLDAY
//
//
//
//
//
//
//
//

Core Settlement Agreement 11.15.01.doc               25

IN WITNESS WHEREOF, the corporate Parties hereto have caused this Agreement to be executed by their respective Officers, hereunto duly authorized, as of the date first above written.

NVID INTERNATIONAL, INC., and Aqua Bio Technologies Inc., its wholly owned subsidiary

INNOVATIVE MEDICAL SERVICES

By: _____
    David Larson, President

By: _____
    Michael L. Krall, President

By: _____
    Michael Redden, Secretary/Treasurer

By: _____
    Dennis Atchley, Secretary

ETIH2O CORPORATION

AQUA BIO TECHNOLOGIES, S. A. DE C. V.

By: _____
    Andrew B. Arata, President

By: _____
    Federico Rodriguez, Director General

WATERTRONICS LTD.

ANDREW B. ARATA, INDIVIDUALLY AND ON BEHALF OF SISTECAM, S.A., A COSTA RICAN CORPORATION

By: _____
    Richard M. Goodall, Managing Director

By: _____
    Andrew B. Arata

// 

//

//

//

//

//

//

//

DAVID LARSON                                MICHAEL REDDEN

√By: _____              √By: _____
     David Larson, an individual                 Michael Redden, an individual

DR. CHARLES LEWIS                           GEORGE L. DUREN

By: _____               √By: _____
     Charles Lewis, an individual                 George L. Duren, an individual

STEVEN GORDON

By: _____
     Steven Gordon, an individual

ORIGINAL

DAVID LARSON

By: _David Larson_
David Larson, an individual

DR. CHARLES LEWIS

By: _____
Charles Lewis, an individual

STEVEN GORDON

By: _____
Steven Gordon, an individual

MICHAEL REDDEN

By: _____
Michael Redden, an individual

GEORGE L. DUREN

By: _____
George L. Duren, an individual

26

Core Settlement Agreement 11.15.01.doc

DAVID LARSON

MICHAEL REDDEN

By: _____
    David Larson, an individual

By: _____
    Michael Redden, an individual

DR. CHARLES LEWIS

GEORGE L. DUREN

By: _____
    Charles Lewis, an individual

By: _____
    George L. Duren, an individual

STEVEN GORDON

By: _____
    Steven Gordon, an individual

Core Settlement Agreement 11.15.01.doc

# AMERICAN ARBITRATION ASSOCIATION
## INTERNATIONAL CENTER FOR DISPUTE RESOLUTION

### IN THE MATTER OF:

| | |
|---|---|
| PURE BIOSCIENCE fka ) | PRELIMINARY HEARING ORDER |
| INOVATIVE MEDICAL ) | NO. ONE |
| SERVICES ) | RULE 20 (a) |
| and ) | |
| NVID INTERNATIONAL, INC. ) | |
| FALKEN INDUSTRIES, LTD, ) | |
| STEVEN GORDON ) | |

RECEIVED
DEC 0 3 2003
INTERNATIONAL CENTER

Having conducted a preliminary hearing pursuant to Rule 20 (a) of the Commercial Arbitration Rules on December 2, 2003 and having heard and considered the statements and recommendations of Wolfgang F. Hahn, Esq. appearing on behalf of Pure Bioscience, and Michael J. Rovell, Esq. appearing on behalf of NVID International, Inc. and Steven Gordon and specially appearing on behalf of Falken Industries, LTD:

### PREAMBLE

The arbitrator acknowledges that Falken Industries, LTD. appears specially for the limited purpose of contesting the jurisdiction of the American Arbitration Association and/or the arbitrator and that nothing in this Order No. One shall constitute a determination that Falken Industries, LTD. has submitted to the jurisdiction of the Association or the arbitrator in his capacity as compliance monitor under the Core Settlement Agreement.

Having so noted:

### IT IS HEREBY ORDERED:

1. On or before December 12, 2003 Falken Industries, LTD. shall file its memorandum in support of its position that it is not amenable to the jurisdiction of the Association and/or the arbitrator.

2. On or before December 22, 2003 Pure Bioscience fka Innovative Medical Services shall file its memorandum in opposition to Falken Industries, LTD.'s memorandum

challenging the jurisdiction of the Association and/or the arbitrator.

3. On or before January 7, 2003 each party may file, should they so choose, a reply memorandum.

4. Oral argument relative to the issue of jurisdiction over Falken Industries, LTD. shall be held on January 13, 2004 at 10:00 a.m. at

> American Arbitration Association
> 600 B Street, Ste. 1450
> San Diego, CA 92101

5. On or before December 12, 2003 NVID International, Inc. shall file any contracts, agreements, memoranda of understanding, letters of intent or the like which contain any agreement between NVID International, Inc. and Falken Industries, LTD. which refer to, reflect or contain material relative to the Core Settlement Agreement or any provision thereof.

6. All parties who are determined to be subject to the jurisdiction of the Association and/or the arbitrator as of January 26, 2004 shall file any response and/or counterclaim they may have on that date.

Note: "file" means to serve upon the arbitrator, all other parties and the case administrator by way of facsimile transmission with hard copy to follow by first class mail.


Dated: _12-2-03_

Jack F. Fitzmaurice, Esq.
Arbitrator

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF:

| | | |
|---|---|---|
| PURE BIOSCIENCE, f/n/a Innovative Medical Services,<br>Claimant, | ) ) ) | |
| | ) | |
| and | ) ) | No. 50 T 133 00528 03 |
| NVID INTERNATIONAL, INC.,<br>FALKEN INDUSTRIES, LTD., and<br>STEVEN GORDON,<br>Respondents. | ) ) ) ) ) | |

## FALKEN MEMORANDUM IN SUPPORT
## OF ITS OBJECTION TO JURISDICTION

Falken Industries, Ltd. submits this memorandum in support of its limited appearance for purposes of contesting the jurisdiction of the American Arbitration Association or the Arbitrator in this matter.

A cornerstone of arbitration law is that arbitration is a creature of contract. Only those who have agreed to arbitrate can be required to arbitrate. See United States v. Panhandle Eastern Corp., 672 F. Supp. 149, 153 (D. Del. 1987) ("a court may not force a party to arbitrate when ordinary contract principles indicate that it has not agreed to do so"); Freeman v. State Farm Mutual Automobile Ins. Co., 14 Cal. 3d 473, 481, 121 Cal. Rptr. 477, 482 (Cal. 1975) ("There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate and which no statute has made arbitrable"); American Builder's Ass'n. v. Au-Yang, 226 Cal. App. 3d 170, 276 Cal. Rptr. 262 (2d Dist. 1990) ("policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate").

Absent an agreement or some exception to the rule requiring an express agreement to arbitrate, neither the AAA nor this Arbitrator has any jurisdiction over Falken. Indeed, in a slightly different context, this Arbitrator recognized these principles in his November 26 letter in which he noted that as the individuals were not signatories to either the Core Settlement Agreement or the Escrow Agreement, "a consensual basis for jurisdiction inherent in contract principles is absent." Falken is indisputably not a signator to the Core Settlement Agreement. Indeed, Falken was not even in existence at the time the agreement was entered.

No exceptions to the rule requiring an arbitration agreement with the party sought to be compelled to arbitrate is present here. While Falken recognizes that a party may be equitably estopped from repudiating an arbitration provision in a contract he did not sign where he seeks to enforce other provisions of the same contract that benefit him, <u>see, e.g.</u>, <u>Metalclad Corp. v. Ventana Environmental Organizational Partnership</u>, 109 Cal. App. 4th 1705, 1713, 1 Cal. Rptr 328, 344 (4th Dist. 2003), Falken is not seeking to enforce the Core Settlement Agreement against Pure Bioscience (f/n/a Innovative Medical Services, hereinafter "IMS").

Similarly, while Falken recognizes that an assignee of a contract may, under certain circumstances, be bound to an arbitration provision contained in the underlying contract, that exception has no application in this case as Falken was indisputably never assigned the Core Settlement Agreement. Thus, the principle that an assignee of a contract can be bound to an arbitration agreement entered by his assignor is inapplicable and provides no basis for this tribunal to assert jurisdiction.

-2-

In arguing that Falken is bound to the obligations of the Core Settlement Agreement, including the arbitration provision, because it received NVID's rights to potential future royalties under the Core Settlement Agreement,[1] IMS appears to rely on section 1589 of the California Code, which provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it . . . ." However, "Civil Code section 1589 'has generally been held to apply only where the person accepting the benefit was a party to the original transaction.'" Recorded Picture Co. v. Nelson Entertainment, inc., 53 Cal. App. 4th 350, 362, 612 Cal. Rptr. 2d 742, 748 (2d Dist. 1997) (quoting Fruitvale Canning Co. v. Cotton, 115 Cal. App. 2d 622, 626, 252 P.2d 953 (1st Dist. 1953), overruled on other grs in Lucas v. Hamm, 56 Cal. 2d 583, 591, 15 Cal. Rptr. 821, 364 P.2d 685 (1961)).

Although an exception to the rule can require an assignee to accept the burdens of an executory contract, that exception only applies where "all benefits of a full performance have inured to him." Recorded Picture Co., 53 Cal. App. 4th at 362, 612 Cal. Rptr. 2d at 748 (quoting Fruitvale Canning Co.). Thus, "mere assignment of rights under an executory contract does not cast upon the assignee the obligations imposed by the

---

[1] While this Arbitrator looking at the verbiage of the Omnibus Assignment, a copy of which is attached as **Exhibit 1**, was under the impression that it attempted to convey more than just the rights to future royalties and a potential reversionary right, the fact of the matter is that it did not. Like the holiday song, "It's been said many times, many ways," the effect of the assignment related solely to the future royalties and the reversionary rights. For example, IMS in a draft press release acknowledged the same, stating that NVID only assigned to Falken its "right to potential future royalties" in connection with the Axenohl technology and patents. **(See draft press release attached as Exhibit 2.)** Moreover, the only reference in the Omnibus Assignment to the Core Settlement Agreement states that NVID is assigning its rights to moneys due and claims NVID may have in relation to it. (Omnibus Assignment, ¶ ii.) Finally, the Omnibus Assignment is not signed by Falken.

contract upon the assignor . . . ." Recorded Picture Co., 53 Cal. App. 4th at 362, 612 Cal.

Rptr. 2d at 748 (quoting Enterprise Leasing Corp. v. Shugart Corp., 231 Cal. App. 3d 737,

745, 282 Cal. Rptr. 620 (1991)). Cf. Lachmar v. Trunkline Lng Co., 753 F.2d 8, 9-10 (2d

Cir. 1985) ("Under New York law . . . the assignee of rights under a bilateral contract is not

bound to perform the assignor's duties under the contract unless he expressly assumes

to do so"; "[i]ncluded among the duties to which this rule has reference is the duty to

arbitrate").

Section 1589 has been found inapplicable in many situations similar to those

here, including at least two cases on which IMS has relied in correspondence.[2]  For

example, in Recorded Picture Co., 53 Cal. App. 4th at 361-62, 612 Cal. Rptr. 2d at 748, a

subdistributor was not bound to an agreement between a producer and the distributor

providing for 70% of home video sales to be paid to the producer where the subdistributor

had not received all of the benefits of that agreement, but rather had, among other things,

been given distribution rights for a shorter duration than that granted to the distributor.

Similarly, in Fruitvale Canning Co., 115 Cal. App. 2d at 626, 252 P.2d 953, the assignees

of a loan agreement providing for the assignor to repay the loan in monthly installments

was not bound to the repayment obligations as they had not received the proceeds of loan.

Here, Falken obtained no benefit under the Core Settlement Agreement as no royalty has

ever been paid to it and it is therefore not bound to the obligations in the agreement,

including NVID's obligation to arbitrate disputes arising under it.

---

[2]In the third case, Enterprise Leasing Corp. v. Shugart Corp., 231 Cal. App. 3d 737,
282 Cal. Rptr. 620 (2d Dist. 1991), the court did not determine whether the obligations had
been assumed, but rather held that the trial court erred in granting summary judgment,
thereby requiring a trial on the issue.

IMS has also suggested that Falken is bound to the arbitration provision in the Core Settlement Agreement between IMS and NVID because Falken had knowledge of the Core Settlement Agreement and therefore the arbitration provision and because paragraph 18.6 states that "[a]ll representations, warranties, covenants and agreements in this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective . . . assigns whether so expressed or not." NVID, however, could not unilaterally bind Falken to an obligation without Falken's consent.

Indeed, IMS's argument was made and rejected in Shutes v. Cheney, 123 Cal. App. 2d 256, 266 P.2d 902 (1st Dist. 1954), where patentees of a meat preparation technique granted an exclusive license for the manufacture and distribution of meat using the patented technique to a third party (Jacky), which later granted to plaintiff Shutes the exclusive right to buy the product and resell it in certain counties in California. 123 Cal. App. 2d at 257-58, 266 P.2d 904. Jacky later assigned its license agreement for the manufacture of the product to a corporation he formed which then assigned it to the defendant (Cheney Bros.), which refused to be bound by the exclusive distribution agreement between Jacky and plaintiff Shutes. 123 Cal. App. 2d at 259, 266 P.2d 905.

Just as IMS alleges that Falken had knowledge of the Core Settlement Agreement arbitration provision because the Core Settlement Agreement was referenced in the NVID/Falken Omnibus Assignment, defendant Cheney had knowledge of the Jacky/Shutes exclusive distribution agreement because it was referenced in the Jacky corporation/Cheney assignment. 123 Cal. App. 2d at 258, 266 P.2d 904. Moreover, the Jacky/Shutes agreement expressly stated that it was "to bind the . . . assigns of the

respective parties," 123 Cal. App. 2d at 259, 266 P.2d 905, just as the Core Settlement Agreement states that it is binding on the parties' assigns.

Nonetheless, the <u>Shutes</u> court held that defendant Cheney was <u>not</u> bound by the Jacky/Shutes agreement because if Cheney had assumed any responsibility to Shutes, "it must be through some provision in the [Jacky corporation/Cheney assignment], 123 Cal. App. 2d at 263, 266 P.2d 907, and while it mentioned the Jacky/Shutes distribution agreement, it contained "no undertaking of any kind for [plaintiff Shutes's] protection or benefit," 123 Cal. App. 2d at 262, 266 P.2d 906, just as the NVID/Falken Omnibus Assignment did not contain any undertaking for IMS's protection or benefit – Nowhere does the NVID/Falken Omnibus Assignment provide for Falken to undertake any obligations to IMS under the Core Settlement Agreement. For the same reasons set forth in <u>Shutes</u>, then, Falken is not bound to the arbitration provision in the Core Settlement Agreement.

Claimant's argument that by virtue of the assignment of rights Falken has submitted itself to jurisdiction for any and all claims that claimant can concoct against NVID would produce absurd results. For example, in Counts I-III, claimant asserts claims against NVID and the individuals for failure to (1) maintain ongoing corporate existence, (2) maintain sufficient asset base, and (3) maintain sufficient assets. In Count IV, it makes the same claim against Falken on the basis that Falken, as an assignee of rights under the Core Settlement Agreement, has a joint and several obligation with its assignor regarding the assignor's corporate existence, asset base, and capitalization. As Falken has no control over NVID, Falken is not in a position to ensure that NVID maintains its corporate existence, a sufficient asset base, or sufficient assets. There is no basis in law or equity

to impose NVID's alleged defaults on Falken. While the Arbitrator made no ruling during the conference call, he did express his opinion that the claims against Gordon would be limited to the guarantee and the fact that he signed the guaranty did not mean that he agreed to arbitrate any claim that could be posited against NVID unrelated to the guaranty.

Even more important, Falken and NVID have rescinded their agreement.[3] Accordingly, Falken is not even putatively an assignee of the Core Settlement Agreement and cannot possibly be bound to it. As set forth in the "Whereas" clause of the rescission agreement, the rescission action was taken because of IMS's position that the royalty requirement can be satisfied in the future by simply selling the patent and paying a one-time 5% transfer fee. NVID and Falken believed that under the Core Settlement Agreement, there were minimum royalties of $1 million beginning in 2004 and that expectation was the benefit of the bargain between NVID and Falken. As that provision has been repudiated by IMS, consideration for the Falken/NVID transaction has failed.

IMS is in no way prejudiced if Falken is not included in the arbitration. Any relief to which IMS believes it is entitled can be obtained through NVID. Since IMS did not know of Falken's existence when it entered the Core Settlement Agreement, refusal to extend the arbitration agreement to a party that was not even in existence can hardly be prejudicial to IMS. Further, since NVID has whatever rights it was accorded under the Core Settlement Agreement, Falken is neither a necessary nor indispensable party to this arbitration.

---

[3]A copy of the agreement, entitled "Covenant To Stand Seized," is attached as **Exhibit 3**. This agreement, together with the Omnibus Assignment, are the only two agreements between NVID and Falken that relate to the Core Settlement Agreement and both have been produced pursuant to the Arbitrator's December 2, 2003 order.

-7-

As stated during the conference call and as noted in the rescission agreement, NVID intends to file a counterclaim seeking, among other things, rescission of the Core Settlement Agreement based on a failure of consideration if IMS contends that it is only obligated to pay a 5% transfer fee rather than the minimum royalties. If the Arbitrator rules in NVID's favor, then there is no arbitration agreement between anyone, nor is there any agreement that Falken could have been assigned. Counsel believes the Arbitrator has suggested that the most efficient manner in proceeding would be to arbitrate the NVID/IMS claims separately and Falken endorses that suggestion, which would necessarily mean that the issue of whether Falken was or was not a proper party to the arbitration could await another time for resolution.

### Conclusion

For the reasons set forth above, Falken requests that this Arbitrator enter an order holding that Falken is not subject to arbitration here.

FALKEN INDUSTRIES, LTD.

By _____
One of its attorneys

Dated: December 12, 2003

Michael J. Rovell
Lisa I. Fair
LAW OFFICES OF MICHAEL J. ROVELL CHTD
20 N. Clark Street, Suite 2450
Chicago, Illinois 60602
tel: (312) 578-9191
fax: (312) 578-9391

### Certificate of Service

The undersigned attorney certifies that the foregoing memorandum was served on the following counsel of record by fax and by placing a copy in a properly addressed, postage prepaid envelope and depositing it In the U.S. mail in Chicago, Illinois on December 12, 2003:

Wolfgang F. Hahn
Wolfgang F. Hahn & Associates
7160 Caminito Pepino
La Jolla, CA 92037
fax (858) 456-5080

Jack F. Fitzmaurice
Fitzmaurice, Demergian & Shuman
55 W. C Street, Suite 1880
San Diego, CA 92101
fax: (619) 239-3029

Lisa I. Fair

# AMERICAN ARBITRATION ASSOCIATION
# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF

PURE BIOSCIENCE
(formerly known as
INNOVATIVE MEDICAL SERVICES)[1],

                    Claimant,             Civil No. 50 T 133 00528 03

v.

NVID INTERNATIONAL, INC.,
FALKEN INDUSTRIES, LTD., STEVEN GORDON, Et Al.

                    Respondents.

---

ARBITRATOR:     JACK F. FITZMAURICE
Appointed Pursuant To Rule R-12(a), Commercial Arbitration Rules [A.A.A.]

---

## PURE BIOSCIENCE'S MEMORANDUM
## IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION

### I.     INTRODUCTION.

Nonsignatory FALKEN, alleging that it is an innocent bystander as a mere assignee of an income stream flowing from the Axenohl® patent, seeks to avoid Claimant PURE BIOSCIENCES (referred to hereinafter alternatively as "INNOVATIVE", or "PURE-BIO") efforts to arbitrate all of its claims relating to the Axenohl® patent rights, all of which arise out of and directly relate to the Core Settlement Agreement.

### II.     FACTUAL AND HISTORICAL BACKGROUND.

**1.     INNOVATIVE, NVID and INNOVATIVE's Acquisition Of Axenohl® Patent Rights, Axen® And Its Related Intellectual Property Under The Terms Of Into Core Settlement Agreement.**

On 15 November 2001, in full and complete resolution of various disputes between the parties and various pending litigation and arbitration matters, including both state and federal

---

[1]     On 6 October 2003, by its filing of a Certificate of Amendment in the office of the California Secretary of State, INNOVATIVE MEDICAL SERVICES formally changed its name to "Pure Bioscience".

IN THE MATTER OF
PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 1

Florida court actions, a federal action in California and a San Diego arbitration, INNOVATIVE and

NVID International, Inc. ["NVID"], *inter alios*, entered into a Core Settlement Agreement.

Pursuant to the Core Settlement Agreement, and "as a core consideration of the global

resolution" embarked upon by the parties, in a separate, but attached document, the parties

executed an "Assignment of Patent and Related Intellectual Property" [the "Assignment"],

pursuant to which NVID, *inter alia*, warranted that it was the sole and exclusive owner of "all

Axenohl® patent rights" and, as assignor, "sold, assigned, transferred and set over" to

INNOVATIVE its "entire right, title and interest in and to" all Axenohl® patent rights that it

possessed.

The Core Settlement Agreement was approved by each company's respective Board of

Directors and all transactions and transfers contemplated by the Core Settlement Agreement

were substantially completed by December 2001. As a direct result thereof, effective as of 15

November, INNOVATIVE became the sole, exclusive and undisputed owner of all Axenohl®

patents, its diluted form Axen®, all related technology and intellectual property, including all

related trademarks.

  a. **Arbitration As To Any "Determination Of Responsibility
And/or Liability" Under The Core Settlement Agreement And
The Joint Appointment Of Jack Fitzmaurice As "Compliance
Monitor", Was Expressly Bargained For By All Of The Parties,
For Themselves And For Their Successors.**

Governance of all aspects of the Axenohl® patents and related technology, all rights to

manufacturing, distribution, sale and marketing, including its patent's transfer and all reversionary

rights thereto, are strictly controlled by the terms of the Core Settlement Agreement. Due to the

multiplicity of actions in which they had been engaged prior to settlement and their costly nature,

the parties to the Agreement intentionally established this arbitration process with the current

arbitrator (in whom all parties were confident and reposed great trust) as one of the benefits of the

Agreement since it provided a concrete and readily discernible method and means by which any

and all future disputes or disagreements would be resolved.

IN THE MATTER OF  PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **2**

2.  **Historical Background Between NICKEL, FALKEN Predecessor, And Its Principals Emile Gouiran and Helle Madso With PURE-BIO And Their Prior Knowledge Of The Axenohl® Patent And The Terms Of The Core Settlement Agreement.**

In January 2003, PURE-BIO and NICKEL, Ltd., "a privately held U.S. company based in Paris, France" entered into a complex cross-marketing and licensing agreement entitled Umbrella Agreement ("UA"),[2] whereby PURE-BIO granted NICKEL, allegedly a major manufacturer and distributor of wet wipes in Europe, a license to utilize Axen® in Europe after regulatory approval in developing a hard surface disinfectant spray and hard surface disinfectant wet wipes for use in hospitals, educational/childcare facilities, food processing and military market segments. In return, NICKEL granted PURE-BIO the exclusive right to market and sell NICKEL's Clean Plus® janitorial/sanitation product line and its to-be-developed Bac'Out® line of disinfectant sprays and wipes in the U.S. to suppliers and distributors. *See, Exhibit A, PURE-BIO Press Release d. 3 Feb. 2003, NICKEL Website and 17 March 2003 Press Release* .

During the parties negotiations, which were handled by Mr. Emile Gouiran and Ms. Helle Madso on behalf of NICKEL and President and Chief Executive Officer Michael Krall and its Chief Operating Officer Gene Auerbach on behalf of PURE-BIO, PURE-BIO's executives divulged their extensive knowledge of Axenohl® patent, Axen® and related technology, as well as the terms of the Core Settlement Agreement with NVID.

For a variety of reasons, including NICKEL's failure to pay a $30,000 invoice for Axen® shipped to NICKEL, the transaction failed and on 4 September 2003, NICKEL's General Counsel Harry Swanson  noticed PURE-BIO that he had been "instructed to initiate suit" *against* PURE-BIO "and others for willful breach of contract, fraud, wrongful inducement, unjust enrichment, trickery, tortuous(sic) interference, slander, libel and other causes sounding in contract or tort", that "(l)itigation for claims arising under the Umbrella Agreement will occur in Sweden" and in accord with

---

[2]     While the UA was negotiated between PURE-BIO's President and Chief executive Officer Michael Krall  and its Chief Operating Officer Gene Auerbach and Emile Gouiran and Ms. Helle Madso on behalf of NICKEL, it was executed by Ms. Helle Madso, NICKEL's Vice President , as amended by correspondence dated 13 January 2003 from Mr. Emile  Gouiran.

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 3

the International Arbitration Rules (effective November 1, 2001) of the American Arbitration

Association. . ." *pp.1, 4, Corres. d. 4 Sept. 2003 from Harry S. Swanson to Michael Krall.*

 Despite numerous threats, statements and posturing from a variety of individuals, including

FALKEN's present counsel on 29 October 2003, no arbitration has ever been initiated or filed with the

American Arbitration Association's New York office relating to the UA by NICKEL – or FALKEN, for

that matter.

   **3. FALKEN[3] Is Formed And Through Various Assignments, NICKEL**
     **Assigns All Of Its Assets, Including Its Rights Under The UA, to**
     **FALKEN And "Collapses" Itself Into FALKEN**

 In late July-early August 2003, NVID principals were approached and courted by NICKEL

principals and ultimately, visited NICKEL's offices in Paris and NICKEL's chemical plant in Rouen.

Shortly thereafter, on 6 August 2003, FALKEN was formed by Messrs. Emile Gouiran, Steven

Gordon, Roy Janis, Keith Duffy and Ms. Helle Madso, and "on August 28, FALKEN acquired from

Nickel, Ltd., the Clean Plus® branded products group", which product line "includes the Bac'Out® line

of cleansing and disinfectant liquids and wet-wipes in which Axen, the Axenohl derivative will be

incorporated." *Exh. B (New Jersey Sec. State Certification); 3 Oct. 2003 Corres. from Helle Madso*

*and Dividend Distribution; and FALKEN Website.* Like NICKEL, FALKEN was also a New Jersey

corporation "based in Paris, France", controlled and managed by Mr. Emile Gouiran, a disbarred New

Jersey attorney, and his live-in Norwegian girlfriend, Helle Madso, with whom he has fathered a child

out-of-wedlock.

   **4. FALKEN Acquires All Of NVID's Interest To The Axenohl® Technology**
     **And Patent Under The Core Settlement Agreement.**

 As a result, on 12 September 2003, NVID and FALKEN entered into the Omnibus

Assignment, whereby NVID "sold and assigned all of its interest in the Axenohl® technology and

patent (Axen®) to Falken Industries, Ltd., a privately held company based in Paris, France."

---

[3] Not to be confused with the Japanese tire giant, FALKEN, or FALKEN TIRE TRADING, LTD., established in June 2003 as a
*holding company for the export sales of the merger between Sumitomo Rubber Industries, Ltd. and OHTSU Tire & Rubber Company* ,
is the European arm of the FALKEN Tires, a large Japanese-owned company, engaged in the export business of tires and tubes for
automobiles and construction, industrial and agricultural vehicles. As pointed out on their Website, their name derives from the
German language, meaning "falcon" in English.

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
IN THE MATTER OF       PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 4

Copies of FALKEN/NVID's 23 September 2003 and 1 October 2003 press releases are marked

Exhibit C,  attached hereto and incorporated herein.

5.     **FALKEN's Launch Of False, Misleading And Negative Media Campaign Blitz Against PURE-BIO, Touting FALKEN's Alleged "Ownership" Of Axenohl® Patent Rights, Axen® And Its Related Intellectual Property, PURE-BIO's "Default" And "Forfeiture" Of The Axenohl® Patent Rights Under The Core Settlement Agreement And The Resulting Reversion To FALKEN Thereof, "By Virtue Of (The) Assignment From NVID To FALKEN".**

With deliberate timing to coincide with its acquisition of all of NVID's rights, title and

interest under the Core Settlement Agreement, FALKEN[4] initiated a continuous barrage

numbering over 300 of publicly disseminated postings of intentionally false, misleading and

disparaging statements. Intended to cause damage to PURE-BIO's licensing and marketing

efforts of its Axenohl® patent rights. Some examples of these libelous postings are:

(a)     INNOVATIVE is "hovering on the threshold of bankruptcy";

(b)     "FALKEN INDUSTRIES LTD. . . also acquired from NVID International Ltd NVID:OTC all of its interest in the Axenohl® patent, concentrate for the Axen product solution"; *[Exh. ___, 12 Oct. 2003 (Yahoo!Finance # 4181];*

(c)     "FALKEN . . . acquired contractual rights and exclusivities, non-competition agreements and other similar privileges as against IMS who is consequently barred from marketing Axen in Europe as a whole and in the United States, except as a component of Clean Plus®' Bac'Out® line of disinfectants";

(d)     "Now while the patent was assigned to IMS in the "Core Settlement Agreement", NVID reserved to itself substantial rights, including that of recovering the patent. IMS is in serious violation of a number of provisions in that contract" *[Exh. D, 24 Oct. 2003 (Lycos/Raging Bull # 9365)];*

(e)     "Under the provisions of the Core Settlement Agreement, IMS has forfeited its rights to the patent, that patent subsequently reverts back to FALKEN under the Core Agreement. Hence as of this day[5], FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent

---

[4]      Without doubt, these postings were initiated by Emile Gouiran under either *nom de plume*: nickelinfo (Yahoo!Finance) or nickel-dispatches (Lycos/Raging Bull). This linkage can be readily established by reviewing the 6 October 2003 posting addressed to Miller and McCollum, PURE-BIO's auditors, who, as part of their annual audit contacted NICKEL to confirm an outstanding account balance due PURE-BIO in the amount of approximately $30,000.00 and comparing it to NICKEL's formal response dated 6 October 2003 from Harry S. Swanson, NICKEL's General Counsel, a copy of which is also attached as part of Exhibit D.
[5]      Statement was posted on "Raging Bull" PURE Message Board on 25 September 2003 @ 1:00PM EDT.

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
IN THE MATTER OF                    PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  5

and all derivatives (judicial determination is being prepared);" *[Exh. D, 24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(f)   "FALKEN owns the Axenohl® Patent and all Axen derivatives. . ." *[Exh. D, 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(g)   "FALKEN has the unqualified absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)"; *[Exh. D, 25 Sep. 2003 (Raging Bull Message Board Postings # 9374 & # 9392)]*;

(h)   "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world . . ."; *[Exh. D, 21 Sep. 2003 (Raging Bull Message Board Potsing # 9315)]*;

(i)   "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com; *[Exh.D, 24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374 & Posting # 9392)]*;

(j)   "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) facility as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories"; *(Exh.D, 12 Oct. 2003 (Raging Bull Message Board Posting # 9632)]*; and

(k)   "As a result of the transaction and as released, all NVID shareholders of record on October 10 will become shareholders of FALKEN INDUSTRIES, LTD. as at October 13 and will receive shares and warrants to purchase a 4.5% preferred at $1,00 and more common at $1,50 per share".

·*See, Exh. D.*

6.   **PURE-BIO's Commencement of Arbitration Against NVID And FALKEN To Enforce And Defend Its Axenohl® Patent Rights And To Enjoin FALKEN's Dissemination Of False Information.**

On or about 28 October 2003, unbeknownst to FALKEN, PURE-BIO commenced the current arbitration against NVID and FALKEN.

IN THE MATTER OF
PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 6

7.    FALKEN's Alleged Rescission Of The Omnibus Assignment.

In FALKEN's moving papers, FALKEN's counsel alleges that "Falken and NVID have rescinded their agreement" and to support his claim, provides us with a copy of a document entitled "Covenant To Stand Seized[6] " dated 8 December 2003.

Although this agreement purports to rescind the Omnibus Agreement in paragraph 1, its subsequent paragraphs clearly negate any rescission, since "*NVID as fiduciary . . . for the use and benefit of FALKEN in its capacity as a fiduciary*" retains all rights previously held under the Omnibus Assignment and Core Settlement Agreement by FALKEN "**in trust for FALKEN**" and "*on FALKEN's written demand*", NVID, as FALKEN's puppet, agrees to "*convey all such right(s) and/or proceeds and benefits . . . to any person, firm, association or corporation specified. . .*" by FALKEN. However, in this latest go-around – lest any confusion linger - they are careful to disclaim "any obligation or liability relating" to any of the seventeen (17) rights granted. In short, FALKEN remains firmly in total and complete control of any and all of NVID'S rights, title and interest under the Core Settlement Agreement

III.    **OMNIBUS ASSIGNMENT IS A COMPLETE AND FULL ASSIGNMENT OF ALL OF NVID'S RIGHTS UNDER THE CORE SETTLEMENT AGREEMENT, WHICH CONTROLS ALL ASPECTS OF THE AXENOHL® PATENT AND ITS RELATED TECHNOLOGY.**

A.    **ANALYSIS OF THE OMNIBUS[7] AGREEMENT.**

Historically, and through to the present, FALKEN, through its counsel, has maintained that no assignment took place and that NVID only assigned to FALKEN its "right to potential future

---

[6]      Black's Law Dictionary defines the verb "seize" 1.  To forcibly take possession (of a person or property). 2. To place (someone) in possession. 3. To be in possession (of property)

[7]      Merriam Webster Dictionary defines the term "omnibus", when used in an adjectival manner,
        "as of, relating to, or providing for many things at once; 2 : containing or including many items.

        Black's Law Dictionary [7th ed.] provides a definition only when the term is used as an adjective:
        relating to or dealing with numerous objects or items at once; including many things or having various purposes

                                     PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
IN THE MATTER OF                              PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
                                    v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
              AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
                                         BEFORE JACK F. FITZMAURICE, ARBITRATOR
                                                                    PAGE  7

royalties" - a statement that was summarily rejected by the arbitrator, in his 26 November 2003 correspondence to Agnieszka Kusmierska, AAA's New York case coordinator.[8]

The Assignment's full title is:

**OMNIBUS ASSIGNMENT OF THE CLAIMS, CONTRACT, ACCOUNT, RIGHTS, EXPECTANCY , MONIES DUE OR TO BECOME DUE, OPTION(S), INVENTION, PATENT(S), CLAIMS FOR PAST INFRINGEMENT, LICENSES, TRADEMARKS RELATING TO AXENOHL® AND AXEN® AND ALL DERIVATIVES THEREOF**

Its very name - language adopted by the Agreement's architect, FALKEN's disbarred New Jersey counsel and corporate secretary Mr. Emile Gouiran - conjures substantially more than a unitary assignment of income.

Furthermore, in its drafting, FALKEN and its principals had *actual knowledge* of each and every one of terms of the Core Settlement Agreement, which are specifically incorporated by reference and annexed to the Omnibus Assignment in its entirety.

The Omnibus Assignment contains *seventeen* (17) specific assignments to FALKEN relating to the various **"rights, title and interest"** held by NVID under the Core Settlement Agreement and **"all claims, demands and causes of action"** that NVID may have, including all of NVID's claims against **"INNOVATIVE MEDICAL SERVICES (NASDAQ SYMBOL 'PURE'), its officers, directors, employees, licensees and assigns from any and all sources and circumstances"**, including any that NVID may have "**in relation to a certain contract settlement agreement entitled 'CORE SETTLEMENT AGREEMENT' dated as of 15th day of November 2001. . ."** ¶¶ *i), ii), pp. 1, 2, Omnibus Agmt.* [9]

Then, at its tail-end, and just to ensure that nothing has been inadvertently left in the cupboard, the Assignment's writer has inserted a "dragnet" or "Mother Hubbard" clause, reserving for FALKEN

---

[8]     In his 26 November 2003 correspondence to AAA's case coordinator, the arbitrator pointed out that "it is beyond cavil that the item (Omnibus Assignment) is broader than an assignment of rights to future royalties."

[9]     And yet, FALKEN's counsel has the temerity and unmitigated gall to flatly state that "Falken is not seeking to enforce the Core Settlement Agreement against Pure Bioscience." *p. 2, ¶ 2, FALKEN's Memo.*

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **8**

> "(a)ll of the foregoing, for assignee's own use and for the use of his legal representatives, as fully and entirely as the same would have been held and enjoyed by the undersigned (NVID) had this assignment and sale not been made"

and in order to guarantee and ensure FALKEN's absolute dominance and control in all things relating to the Core Settlement Agreement, the Omnibus Assignment appoints FALKEN as NVID's

> "true and lawful attorney, with full power of substitution and revocation, for its sole use and benefit, and at its own cost and expense, to ask, demand, sue for, collect, receive in the assignor's name or otherwise, the moneys, claims, demands and causes of action, pursue every other additional, alternative or novel remedy, sell, assign, transfer, pledge, compromise or discharge the whole or any part of them. And generally, to do all acts necessary and or convenient to accomplish any of the foregoing terms, intents and or purpose."

What's left? What benefit did NVID retain? Other than the NVID's affirmative duties and liabilities, one is hard-pressed to list a single item of value that remained with NVID after the Omnibus Assignment.

### B.   FALKEN IS NOT AN UNSUSPECTING UNWITTING THIRD PARTY STRANGER TO EITHER PURE-BIO, NVID OR TO THE CORE SETTLEMENT AGREEMENT.

Courts have unanimously held that the determination whether or not an assignee is to be bound under the terms of the original transaction depends on the intent of the parties and the assignee's assumption of liability may be implied from the acceptance of the rights and privileges under the original agreement. *Witkin, Summ. Cal. Law (9th ed) Vol. 1, § 953, p. 850.* "A party may be bound by an agreement to arbitrate even in the absence of a signature. . . [O]rdinary principles of contract and agency determine which parties are bound by an agreement to arbitrate." *McAllister Bros. v. A & S Transp. Co. (2nd Cir.1980) 621 F.2d 519, 524; Wagner v. Stratton Oakmont, Inc. (9th Cir.1996) 83 F3d 1046,1048.*

In the present context, in addition to the all-encompassing language contained in the Omnibus Assignment, the surrounding fact pattern, existent at the time of the Assignment's

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 9

execution, will greatly assist the arbitrator in reaching his ultimate jurisdictional determination in this matter:

(1)     These parties and their principals are not strangers to each other. The prior relationship and extensive history between NICKEL, Messrs. Steven Gordon, Emile Gouiran, Roy Janis, Keith Duffy and Ms. Helle Madso, NICKEL and FALKEN principals, and PURE-BIO's President and Chief Executive Officer Michael Krall and its Chief Operating Officer Gene Auerbach and the parties' involvement and extensive knowledge of the Axenohl® patent, Axen® and related technology.

(2)     Under the UA, NICKEL, FALKEN's predecessor, incorporated PURE-BIO's Axen® and its related technology into its Clean Plus® line of products, including Bac'Out® and won the Prize for Innovation at Europropre 2003. *Exh. A, Press Release d. 17 Mar. 2003.*

(3)     The Core Settlement Agreement was annexed and attached to the Omnibus Assignment and FALKEN and its principals had *actual knowledge* of each and every term thereof and repeatedly expressed their intention to enforce their rights under the Agreement against PURE-BIO.

(4)     Mr. Steven Gordon – one of the Agreement's signatories – is presently President and Chief Executive Officer of both NVID and FALKEN. (Mr. Gordon is also represented individually in this matter by Mr. Rovell, FALKEN and NVID's counsel.)

(5)     NVID principals Steven Gordon, Roy Janis and Keith Duffy were, and remain, intimately involved in the NVID-FALKEN transaction and FALKEN's ongoing operations.

(6)     Falsely and fraudulently, since late August through to the present, FALKEN and its principals have publicly and steadfastly maintained that FALKEN "owns the patent for Axenohl®." (*Exh. d, 11 Oct. 2003 Posting*) and that "IMS is in serious default and consequently the patent reverts to NVID which in turn has assigned to FALKEN. . ." *Exh. D, p. 2, 27 Sep. 2003 Posting.*

(7)     FALKEN's ownership of the Axenohl® patents and all of NVID's rights under the

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 10

Core Settlement Agreement was a part of its concerted plan by FALKEN AND NVID's principals to "end run" PURE-BIO's patent rights and drive PURE-BIO into bankruptcy.

(8)     Any and all rights FALKEN has, or may have, in regard to the Axenohl® patent (which it has publicly claimed it owns) and any revenue stream derived therefrom, are strictly governed by the terms of the *Core Settlement Agreement and as pointed out in various press releases by* FALKEN, "[T]he Core Settlement Agreement will be enforced" and *Exh. D, p. 2, 27 Sep. 2003 Raging Bull Posting.*

(9)     Under current applicable law and under the terms of the Core Settlement Agreement, FALKEN could compel enforcement of its rights to the Axenohl® patent, Axen® and the related technology through arbitration with PURE-BIO.

(10)     Shareholders of NVID are shareholders of FALKEN and FALKEN flatly states, incorrectly, that "FALKEN shareholders have nearly 700,000 (IMS shares) reasons to support" their further business plans. *Exh. D, 11 Oct. 2003 Raging Bull Posting.*

(11)     FALKEN has steadfastly maintained that it plans to commence production and manufacture of Axenohl® at its "plant in ROUEN . . . (which is) expected to be completed by the end of the year" and in production early next year (Jan/Mar). *Exh.D, 11 Oct. 2003 Raging Bull Posting.*

For clarification purposes, given the rather complex nature of the parties' interrelationships and intermingling of NVID, FALKEN and NICKEL's assets, principals, two (2) charts have been prepared, illustrating these issues in diagrammatic format. *See, Exh. E, Asset Transfer Chart & Interrelated Principals & Officers Chart.*

III.   **LEGAL ARGUMENT.**

Courts have recognized a number of theories arising out of common law principles of contract and agency law under which non-signatories may be bound to the arbitration agreements of others. Five (5) theories "for binding non-signatories to arbitration agreements: (1) incorporation by reference; (2) *assumption*; (3) *agency*; (4) *veil-piercing/alter ego*; and (5)

IN THE MATTER OF
PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **11**

*estoppel*", of which at least the four (4) italicized have application in the present context. *Thomson-CSF, S.A. v. Am. Arbitration Ass'n. (2d Cir. 1995) 64 F.3d 773, 776.*

"The general rule is that the mere assignment of rights under an executory contract does not cast upon the assignee the obligations imposed by the contract upon the assignor.... The rule is otherwise, however, where the assignee assumes such obligations.... '[W]hether there has been an assumption of the obligations is to be determined by the intent of the parties as indicated by their acts, the subject matter of the contract or their words.' ... Assumption of obligations may be implied from acceptance of benefits under the contract. *(Civ. Code § 1589....)*" *Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc. (1997) 53 Cal.App.4th 350, 362,* citing *Enterprise Leasing Corp. v. Shugart Corp. (1991) 231 Cal.App.3d 737, 745.*

While Civil Code § 1589 "has generally been held to apply only where the person accepting the benefit was a party to the original transaction", under a well established exception to the general rule, section 1589 "requires the assignee of an executory contract to accept the burdens when all the benefits of a full performance have inured to him." *Fruitvale Canning Co. v. Cotton (1953) 115 Cal.App.2d 622, 626.*

### A. THE LANGUAGE OF THE OMNIBUS ASSIGNMENT ITSELF STRONGLY SUPPORTS THE INTERPRETATION THAT A FULL ASSIGNMENT WAS INTENDED BY THE PARTIES.

#### 1. After Its Execution Of The Core Settlement Agreement, Other Than The Right To Royalty Payments And A Potential Reversionary Right To The Axenohl® Patent in the Event Of PURE-BIO's Non-Payment, NVID Retained Nothing.

After NVID executed the Core Settlement Agreement - other than its ongoing and surviving duties and obligations of full and complete indemnification re Axenohl® patent ownership and its full and complete cooperation with INNOVATIVE in "enforcing and defending" the Axenohl® patent and its related intellectual property - NVID retained only its right to the payment of royalties based upon PURE-BIO's net sales of products utilizing Axenohl® and/or Axen® and a reversionary right to Axenohl® patent in the event that PURE-BIO either failed to

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
IN THE MATTER OF          PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 12

make the royalty payments or it chose to return the patent in lieu of such royalty payments. Both

of these events remain strictly governed by the terms of the Core Settlement Agreement and

without this language, neither NVID or FALKEN could enforce any of these provisions.

### 2. Through The Omnibus Assignment, FALKEN Has Received All Of The Benefits Of The Core Settlement Agreement.

A complete and thorough reading of the Omnibus Assignment leaves little doubt that

FALKEN obtained any and all of the "**rights, title and interest to moneys due and to become**

**due, and all claims, demands and causes of action**" held by NVID under the terms of the Core

Settlement Agreement:

"i)      . . . from any and all sources and circumstances";

"ii)     . . . in relation to a certain contract settlement agreement entitled 'CORE SETTLEMENT AGREEMENT' dated as of 15th day of November 2001. . .";

"iii)    . . . any statement of account and/upon the sale of goods, wares and merchandise relating to, incorporating or in any manner concerning the Axenohl patent and any modification, addendum, improvement, paper(s), document(s) relating thereto";

"iv)    . . . in relation to any activity concerning, in any manner the (Axenohl) technology";

"v)     . . . in any copyright, and in any renewal s and extensions of said copyright. . .";

"vi)    . . . in any manuscript, notes, journals, scientific and technical books and reflections, studies and records relating to, directly or indirectly, to the Axenohl patent";

"vii)   . . .any expectancy (present or future) relating to the Axenohl patent";

"viii)  . . .in any judgment obtained by the undersigned against any party in any jurisdiction, directly or indirectly, to the Axenohl patent";

"ix)    . . .any lien, together with debt, claim or demand for which such lien was obtained. .";

"x)     . . .any debt due to the undersigned from any party for moneys loaned. . ."

"xi)    . . .in and to any option agreement, relating to directly or indirectly, to the Axenohl patent";

"xii)   . . . in and to any invention. . . relating to directly or indirectly, to the Axenohl patent";

"xiii)  . . . in and to the letters patent relating to the Axenohl patent";

IN THE MATTER OF      PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 13

"xiv)   . . . the undersigned now has, or may have, in and to and under the Axenohl patent and their inventions and in, to and under any reissue or reissues, extension or extensions, and all interests in or under them. . . together with all claims for damages and profits by reason of past infringements of the letters patent by any person, form or association or corporation, with the right to sue and collect the same;

"xv)    . . . . in and to and under any license, exclusive or not to manufacture and sell the Axenohl patent. . ."

"xvi)   . . . . in and to and under the trademark Axenohl®, together with the good will of the business symbolized by the mark and the registration of it;"

"xvii)  . . . any and all claims, contract, account, rights, expectancy, monies due or to become due, option(s), invention, patent(s), claims for past infringement, licenses, trademarks relating to Axenohl® and Axen® and all derivatives thereof.

When one compares the two documents, inventories NVID's proprietary holdings relative to the Axenohl® patent post-Core Settlement Agreement, and carefully reads the terms embodied in the Omnibus Assignment, one can only conclude that whatever rights NVID had post-Core Settlement Agreement, NVID effectively sold, transferred, assigned, gave, granted, bargained and "set over forever to Falken Industries, Ltd., a New Jersey Corporation (the 'Assignee)'. *p. 2, Omnibus Agmt.*

**B.    THE OVERALL SCOPE OF FALKEN AND ITS PRINCIPALS' CONDUCT AND THEIR SINGLE-MINDED PURPOSE IN ACQUIRING THE AXENOHL® PATENT, WHEN COUPLED WITH THE LANGUAGE OF THE OMNIBUS ASSIGNMENT, PROVIDES INSURMOUNTABLE EVIDENCE THAT FALKEN VOLUNTARILY AND WILLINGLY SUBJECTED ITSELF TO THE TERMS OF THE CORE SETTLEMENT AGREEMENT.**

FALKEN and its principals' acquisition of the Axenohl® patent was carefully and diligently orchestrated with the predetermined intent to place itself completely in charge of all aspects of the Axenohl® patent through assignment of all operative rights enjoyed by NVID under the Core Settlement Agreement and to ultimately position itself for the eventual reversion and "take-over" of the Axenohl® patent. This intent is indisputable and moreover, was publicly trumpeted by FALKEN principals in hundreds of postings on both Yahoo!Finance and Lycos Raging Bull message boards. *See, Exh D.* It was FALKEN and its principals' specific intent to acquire all the benefits under the Core Settlement Agreement and FALKEN's public crowing supports the

IN THE MATTER OF         PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **14**

conclusion that it has successfully done so. Having accomplished its goals, as a matter of law,

FALKEN must accept the burdens with the benefits it so ardently sought after. *Fruitvale Canning*

*Co. v. Cotton (1953) 115 Cal.App.2d 622, 626.*

C.   **THE RIGHTS THAT WERE TRANSFERRED AND ASSIGNED TO FALKEN UNDER THE TERMS OF THE OMNIBUS AGREEMENT, NAMELY THE "CLAIMS, CONTRACT, ACCOUNT, RIGHTS, EXPECTANCY , MONIES DUE OR TO BECOME DUE, OPTION(S), INVENTION, PATENT(S), CLAIMS FOR PAST INFRINGEMENT, LICENSES, TRADEMARKS RELATING TO AXENOHL® AND AXEN® AND ALL DERIVATIVES THEREOF" ARE "INTIMATELY FOUNDED IN AND INTERTWINED WITH" THE CORE SETTLEMENT AGREEMENT, AND FALKEN'S RIGHTS TO THE AXENOHL® PATENT FLOW DIRECTLY FROM THAT AGREEMENT.**

1.   **Typically, The Courts Have Utilized An Estoppel Theory Where the Involved Claims Are *Integrally Related* To The Contract Containing The Arbitration Clause.**

Existing law allows a signatory to compel arbitration against a non-signatory to an

agreement that contains an arbitration clause in two different circumstances. First, equitable

estoppel applies when the signatory to a written contract containing an arbitration clause must rely

on the terms of the written agreement in asserting its claims against the nonsignatory. When the

signatory's claims against the nonsignatory make reference to or presumes the existence of the

written agreement, the signatory's claims arise out of and relate directly to the written agreement

and arbitration is appropriate. Second, the application of equitable estoppel is warranted when the

signatory to the contract containing an arbitration clause raises allegations of substantially

interdependent and concerted misconduct by both the nonsignatory and one or more of the

signatories to the contract. Otherwise, the arbitration proceedings between the two signatories

would be rendered meaningless. *Grigson v. Creative Artists Agency (5th Cir.2000) 210 F.3d 524,*

*527.*

PURE-BIO's claims are integrally related to the terms of the Core Settlement Agreement

and all of the conduct and acts of FALKEN, NVID and their overlapping principals Messrs.

Gouiran, Gordon, Duffy, Janis and Ms. Madso complained of by PURE-BIO, while virtually

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 15

indistinguishable, are substantially interdependent and concerted by and between the signatory and non-signatory participants.

> **2.    In Its Acquisition Of The Axenohl® Patent Rights, FALKEN Has Totally Relied Upon The Terms Of The Core Settlement Agreement And Knowingly "Exploited" Its Terms.**

Under the estoppel theory, a company "knowingly exploiting [an] agreement [with an arbitration clause can be] estopped from avoiding arbitration despite having never signed the agreement." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n. (2d Cir. 1995) 64 F.3d 773, 778.* Guided by "[o]rdinary principles of contract and agency," courts have concluded that where a company "knowingly accepted the benefits" of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S. (2d Cir. 1993) 9 F.3d 1060, 1064.* The benefits must be direct-which is to say, flowing directly from the agreement. *Thomson, supra, 64 F.3d at 779. Deloitte*, for example, concerned an agreement containing an arbitration clause which governed the terms of use of a trade name. A non-signatory who had received a copy of the agreement, raised no objections to it and made use of that trade name pursuant to the agreement was estopped from arguing it was not bound by the arbitration clause in the agreement. *Deloitte, 9 F.3d @ 1064.*

The situation herein is much the same as that faced by the court in *Deloitte*. Here, FALKEN has acquired a patent that is governed by an agreement containing an arbitration clause. FALKEN has made use of the patent, publicly declaring to one and all that it holds all rights to royalty payments due, all reversionary rights and it mistakenly claims that due to PURE-BIO's defaults under the agreement, FALKEN is now the owner of that patent. In the past FALKEN·has raised no objections to the agreement's terms and has, in fact, aggressively asserted the benefits accruing to them under the Agreement, namely that:

(a)    "FALKEN owns the Axenohl® Patent and all Axen derivatives. . .";

IN THE MATTER OF     PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 16

(b)    "FALKEN has the unqualified absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)";

(c)    "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world . . ."; and

(d)    "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) facility as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories".

*See, Exh. D*

"Equitable estoppel precludes a party from asserting rights "he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity." *Metalclad Corp. v. Ventana Environmental Organizational Partnership (2003) 109 Cal. App. 4th 1705, 1713, citing International Paper v. Schwabedissen Maschinen & Analagen (4th Cir. 2000) 206 F.3d 411, 417-418.* In the arbitration context, a party who has *not* signed a contract containing an arbitration clause may nonetheless be compelled to arbitrate when he seeks enforcement of other provisions of the same contract that benefit him. *Schwabedissen, supra @ 418; NORCAL Mutual Ins. Co. v. Newton (2000) 84 Cal.App.4th 64, 81.*

In the present case, given the surrounding fact pattern, the history and relationships between NICKEL, FALKEN'S predecessor, FALKEN, FALKEN's principals Messrs. Gouiran, Gordon, Duffy, Janis and Ms. Madso with PURE-BIO and the Axenohl® patent and its related technology, one must conclude that FALKEN's ownership of NVID's rights to the Axenohl® patent are so "*intimately founded in and intertwined with*" the Core Settlement Agreement that FALKEN should be precluded and estopped from arguing against the imposition of this tribunal's jurisdiction and should nonetheless be compelled to arbitrate since it has clearly and indisputably maintained its rights to the Axenohl® patent and its related technology to FALKEN's benefit under the provisions of the same contract that also contains an arbitration clause that FALKEN seeks to avoid.

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 17

D.   **FALKEN COULD READILY COMPEL THE ARBITRATION OF ANY CLAIMS IT HAD AGAINST PURE-BIO ENFORCE THE TERMS OF THE CORE SETTLEMENT AGREEMENT.**

1.   **Arbitration Is One of The Benefits Created Under The Core Settlement Agreement By The Parties For Themselves And Their Successors.**

When viewed in its entirety, FALKEN's Memorandum adopts a tone that characterizes this arbitration as a horrific burden that FALKEN must avoid at all costs. While FALKEN seems determined to hang onto whatever rights to the Axenohl® patent and its related technology that it has obtained from NVID, it seems to ignore the benefit inuring to FALKEN and its shareholders of having an efficient and expeditious dispute resolution mechanism in place to safeguard FALKEN and its shareholders from lengthy, time-consuming and costly litigation in various nationwide venues. Given the past litigious history of the Axenohl® patent and the combative nature of the persons involved, the orderly administration of the Axenohl® patent emplaced by the Core Settlement Agreement should be viewed as a benefit to FALKEN and its shareholders.

To this end, given FALKEN's publicly trumpeted claims of patent ownership and allegations of PURE-BIO's defaults under the Core Settlement Agreement, FALKEN should welcome this opportunity to rectify these matters before a knowledgeable arbitrator previously appointed by many of these same parties.

Moreover, had PURE-BIO not initiated this arbitration matter, FALKEN would have been entitled to compel PURE-BIO to submit to arbitration relative to the Axenohl® patent, because when requested by non-signatories, courts have applied these same equitable estoppel principles to force signatories to arbitrate when the issues were intertwined with the underlying contract obligations. Courts have not permitted signatories to avoid arbitration after they "looked to the relationships of persons, wrongs and issues, in particular whether the claims that the non-signatory sought to arbitrate" and determined that they were "***intimately founded in and intertwined with the underlying contract obligations.***" *Choctaw General Ltd. Partnership v. American Home Assur. Co. (2d Cir. 2001) 271 F.3d 403, 406 .*

IN THE MATTER OF          PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **18**

E.   **FALKEN HAS ACTED, AND CONTINUES TO ACT, AS THE "ALTER EGO" OF NVID, EITHER BY *DE FACTO* MERGER, OR THROUGH A "PARENT-SUBSIDIARY" RELATIONSHIP.**

In its present state, NVID is a "void" corporation, without assets, having substantial liabilities, but having transferred all of its remaining assets to FALKEN pursuant to the Omnibus Assignment. Under the Omnibus Assignment, it has assigned all of its powers to FALKEN and appointed FALKEN as its **"true and lawful attorney"**, retaining no powers unto itself. Its abject state is further documented in the Covenant To Stand Seized, in which, it acknowledges (a) its duties to FALKEN "as fiduciary"; (b) agrees to fully indemnify FALKEN; (c)  warrants that it will accede to any demand or request of FALKEN and "convey all of such rights and/or proceeds and benefits" to whomever FALKEN directs.

1.   **As Purchaser Of All Of NVID's Assets, By Operation Of Law, FALKEN Has Assumed All Of NVID's Liabilities 's Under The Theory Of "De Facto" Merger.**

Generally, a purchaser of assets does not assume the seller's liabilities. However, a sale that leaves the selling corporation unable to satisfy its creditors has the same practical result as a merger and may be treated as a "de facto merger" i.e. the purchaser will be liable for all the seller's debts by operation of law, the same as in a merger. *Cal. Prac. Guide, C.H. Friedman, Corporations (TRG 2002) p. 8-48.8, § 8:275.1.*

2.   **FALKEN's Control And Dominion Over NVID Suggests That FALKEN Is The "Alter Ego" Of NVID And As Such, NVID's Corporate Status Should Be Pierced And FALKEN And Its Principals, Should Be Ordered To Submit To This Arbitration.**

Courts will pierce the corporate veil "in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary." *Carte Blanche (Singapore) Pte., Ltd. v. Diners' Club Int'l., Inc. (2nd Cir.1993) 2 F.3d 24, 26; Thomson-CSF, S.A., supra, @ 777.* Veil piercing determinations are fact specific and "differ with the circumstances of each case. *American Protein Corp. v. AB Volvo (2d Cir.____) 844 F.2d 56, 60.*

IN THE MATTER OF    PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  19

While, at present, to PURE-BIOS' knowledge, NVID and FALKEN are not technically the parent-subsidiary of each other, the control and dominion seemingly exercised by FALKEN over NVID suggests that either a parent-subsidiary relationship exists or a *de facto* merger has occurred. Both circumstances warrant compelling FALKEN to participate in the current arbitration process and PURE-BIO is confident that discovery would ferret out additional facts supporting PURE-BIO's contentions in this regard.

Accordingly, PURE-BIO reserves the right to conduct discovery of these issues in the event that the arbitrator does not find in its favor in the motion before this tribunal.

F.   IN LIGHT OF THE TERMS OF BOTH THE OMNIBUS ASSIGNMENT AND THE COVENANT TO STAND SEIZED, IT IS INDISPUTABLE THAT PURE-BIO WILL BE SEVERELY PREJUDICED WITHOUT THE INCLUSION OF FALKEN IN THIS ARBITRATION MATTER.

Under both the Omnibus Assignment and, most recently, under the terms of the Covenant To Stand Seized, NVID is FALKEN's vassal, slavishly bound to do its bidding. To permit FALKEN to avoid its duties and responsibilities under the Core Settlement Agreement - duties and responsibilities that it aggressively sought and freely contracted for, when it believed that they would be useful in enforcing its Axenohl® patent rights against PURE-BIO – would render the arbitration clause meaningless, effectively thwart PURE-BIO and NVID's stated intent when they framed the Agreement and make a mockery of the strong public policy favoring arbitration.

Furthermore, disincluding FALKEN in this process based upon FALKEN's counsel's suggestion that "any relief to which IMS believes that it is entitled can be obtained through NVID" is ludicrous. As FALKEN's fiduciary, NVID is a mere puppet to the unfettered whims of FALKEN and would be able to thwart this tribunal's orders and authority, arguing that, as FALKEN's fiduciary, it was honor-bound to adhere to FALKEN's wishes. To permit such a scenario to develop would fatally compromise this tribunal and create a situation where its orders and authority could be effectively ignored and the entire process would be rendered meaningless.

IN THE MATTER OF

PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 20

The reality is quite simple. FALKEN is an indispensable and necessary party to this arbitration proceeding.

## IV.    CONCLUSION.

A maxim of jurisprudence is relevant and applicable here, namely "He who takes the benefit must bear the burden." *Civ. Code § 3521.* FALKEN has greedily drained the Core Settlement Agreement of its benefits; it must shoulder its burdens as well.

For the reasons set forth herein, PURE-BIO respectfully requests that this Arbitrator make a finding that FALKEN is subject to the jurisdiction of American Arbitration Association pursuant to the terms of the Core Settlement Agreement and enter an Order compelling FALKEN to participate in this arbitration.

Respectfully submitted,

WOLFGANG F. HAHN & ASSOCIATES

DATED:  22 December 2003                    By:_____
                                                                    WOLFGANG F. HAHN
                                                                    *Attorney for Claimant*
                                                                    PURE BIOSCIENCE

IN THE MATTER OF
PURE BIOSCIENCE'S MEMORANDUM IN OPPOSITION TO FALKEN'S OBJECTION TO JURISDICTION
PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  21

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF:

| | | |
|---|---|---|
| PURE BIOSCIENCE, f/n/a Innovative Medical Services, Claimant, | ) ) ) | |
| | ) | |
| and | ) | No. 50 T 133 00528 03 |
| | ) | |
| NVID INTERNATIONAL, INC., FALKEN INDUSTRIES, LTD., and STEVEN GORDON, Respondents. | ) ) ) ) | |

### FALKEN REPLY MEMORANDUM IN
### SUPPORT OF ITS OBJECTION TO JURISDICTION

Falken Industries, Ltd. submits this reply memorandum in support of its

limited appearance for purposes of contesting the jurisdiction of the American Arbitration

Association and/or the Arbitrator in this matter.

### Introduction

IMS's response suggests that since arbitration is a favored form of dispute

resolution, Falken should be compelled to arbitrate IMS's claims arising from the Core

Settlement Agreement that was entered 21 months before Falken even existed (see IMS

Mem. at 1, 4) and to which Falken was not a signatory. (See, e.g., IMS Mem. at 18, 20.)

As shown in Falken's opening brief, however, California courts are uniform in holding that

no party can be compelled to arbitrate absent their agreement, either express or implied,

to do so. Freeman v. State Farm Mutual Automobile Ins. Co., 14 Cal. 3d 473, 481, 121

Cal. Rptr. 477, 482 (Cal. 1975) ("There is indeed a strong policy in favor of enforcing

agreements to arbitrate, but there is no policy compelling persons to accept arbitration of

controversies which they have not agreed to arbitrate and which no statute has made

arbitrable"); <u>American Builder's Ass'n. v. Au-Yang</u>, 226 Cal. App. 3d 170, 276 Cal. Rptr. 262 (2d Dist. 1990) ("policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate"); <u>see also United States v. Panhandle Eastern Corp.</u>, 672 F. Supp. 149, 153 (D. Del. 1987) ("a court may not force a party to arbitrate when ordinary contract principles indicate that it has not agreed to do so"). As Falken was not assigned the Core Settlement Agreement and cannot be held to have impliedly assumed its obligations or be estopped from denying the applicability of the arbitration clause to it, Falken should be dismissed as a party.

<u>Argument</u>

I. **AS FALKEN HAS NOT RECEIVED FULL PERFORMANCE UNDER THE CORE SETTLEMENT AGREEMENT, IT CANNOT BE FOUND BY IMPLICATION TO HAVE ACCEPTED ITS BURDENS, INCLUDING THE ARBITRATION CLAUSE**

As the Core Settlement Agreement was indisputably never assigned to Falken, assignment cannot be a basis to impose on Falken an obligation to arbitrate. At most, certain rights derived by NVID from the Core Settlement Agreement were assigned to Falken. The law, however is clear that the assignment of rights derived from a contract is not the same as an assignment of that contract. (See Falken Mem. at 3-4; IMS Mem. at 12.) Thus, IMS's attempt to establish that more than just the right to NVID's royalties were assigned is not only unfounded, but irrelevant. (See IMS Mem. at 8-9, 13-14.)

First, the Omnibus Assignment states that the purpose of the agreement is to assign NVID's "entire right, title and interest . . . in, to and under the said Axenohl patent." (Omnibus Agreement at 2, Preamble.) The fact that the assignment includes 17 assignment paragraphs is not evidence that all of the rights and benefits set forth in the

-2-

Core Settlement Agreement were assigned to Falken. Indeed, paragraphs iii-xvii all state in slightly different words that NVID is assigning all rights and interests to claims and/or money to become due under the "Axenohl patent." They do not, as IMS contends, relate to "'rights, title and interest' held by NVID under the Core Settlement Agreement." (See IMS Mem. at 8.) To the contrary, the only paragraphs that relate to the Core Settlement Agreement or IMS are paragraphs i and ii, which assign the right to moneys due to NVID under the Core Settlement Agreement and claims that NVID may have as of the date of the assignment under the Core Settlement Agreement.[1] Although IMS asks "What's left?" (IMS Mem. at 8, see also IMS Mem. at 13-14), Article 4 of the Core Settlement Agreement provides for IMS obligations to NVID beyond the payment of royalties, including those relating to the transfer of IMS shares, audit rights, amendment of the arbitration claim, and a release.

More importantly, even if the Omnibus Assignment did purport to assign all of the benefits of the Core Settlement Agreement to Falken, as provided in cases interpreting section 1589 and as admitted by IMS (IMS Mem. at 12), the exception to the general rule that can require an assignee of rights under a contract to accept the burdens of the contract does not apply to an executory contract. Section 1589, as IMS admits, only applies when the benefits have been fully obtained by the party against whom arbitration is sought to be compelled. (See Falken Mem. at 3-4, 12.) In this case, Falken has not

_____

[1] IMS's harangue in its footnote 9 that Falken's "counsel has the temerity and unmitigated gall to flatly state that 'Falken is not seeking to enforce the Core Settlement Agreement against Pure Bioscience" when the Omnibus Assignment allegedly assigns a right to sue is unfounded and mystifying. The only claims that IMS has identified that have been made against it are claims by Nickel, not Falken, under the Umbrella Agreement, not the Core Settlement Agreement. (See IMS Mem. at 3-4.)

-3-

received a single penny from the royalties that are owed by IMS to NVID. So, not only has

Falken not received full performance, it has received no performance, a proposition with

which IMS has not taken issue in its response. Nonetheless, IMS contends that because

"it was Falken and its principals' specific intent to acquire all the benefits," it must accept

the burdens. (IMS Mem. at 15-16, emphasis added.) Intention and accomplishment,

however, are two different things and the case law certainly does not require Falken to

accept the burdens of the contract merely because it wanted the benefits.

## II.   AS FALKEN HAS NOT ATTEMPTED HERE TO ENFORCE ANY RIGHTS UNDER THE CORE SETTLEMENT AGREEMENT, IT IS NOT ESTOPPED BY EITHER THE INTERTWINING CLAIMS OR EXPLOITATION OF BENEFITS THEORIES OF ESTOPPEL FROM DENYING THE ARBITRATION AGREEMENT

Neither of the estoppel theories applicable to attempts to compel arbitration

("intertwining claims" and exploitation of benefits," see IMS Mem. at 15-17) are applicable

here. For, both theories require that the party sought to be estopped from denying

arbitration is attempting to enforce rights under the contract – is, in other words, the

plaintiff. The paucity of IMS's argument on the estoppel issue is exemplified by its

misplaced reliance on Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064

(2d Cir. 1993), at page 16 of its brief. In that case, the party sought to be compelled to

arbitration was sent the agreement before it was executed and had not objected to its

terms. Unlike here, the existence of that party was known and it was intended to be bound

by the agreement when it was executed. Moreover, that party had accepted the benefits

of the agreement and had itself sued to enforce them. Accordingly, the court held that it

was estopped from objecting to jurisdiction. Here, Falken has filed no suit, has taken no

action to enforce the Core Settlement Agreement, and has not received any benefits under

-4-

it. At most, IMS points to Internet postings of dubious parentage claiming that Falken has certain rights (see IMS Mem. at 5-6, 10-11, 16-17), which is a far cry from a party attempting to judicially enforce an agreement on one hand and denying its binding effect on the other.

This case is therefore completely unlike Deloitte Noraudit, on which IMS relies, but rather like Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 778-79 (2d Cir. 1995), on which IMS also relies at page 16, where the court of appeals held that the non-signatory was not bound to arbitrate under estoppel principles. The agreement at issue provided that one party would purchase certain equipment exclusively from the supplier party and the supplier in turn agreed that it would not sell the equipment to anyone else. 64 F.3d at 775. The purchasing party was ultimately sold to another party, which integrated the purchasing party into one of its subsidiaries. 64 F.3d at 775. The acquiring company had notice of the exclusivity agreement, which contained an arbitration clause, before it acquired the purchasing party, just as Falken is here alleged to have had notice of the Core Settlement Agreement with its arbitration provision before it was assigned any rights by NVID (see IMS Mem. at 8, 10), and the supplier even notified the parent before it acquired the subsidiary that it intended to bind the parent as it bound the subsidiary. 64 F.3d at 775.

The district court held that the parent was bound to the arbitration clause because it had notice of the agreement before it bought the purchasing party, the supplier expressed its intention to bind the parent to the agreement, the purchasing party was incorporated into the parent's corporate structure, and the parent benefitted from that incorporation. 64 F.3d at 778. The court of appeals, however, held that the parent had

-5-

never benefitted from the agreement because it had not purchased any equipment from the supplier or attempted to enforce the exclusivity provisions against the supplier and thus was not bound to the arbitration provision in the agreement. 64 F.3d at 779.

Similarly, in this case, Falken's knowledge of the Core Settlement Agreement with its arbitration provision, like the knowledge of the parent in Thomson-CSF of the arbitration agreement, is insufficient to require Falken to arbitrate. (See IMS Mem. at 8, 10.) The relevant inquiry is whether Falken has taken steps to enforce the Core Settlement Agreement. Because Falken, like the parent in Thomson-CSF, has not received the benefits of the agreement and sought to enforce them, it is not bound to its burdens, including the arbitration clause.

IMS implies that because Falken "could compel enforcement of its rights to the Axenohl patent . . . through arbitration with [IMS]," IMS ought to be able to compel arbitration against Falken. (IMS Mem. at 11, emphasis added; see also IMS Mem. at 18.) This contention, however, is false. For, Deloitte Noraudit and Thomson-CSF establish that a non-signatory is not estopped from denying an arbitration provision in an agreement unless it is actually attempting to enforce provisions of the agreement against a signatory. As set forth in Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347, 360-62 (5th Cir. 2003), equitable estoppel under either an "intertwined claims" or "direct benefits" theory is only applicable when a signatory plaintiff attempts to avoid arbitration with a nonsignatory defendant because "to do otherwise would permit the signatory plaintiff to 'have it both ways.'" In other words, the signatory plaintiff "cannot, on one hand, seek to hold the nonsignatory defendant liable pursuant to duties imposed by the agreement, which

-8-

contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory." 345 F.3d at 360-61.

Thus, estoppel applies "to prevent a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Contrary to IMS's contention, however, because "arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." 345 F.3d at 361 (emphasis omitted). IMS's allegations concerning the alleged connections between Falken and NVID are therefore irrelevant. (See IMS Mem. at 10, 17.)

Moreover, the same analysis applies when a nonsignatory has received direct benefits under an agreement containing an arbitration clause. This form of estoppel applies where "a nonsignatory knowingly exploits the agreement containing the arbitration clause." (Citations omitted.) Bridas, 345 F.3d at 362. Where a nonsignatory has not sued to enforce the agreement, Bridas holds that it has not "exploited" the agreement "to the degree that the cases that consider applying this version of estoppel require." 345 F.3d at 362. As Falken has not sued IMS under the Core Settlement Agreement, it cannot be estopped from denying the applicability of the arbitration provision to it.

Although IMS relies on Grigson v. Creative Artists Agency, 210 F.3d 5245, 527 (5th Cir. 2000), in support of its estoppel argument, the Fifth Circuit in Bridas noted that the district court there had misapplied its opinion in Grigson, just as IMS urges the arbitrator to do here, when the district court found that a nonsignatory defendant, like Falken, could be estopped from relying on its status as a nonsignatory to avoid arbitration.

-7-

Instead, the Fifth Circuit in Bridas stated that in Grigson, it had estopped a "signatory plaintiff from relying upon the defendants' status as a nonsignatory to prevent defendants from compelling arbitration under the agreement." Bridas, 345 F.3d at 360 (emphasis changed from original). Moreover, the court went on, Grigson "does not apply to the circumstances of [Bridas] where the [nonsignatory] Government, unlike the party estopped in Grigson, . . . never sued [the signatory] on the agreement." Bridas, 345 F.3d at 361. Grigson and Bridas therefore reject IMS's argument here that Falken, as a nonsignatory defendant, can be compelled to arbitrate.

## III. THERE IS NO CORPORATE VEIL BETWEEN NVID AND FALCON TO PIERCE AND IMS IGNORES THE COVENANT TO STAND SEIZED THAT RESCINDED THE OMNIBUS ASSIGNMENT

Although IMS cites no authority, it contends that a parent corporation may be compelled to arbitrate based on an arbitration agreement with the subsidiary where the corporate veil between the parent and subsidiary is pierced. (IMS Mem. at 19.) Recognizing that Falken is not NVID's parent, however, IMS broadens this unsupported proposition to include the equally unsupported proposition that a "de facto merger" has occurred and Falken is therefore liable under NVID's arbitration agreement. (See IMS Mem. at 19-20.) Quite apart from the fact that this argument is unfounded both in law and fact, it ignores the effect of the Covenant to Stand Seized, which rescinded the NVID/Falken transaction. As a consequence of that agreement, NVID still has whatever rights it had before its agreement with Falken and is therefore not a "void" corporation. (See IMS Mem. at 19.)

-8-

IMS's argument on this point is simply bizarre. In Counts I-III of its claim, IMS complains that by entering into the agreement with Falken, NVID denuded itself and hence made it judgment-proof for any violation of the Core Settlement Agreement. By rescinding the NVID/Falken agreement, however, NVID still has the very same assets that IMS complained it had dissipated. In essence, the Covenant to Stand Seized not only becomes a complete defense to IMS's claims, but gives IMS the protection for which it claims it bargained in entering the Core Settlement Agreement in the first place.

The fact that whatever right to income NVID ultimately has is held in a fiduciary capacity for Falken is of no moment. (See IMS Mem. at 7, 19.) Assuming *arguendo* that IMS is entitled to some damages from NVID for some alleged breach, those damages would be an offset against the royalties that IMS owes NVID. The fact that the net amount would then be held by NVID for the benefit of Falken in no way harms IMS. By seeking to hold Falken liable here, then, IMS is actually attempting to make Falken, which has greater assets than NVID, a guarantor of NVID's performance which would result in a windfall to IMS. Even assuming *arguendo* that Falken and NVID are in some manner acting in concert, IMS is not without remedy. (See IMS Mem. at 20.) First, as set forth above, IMS would be able to claim its damages against NVID and use the royalties that are owed as an offset. Second, nothing precludes IMS from filing suit against Falken in a jurisdiction in which Falken is amenable to process. The only thing that IMS cannot do is compel Falken to arbitrate pursuant to the Core Settlement Agreement to which Falken was never a party and to which it was never contemplated to be a party at the time the Core Settlement Agreement was entered.

-9-

**IV.  EVEN IF THERE WAS A BASIS ON WHICH TO COMPEL FALKEN TO ARBITRATE, RESOLUTION OF THAT ISSUE IS PREMATURE IN LIGHT OF NVID'S UPCOMING COUNTERCLAIM TO RESCIND THE CORE SETTLEMENT AGREEMENT**

Finally, IMS has not even addressed the suggestion that in any event, the resolution of jurisdiction over Falken in this arbitration may be premature if the arbitrator determines pursuant to NVID's anticipated counterclaim that the Core Settlement Agreement should be rescinded. For, it the Core Settlement Agreement is rescinded, there is no basis for any party to be compelled to arbitrate any matter arising from an agreement that no longer has any validity.

### Conclusion

For the reasons set forth above and in Falken's opening memorandum, Falken requests that this Arbitrator enter an order holding that Falken is not subject to arbitration here.

FALKEN INDUSTRIES, LTD.

By _____
One of its attorneys

Dated:  January 12, 2004

Michael J. Rovell
Lisa I. Fair
LAW OFFICES OF MICHAEL J. ROVELL CHTD
20 N. Clark Street, Suite 2450
Chicago, Illinois 60602
tel: (312) 578-9191
fax: (312) 578-9391

-10-

**Certificate of Service**

The undersigned attorney certifies that the foregoing memorandum was served on the following counsel of record by fax on January 12, 2003:

> Wolfgang F. Hahn
> Wolfgang F. Hahn & Associates
> 7160 Caminito Pepino
> La Jolla, CA 92037
> fax (858) 456-5080

> Lisa I. Fair

-11-

# AMERICAN ARBITRATION ASSOCIATION
# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF

| | |
|---|---|
| PURE BIOSCIENCE<br>(formerly known as<br>INNOVATIVE MEDICAL SERVICES), | Civil No. 50 T 133 00528 03 |

Claimant,

v.

NVID INTERNATIONAL, INC.,
FALKEN INDUSTRIES, LTD., STEVEN GORDON, Et Al.

Respondents.

ARBITRATOR:    JACK F. FITZMAURICE
Appointed Pursuant To Rule R-12(a), Commercial Arbitration Rules [A.A.A.]

# PURE BIOSCIENCE'S SURREPLY
# TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS
# OBJECTION TO JURISDICTION

## I.    INTRODUCTION.

Although the initial federal arbitration act was enacted by Congress in 1925[1], it was not until a series of Supreme Court decisions were handed down in the 1980's that judicial hostility to arbitration was displaced by an express judicial policy favoring arbitration. While courts initially applied traditional doctrines (whereby non-signatories could be required to arbitrate), equitable estoppel was introduced as a method in to achieve this same result in the 1960's with the *Tepper* case.[2] Since *Tepper*, the doctrine has been given broad application by the courts and its rapid growth has spider-webbed into many new directions, providing a constantly and continuously emerging landscape due to a liberal sea-change in judicial attitudes on the issue.[3]

---

[1]    On 12 February 1925, Congress enacted the United States Arbitration Act, later enacted and codified in 1947 as the Federal Arbitration Act. 9 U.S.C. §§ 1-14 (1995).

[2]    *Tepper Realty Co. v. Mosaic Tile Co. 259 F. Supp 688 (S.D.N.Y.) 1966)*

[3]    *J. Douglas Uloth & J. Hamilton Rial, Equitable Estoppel as a Basis fro Compelling Nonsignatories to Arbitrate – A Bridge Too Far? 21 L. Rev. Litig.593, 633 (2002).*

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :        PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. , FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 1

Because arbitration is a creature of contract law, when asked to enforce an arbitration agreement against a non-signatory to an arbitration clause, courts inquire "whether (a party) is bound by that agreement under traditional principles of contract and agency law." Equitable estoppel is a recognized principle of contract or agency law applicable in the arbitration context. *E.I. Dupont de Nemours v. Rhone Poulenc Fiber and Resin (3rd Cir.2001) 269 F.3d 187, 195.*

## II.    LEGAL ARGUMENT

### A.    FALKEN HAS "EXPLOITED" THE RIGHTS IT RECEIVED THROUGH THE OMNIBUS ASSIGNMENT AND HAS RECEIVED "DIRECT BENEFITS" FLOWING FROM THE CORE SETTLEMENT AGREEMENT – BENEFITS THAT IT ENJOYS TO THIS DAY - EVEN AFTER ENTERING INTO THE DISINGENUOUS COVENANT TO STAND SEIZED.

In its simplest form, "equitable estoppel precludes a party from asserting rights "he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity." *Metalclad Corp. v. Ventana Environmental Organizational Partnership (2003) 109 Cal. App. 4th 1705, 1713, citing International Paper v. Schwabedissen Maschinen & Analagen (4th Cir. 2000) 206 F.3d 411, 417-418.*

### 1.    A Party Is Estopped From Denying Its Obligation To Arbitrate When It "Knowingly Accepted The ('Direct') Benefits Of' From The Contract Containing The Arbitration Clause.

"Direct benefits" estoppel applies when a nonsignatory "knowingly exploits the agreement containing the arbitration clause. *E.I. Dupont de Nemours v. Rhone Poulenc Fiber and Resin (3rd Cir.2001) 269 F.3d 187, 199, citing Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S. (2d Cir. 1993) 9 F.3d 1060, 1064 (binding a nonsignatory local affiliate, who used a trade name pursuant to an agreement that contained an arbitration clause); and American Bureau Of Shipping v. Tencara [C.A.2(N.Y.)1999] 170 F.3d 349 (binding a nonsignatory to a contract under which it received direct benefits of lower insurance and the ability to sail under the French flag).*

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :     PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 2

FALKEN has steadfastly maintained that it has received no benefits from either the Omnibus Assignment or the Core Settlement Agreement and, in fact, that it "has not received a single penny from the royalties that are owed by IMS to NVID." *FALKEN Reply Memo., pp. 3-4.*

But in so doing , FALKEN stubbornly ignores and steadfastly refuses to acknowledge the significant benefits that it has taken and received, virtually all of which it has publicly reported. These benefits have directly benefited FALKEN and assisted it in creating and increasing the perceived value of its stock.

FALKEN has openly and aggressively touted, asserted and positively crowed about (i) its ownership of the Axenohl® Patent and all Axen® derivatives. . ."; (ii) its unqualified and absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States; (iii) its absolute right to manufacture  Axenohl®; (iv) its intention to commence manufacture of Axenohl®; at its ROUEN (FRANCE) facility as early as January 2004 and its "ramping up" for the commencement of the manufacturing process; (v) its right to outsource production and its intention to so; and (vi) its right to enforce the terms of the Core Settlement Agreement against PURE, its executives, officers and agents.

All of these "benefits" were derived by FALKEN from the Core Settlement Agreement, through the Omnibus Assignment. All of these business activities and operations conducted by FALKEN are directly premised upon the rights conferred to FALKEN pursuant to the express terms of the Core Settlement Agreement.

   **2. The Value of FALKEN's Derived Benefits Is Supported By Both The Amount Paid by FALKEN For Their Purchase As Well The Amount Sought By FALKEN In Selling Its Stock Post-Closing Of The Omnibus Assignment Transaction.**

Their significance and substantial value is beyond cavil. Otherwise how could FALKEN have justified to its shareholders the payment of "460,000 shares of Falken common stock and warrants to acquire (an additional) 460,000 shares of 4.5% coupon Preferred stock at $1.00 per

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :  PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 3

share and (an additional) 2,300,000 shares of Falken common at $1.50 per share" that it paid to NVID to acquire these rights?

To recap, FALKEN paid a total purchase price of $690,000 for these rights received pursuant to the Omnibus Assignment. *Exh. C. Not. Lodgmt. Exhbts.* Moreover, FALKEN's recognition of the valuable nature of the rights it received under the Omnibus Assignment is freely admitted by Ms. Madso's own gushing words in her illegal solicitation letter dated 13 October 2003 to NVID shareholders. For example, Ms. Donna Singer was asked by Ms. Madso to send FALKEN her "$43" for "5 shares of Falken Industries Ltd. (FALKEN) common stock as well as a warrant which give . . . the special right of purchasing 5 shares of FALKEN's 4.5% coupon preferred stock and 25 additional FALKEN common stock." *Exh. B. Not. Lodgmt. Exhbts.* In effect, FALKEN post-Omnibus Assignment stock valuation equates to $1.50 per common share of stock and $1.00 for the preferred stock. A significant per share stock valuation for a company that had been in existence for a mere eight (8) weeks! [4]

Furthermore, in FALKEN's post-Omnibus Assignment solicitation of NVID shareholders, such as Ms. Donna Singer, FALKEN sought to sell 460,000 shares of its preferred stock at a strike price of $1.00/share for a total of $460,000 and 2,300,000 shares of common stock at $1.50 per share for a total of $3,450,000. Based upon FALKEN's own financial assessment after its acquisition of the Axenohl® patent rights, FALKEN "as a high growth company whose management (was) noted for keeping shareholder value squarely at the forefront of its agenda", sought to raise $ 3,910,000 of new money, in return for providing shareholders with an opportunity to invest with a self-proclaimed "dynamic consumer and industrial goods manufacturer." Clearly, without the Omnibus Assignment, FALKEN would have been unable to launch such fund raising effort.

---

[4] FALKEN was formed on 6 August 2003. See, *Exh. B. Not. Lodgmt. Exhbts.*

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :        PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  4

B.   **COURTS HAVE PREVENTED NON-SIGNATORIES, SUCH AS FALKEN,  FROM EMBRACING A CONTRACT, AND THEN TURNING ITS BACK ON THE PORTIONS OF THE CONTRACT, SUCH AS THE ARBITRATION CLAUSE, THAT IT FINDS DISTASTEFUL.**

Through the concept of equitable estoppel, courts have prevented non-signatories from embracing a contract, and then turning its back on portions of the contract, such as an arbitration clause, that it finds distasteful. *American Bureau of Shipping v. Tencara Shipyard S.P.A. 170 F.3d 349, 353 (3d Cir. 1999) (non-signatory bound by contract under which it received the direct benefits of lower insurance and the ability to sail under the French flag); Thomson-CSF, S.A.; 64 F.3d at 779 (finding only indirect benefit insufficient to invoke equitable estoppel against a non-signatory).*

As the Fourth Circuit explained,

> **"In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. 'To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.' "**

*International Paper v. Schwabedissen Maschinen & Analagen (4th Cir. 2000) 206 F.3d 411, 417-418, citing Avila Group, Inc. v. Norma J. of California, 426 F. Supp. 537, 542 (S.D.N.Y. 1977).*

Stated in another manner, equitable estoppel is appropriate and should be applied "where a party seeks, in some way, to benefit from an agreement without being in turn bound by it." *Wilson v. Waverlee (M.D. Ala.1997) 954 F. Supp. 1530*

FALKEN's Reply Memorandum, opposing counsel, citing *Bridas*, claims that equitable estoppel under either an intertwined claims" or "direct benefits" theory are applicable only when a signatory plaintiff attempts to avoid arbitration with a nonsignatory defendant" and that to do otherwise violates the conceptual legal principle upon which equitable estoppel is based. *FALKEN Reply Memo., p. 6.*

This simply is not so. . .  In fact, the Court in *E.I. Dupont*, while admitting that the Third Circuit courts had never "applied an equitable estoppel theory to bind a non-signatory to an

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :        PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 5

arbitration clause", was quick to point out that it was unaware of any compelling legal reason why, "in an appropriate case, (they) would refrain from doing so." *E.I. Dupont de Nemours v. Rhone Poulenc Fiber and Resin (3rd Cir.2001) 269 F.3d 187, 199.*

> **C.   ALL RIGHTS TO THE AXENOHL® PATENT AND ITS RELATED TECHNOLOGY THAT FALKEN OBTAINED THROUGH THE OMNIBUS ASSIGNMENT WERE PREMISED ON THE TERMS EMBODIED IN THE CORE SETTLEMENT AND ACCORDINGLY, FALKEN IS BOUND BY AGREEMENT'S REMEDIAL PROVISIONS BARGAINED FOR BETWEEN THE AGREEMENT'S ORIGINAL PARTIES.**

> **1.   Courts Have Unanimously Held That Arbitration Is A Contractual Remedy, Not An Obligation.**

While the Core Settlement Agreement meted out various obligations to its signatories, it also provided the parties and their successors and assigns with certain remedial[5] rights, including arbitration, affording them the right and power to enforce the terms of the Agreement. Under the Omnibus Assignment, FALKEN received the Axenohl® patent rights, together with these related remedial rights.

FALKEN's Omnibus Assignment can not alter the Core Settlement Agreement's bargained-for remedial measures for then assignment would change the very nature of the rights assigned. If a party "could escape the effect of such a clause by assigning a claim subject to arbitration, between the original parties  to a third party", arbitration provisions would be of no value. *GMAC Commercial Credit, LLC v. Springs Industries, Inc. (S.D.N.Y.2001) 171 F. Supp. 2d 209; Caribbean Steamship  Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S. (2d Cir.1979) 598 F.2d 1264, 1266-67; Banque De Paris et des Pays-Bas v. Amoco Oil Co. (S.D.N.Y.1983) 573 f. Supp. 1464, 1469-70.*

FALKEN can not be permitted to re-write the terms of the Core Settlement Agreement to suit itself.

.  .  .

.  .  .

---

[5]      As defined in Black's Law Dictionary, a "remedy" is "the means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." Black's Law Dictionary (7th ed.) .

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :       PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE  6

**D.    AS OPENLY ADMITTED BY MR. GOUIRAN IN HIS E-MAIL TO PURE EXECUTIVES, FALKEN IS A KEY INDISPENSABLE PARTY WITHOUT WHOM TRUE AND COMPLETE RESOLUTION OF THIS MATTER IS NOT POSSIBLE.**

In his 28 December 2003 e-mail transmission to PURE executives, Emile Gouiran, FALKEN's corporate secretary explores the possibility of "developing a medium for settlement discussions" and openly boasts that "(t)here can be no settlement as you well know, without our accord and so it is essential that discussions be held here". *p. 1, ¶¶ 2, 5, Gouiran E-mail, attached to Decl., G. Auerbach.* He goes on to state that FALKEN "has no difficulty with your attorney opening discussions in light of a settlement with attorney Rovell. . ." *p. 1, ¶ 5, Gouiran E-mail, attached to Decl., G. Auerbach.*

Mr. Gouiran, obviously in a chatty mood, comments about the pending arbitration:

> The litigation outstanding is itself mayhem for your company as you know, and I must compliment you on your excellent dilatory tactics and pointed argumentation which has seemingly sufficed to avoid any obligation on your part to disclose the inevitable : the consequence of the slightest loss in any of the multiple frames of the various litigation, is the possible loss of the Axenohl patent, or the loss of all powers to exploit it, save through the medium of Clean Plus. Moreover the cost of litigation can be formidable, and the very risk of loss of the patent (assume NVID - who is present in their case as trustee for the interest of FALKEN as I interpret the recently produced Covenant to Stand Seized - wins on either of its counter-claims for rescission (sp.) or for reformation. Either will down your company instantly, because either results in the loss of the patent. Arguably if reformation prevails rather than rescission (sp.) you would have the right to continue exploiting the Axen technology, but then you must overcome the matter of the Super Distribution claims which will be litigated in France, wherein you signed unconditionally a covenant not to compete with Clean Plus products.

*p. 2, ¶ 2, Gouiran E-mail, attached to Decl., G. Auerbach.*

Mr. Gouiran's e-mail strongly supports PURE's contention that, without FALKEN's involvement no realistic resolution of this matter is possible.

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :        PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 7

E.    **FALKEN AND NVID HAVE BETRAYED THEIR TRUE STATE OF MIND
AS TO THE EXACT NATURE OF THE OMNIBUS ASSIGNMENT BY
THEIR ALMOST FREUDIAN REJECTION OF ITS TERMS BY ITS
BELATED "RESCISSION".**

While FALKEN and its counsel have strenuously argued that the Omnibus Assignment

was not a "complete assignment" and continue to insist that the Core Settlement Agreement was

never assigned to FALKEN, they have betrayed their true beliefs as to its real nature by their

impulsive rescission ostensibly effected by the Covenant to Stand Seized. If the facts are as

FALKEN and its counsel have maintained, in almost mantra-like fashion, why did they feel the

need to rescind it? And, in so doing, why the need to carefully reiterate therein, over and over, in

Freudian fashion, that no assignment "of any obligation or liability relating" was intended? And yet,

their schizophrenia is clearly manifested by their retention of effective control of all of the "rights,

title and interests" under the ostensibly rescinded Omnibus Assignment by placing them with

NVID acting as FALKEN's fiduciary, subject to direction and whim of FALKEN.

Only two (2) logical conclusions seem plausible:

    (a)    The Omnibus Assignment was a "complete" assignment; and

    (b)    As such, FALKEN adopted the "obligations and liabilities" founded upon
           the terms of the Core Settlement Agreement.

F.    **EVEN IF FALKEN WAS ASSIGNED ONLY A "RIGHT TO POTENTIAL
FUTURE ROYALTIES, AS IT MAINTAINS, AS A FINANCE ASSIGNEE,
FALKEN   WOULD BE BOUND BY THE ARBITRATION CLAUSE THROUGH
APPLICATION OF UNIFORM COMMERCIAL CODE § 9-318.**

California Commercial Code § 9404 provides, in part, that:

    (a)    Unless an account debtor has made an enforceable agreement not
           to assert defenses or claims, and subject to subdivisions (b) to (e),
           inclusive, the rights of an assignee are subject to both of the following:

           (1)    All terms of the agreement between the account debtor and
                  assignor and any defense or claim in recoupment arising from the
                  transaction that gave rise to the contract.

Utilizing the Uniform Commercial Code, in substantially similar form as the above-cited

Commercial Code section, in the area of nonsignatory finance assignees, court have traditionally

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :        PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE **8**

bound nonsignatory assignees to arbitration, holding that arbitration - a contractual remedy, and not an obligation - cannot be abrogated through a finance assignment. *GMAC Commercial Credit, LLC v. Springs Industries, Inc. (S.D.N.Y.2001) 171 F. Supp. 2d 209.* In so doing, the courts have reasoned that this principle is "essentially an application of the 'elementary ancient law that an assignee never stands in any better position than his assignor. An assignee is subject to all the equities and burdens which attach to the property assigned because he receives no more . . . than his assignor.' " *GMAC Commercial Credit, supra, @ 214, citing Septembertide Publishing, B.V. v. Stein and Day, Inc. (2nd Cir.1989) 884 F.2d 675, 689 .*

Accordingly, FALKEN finds itself in a similar position regardless if the Omnibus Assignment is a "complete assignment" or only an assignment for monies to be paid, FALKEN is subject to all of the terms of the Core Settlement Agreement.

G.   **THE COVENANT TO STAND SEIZED CAN NOT BE USED AS A SHIELD TO UNDO THAT WHICH WAS PREVIOUSLY DONE BY NVID AND FALKEN, ACTING IN CONCERT.**

Without citing any authority, FALKEN argues that since it has rescinded the Omnibus Assignment, the issue of its involvement is mooted. Utilizing this FALKEN-like concept, a defendant in a litigation matter could effectively thwart venue by moving to another jurisdiction. More importantly , rescission of a agreement so a material requires the assent and approval of a majority of both FALKEN and NVID's shareholders and its Board of Directors. No such action has been undertaken.

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :      PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 9

## III.   CONCLUSION.

For the reasons set forth above and in its previous Memorandum, PURE-BIO respectfully

requests that this Arbitrator make a finding that FALKEN is subject to the jurisdiction of American

Arbitration Association pursuant to the terms of the Core Settlement Agreement and enter an

Order compelling FALKEN to participate in this arbitration.

Respectfully submitted,

WOLFGANG F. HAHN & ASSOCIATES

DATED:  16 January 2004

By:_____
WOLFGANG F. HAHN
Attorney for Claimant
PURE BIOSCIENCE

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing Memorandum  was served
on the following counsel of record by facsimile transmission on 16 January 2004.

Michael J. Rovell, Esq.
Lisa I. Fair, Esq.
LAW OFFICES OF MICHAEL J. ROVELL
20 North Clark Street, Suite 2450
Chicago, Illinois 60602
Telecopier: 312. 578. 9391

Jack F. Fitzmaurice, Arbitrator
FITZMAURICE & DEMERGIAN
550 West C Street, Suite 990
San Diego, California 92101

Telecopier: 619. 239. 3029

Executed on 16 January 2004 at La Jolla, California 92037.

By:_____
WOLFGANG F. HAHN

PURE BIOSCIENCE'S SURREPLY TO FALKEN'S REPLY MEMORANDUM IN SUPPORT OF ITS OBJECTION TO JURISDICTION
IN THE MATTER OF :      PURE BIOSCIENCE (fka INNOVATIVE MEDICAL SERVICES)
v. NVID INTERNATIONAL, INC. ., FALKEN INDUSTRIES, LTD, ET AL.
AMERICAN ARBITRATION ASSOCIATION [INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION]
BEFORE JACK F. FITZMAURICE, ARBITRATOR
PAGE 10

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTER FOR DISPUTE RESOLUTION

IN THE MATTER OF:

| | |
|---|---|
| PURE BIOSCIENCE fka ) | DECISION OF ARBITRATOR |
| INOVATIVE MEDICAL ) | RE: FALKEN INDUSTRIES, LDT. |
| SERVICES ) | OBJECTION TO JURISDICTION AS |
| and ) | TO THIS ARBITRAL PROCESS |
| NVID INTERNATIONAL, INC. ) | |
| FALKEN INDUSTRIES, LTD, ) | ORDER THEREON |
| STEVEN GORDON ) | |

RECEIVED

JAN 2 9 2004

INTERNATIONAL CENTER

## PRELIMINARY ASPECT

This proceeding arises out of an arbitration had in 2001 by and between Innovative Medical Services, Inc., now Pure Bioscience (hereinafter "Pure"), and NVID International, Inc. (hereinafter "NVID"), as well as certain peripheral parties. The arbitrator in that proceeding was Jack F. Fitzmaurice, Esq. Prior to the conduct of the final evidentiary hearing, Pure, NVID and the peripheral parties entered into an arrangement, denominated Core Settlement Agreement, which addressed the status of the Axenohl Technology patent, license, royalty entitlements, distribution arrangements and stock transfers. Moreover, the Core Settlement Agreement contained the following arbitration clause:

> "18.1 Dispute Resolution. The parties agree that the American Arbitration Association of San Diego, California (in the person of the Arbitrator) shall maintain exclusive jurisdiction over any questions concerning the interpretation or enforcement of this Agreement and all of its component exhibits. Should legal action to enforce this Agreement, or any portion hereof, be commenced, the prevailing party to such binding arbitration shall be entitled to recover, in addition to any award by the arbitrator, its attorney fees incurred in such action."

1

Finally, the parties mandated that any dispute arising out of the Core Settlement would be arbitrated before Jack F. Fitzmaurice, Esq. who was designated as a species of compliance monitor. Thus the matter rested until the latter part of 2003.

### THE INSTANT DISPUTE

On October 27, 2003, Pure submitted a demand for arbitration before the International Centre for Dispute Resolution of the American Arbitration Association urging claims against NVID, Falken Industries, Ltd. and various individuals. The threshold issue then presented was the amenability of some non-signatories, especially Falken, to the arbitral process. Accordingly, a preliminary conference was held at which the issue of arbitrability was raised. In doing so the arbitrator ordered that the appearance by Falken be a special appearance for the limited purpose of objecting to Falken involvement in an arbitration had pursuant to the arbitration clause of the Core Settlement Agreement on the ground that Falken was not a signatory to the Core Settlement Agreement. A briefing schedule was ordered and a hearing date set; all relative to the limited issue of the subjection of Falken to the arbitral process. The hearing was held on January 22, 2004.

IMS contends that Falken is properly a party to this arbitration proceeding because NVID has assigned all of its right, title and interest in the Core Settlement Agreement as well as the Axenohl patent itself to Falken. Chief among Pure's factual predicates to involve Falken is the Omnibus Assignment dated September 12, 2003, a copy of which is attached hereto as Exhibit A. It is Falken's view that the Omnibus Assignment does little more than assign NVDI's Axenohl patent license royalty stream to Falken and that it does not assign the Core Settlement Agreement arbitration clause. Perusal of the document indicates otherwise.

In the first instance the Omnibus Assignment recites:

> "OMNIBUS ASSIGNMENT OF CLAIMS, CONTRACTS, ACCOUNT RIGHTS, EXPECTANCY, MONIES DUE OR TO BECOME DUE, OPTION(S), INVENTION, PATENT(S), CLAIMS FOR PAST INFRINGEMENT, LICENSES, TRADEMARKS

RELATING TO AXENOHL AND AXENAND ALL
DERIVATIVES THEREOF"

The document continues, setting out twelve (12) detailed
categories of benefits assigned to Falken. Taken together,
they encompass all of the benefits of consequence accruing
to NVID by reason of the Core Settlement Agreement. Lest
there be any doubt in that regard, subpart (ii) of the
Omnibus Assignment transfers:

> "all of [NVID's] rights, title and
> interests to monies due and to become
> due and all claims, demands and causes
> of action that [NVID] has, or may have,
> in relation to a certain contract
> settlement agreement entitled "CORE
> SETTLEMENT AGREEMENT" dated as of the
> 15th day of November, 2001 ..."

Contemporaneously with the Omnibus Assignment NVID
received 460,000 shares of Falken common stock, warrants to
acquire 460,000 share of 4.5% coupon preferred Falken Stock
at $1.00 per share and 2,300,000 shares of Falken Common
Stock valued at $1.50 per share. Thereafter, NVID
distributed the Falken equity interests to its
shareholders. At the close of the transactional activity,
NVID had assigned all of its assets of consequence to
Falken and NVID's shareholders had become Falken
shareholders. At the same time, Falken announced its
intention to manufacture and sell Axenohl based products in
consequence of its acquisition of NVID rights.

Perhaps concerned that the Omnibus Assignment may be
viewed in a fashion more expansive than Falken/NVID would
prefer, Falken and NVID entered into a certain Covenant To
Stand Seized. The Covenant, etc. document is dated December
8, 2003, some six (6) weeks after the initiation of this
proceeding Falken contends, at p.7 ll 5-7 of Falken
Memorandum in Support of the Objection to Jurisdiction
dated December 12, 2003 that Falken and NVID have rescinded
the Omnibus Assignment. As a result Falken argues that it
"... is not even putatively an assignee of the Core
Settlement Agreement and cannot possibly be bound by it."
See Falken Memorandum, etc., at p.7. ll 5-7.

Perusal of the Covenant To Stand Seized, a copy of
which is attached hereto as Exhibit B, is instructive. The

preamble is identical to the Omnibus Assignment, except that the words "Of Rights To The Revenue Stream And Other Benefits Arising Out Of ..." have been inserted. Turning the body of the document, it is substantially identical to the Omnibus Assignment. In the first instance, NVID is designated as the fiduciary for Falken. In the second instance each substantive subpart is identical to the substantive subparts of the Omnibus Assignment except for the insertion of the following phrase in each subpart: "but in no event any obligation or liability relating thereto." Read together, the Omnibus Assignment and the Covenant To Stand Seized effect no material change in the scope and meaning of the Omnibus Assignment. Falken retains the beneficial ownership of every benefit assigned to it in the Omnibus Assignment. No material economic or legal interest has been altered and the sole purpose of the Covenant, etc. would appear to be to distance Falken from the Omnibus Assignment and therefore the risk of being compelled to participate in the arbitration. If so, it is ineffective for that purpose. The issue thus devolves into whether, by reason of the Omnibus Assignment and related conduct, Falken is bound by the arbitration clause appearing in the Core Settlement Agreement. If not, is Falken equitable estopped from avoiding participation in this arbitration in consequence of acceptance of benefits and other conduct. For the reasons stated above, I hold that the Omnibus Assignment is a full and complete assignment of the Core Settlement Agreement from NVID to Falken. Further, Falken's reliance on the Omnibus Assignment for the purpose of the manufacture and sale of products based upon the Axenohl technology estops it from avoiding the burden of the Core Settlement Agreement while seeking to feast upon its benefits.

In my view the posture of Falken in no wise differs from that of the subcontractor in Smith v. Cumberland, 687 A2d. 1167 (Penna. Sup. Ct. 1997) In Smith, a restaurant owner (Smith) contracted with Cumberland to renovate a restaurant. Cumberland assigned the contract to Mass who performed the work. Thereafter, a dispute arose, Mass demanded arbitration and Smith refused on the ground that he (Smith) had not signed a document containing an arbitration clause with Mass. The court held that where effectively the entire contract had been assigned, a party may not refuse to arbitrate on the ground that the assignee is not a signatory in circumstances where assignment had

occurred[1]. See also <u>Norcal</u> v. <u>Newton</u> 84 Cal App. 4th 64. (2000) <u>Monsanto Chemical</u> v. <u>Benton Farms</u>, Case # CV-2000-24.80 (Supreme Court of Alabama 2001) and <u>Deloitte Noraudit</u> v. <u>Deloitte Haskins & Sells</u>, 97.3r 1080 (2nd Cir, 1993).

Even should one conclude that full assignment had not taken place in the Pure-NVID-Falken schema, Falken is estopped form denying its submission to arbitration as a result of its own conduct. The precepts of equitable estoppel as a predicate to prohibit avoidance of arbitration by a non-signatory were best stated in <u>Grigson</u> v. <u>Creative Artists Agency</u>, 210 F. 3d 524 (5th Cir. 2000)[2] wherein the following appears.

> "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."
> 210 F. 3d at 527

So also here.

---

[1] I am aware that the positions of Pure and Falken are the reverse of Smith and Mass; i.e., that it was signatory Smith who refused to arbitrate. In my view it matters not whether the signatory or non-signatory objects. The substantive issue would be the same; i.e., whether complete assignment occurred.

[2] It is somehow apropos that the <u>Grigson</u> opinion arises out of a dispute involving the film "Return of the Texas Chain Saw Massacre"

Pure's claims presume the existence of the Core Settlement Agreement and its claims arise out of and are directly related to that document. Further the application of the doctrine of equitable estoppel is appropriate here because the allegations of the claims in arbitration are bottomed upon contentions of interdependent and concerted misconduct by signatory NVID and non-signatory Falken. Finally, as in Grigson, the arbitration process would be meaningless here absent Falken's involvement.

## ORDER

IT IS **HERBY ORDERED** that Falken Industries, Ltd. shall answer or otherwise respond to the Demand for Arbitration filed herein on or before the expiration of ten (10) days from the date of receipt of this decision and order.

IT IS **FURTHER ORDERED** that the below listed persons are not subject to the jurisdiction of this arbitration and are not required to participate herein.

Steven Gordon
Michael Redden
Phil Lewis
Keith Duffy
Robert Edelson
Roy Janis
Helle A. Madso

JACK F. FITZMAURICE, ESQ.

Dated: _1·28·04_

Jack F. Fitzmaurice, Esq.
Arbitrator

20 North Clark Street
Suite 2450
Chicago, IL 60602
312-578-9191
312-578-9391 Fax

Lisa I. Fair*
Michael J. Rovell**

Of Counsel:
Alexis Maitland Hudson***

Affiliated Offices
Oklahoma City
San Juan
Brussels
London
Paris

* Licensed in Illinois
** Licensed in Illinois &Puerto
   Rico District Court
*** Licensed in the U.K.,
    Ireland and France

# Law Offices of **Michael J. Rovell** Chtd

March 18, 2004

By Fax (212) 805-0426
Hon. Laura Taylor Swain
United States District Judge
United States Courthouse
40 Centre Street, Room 426
New York, NY 10007-1581

Re: Falken Industries Ltd. v. American Arbitration Association, Inc. Centre For International Dispute Resolution, No. 04 CV 1073 (LTS)

Dear Judge Swain:

The parties participated in a telephonic hearing with you on March 8, 2004, in connection with plaintiff's motion for a temporary restraining order that would enjoin the AAA and Pure Bioscience from defaulting Falken in Pure Bioscience's arbitration against Falken in the absence of a court determination that Falken is subject to the arbitration. In response to your request for a status on our negotiations, I can report that plaintiff and Pure Bioscience are in the process of entering in the arbitration the attached stipulation providing that a default will not be entered and this action will be dismissed. We therefore anticipate voluntarily dismissing this action within the next few days so the Court need not fashion any scheduling order in connection with the motion.

I know that all sides appreciate the time Your Honor took with this matter. Personally speaking, I hope to have the privilege of some day appearing before Your Honor again.

Very truly yours,

Michael J. Rovell

cc: Wolfgang Hahn (858) 456-5060
    Theodore Hecht (914) 681-0013

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF:

PURE BIOSCIENCE, f/n/a Innovative )
Medical Services, )
        Claimant, )
          )
      and )  No. 50 T 133 00528 03
          )
NVID INTERNATIONAL, INC., )
FALKEN INDUSTRIES, LTD., and )
STEVEN GORDON, )
        Respondents. )

## JOINT STIPULATION

It is hereby stipulated by the parties through their respective counsel that:

1. No default judgment will be entered by arbitrator Fitzmaurice against Falken until after a court determination has been made that Falken is properly a party to this arbitration and that the arbitrator has jurisdiction over Falken in connection with Pure Bioscience's claims here.

2. A condition of this stipulation is that it does not constitute a waiver of Falken's position that it is not properly before the arbitrator and has not consented to arbitrate these matters.

3. Falken Industries, Ltd. will cause the action it filed in the United States District Court for the Southern District of New York, Falken Industries, Ltd. v. American Arbitration Association, Inc. International Centre for Dispute Resolution, case no. 04 Cv 1073 (LTS), to be voluntarily dismissed within three days of the execution of this stipulation.

FALKEN INDUSTRIES, LTD.          PURE BIOSCIENCE

_____       _____
Michael J. Rovell                  Wolfgang F. Hahn
Law Offices of Michael J. Rovell Chtd.    Wolfgang F. Hahn & Associates
20 N. Clark Street, Suite 2450        7160 Caminito Pepino
Chicago, Illinois 60602              La Jolla, CA 92037
tel: (312) 578-9191; fax: (312) 578-9391   tel: (858) 535-1000; fax (858) 456-5080

Dated: March 18, 2004

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

PURE-BIO SCIENCE
FKA INNOVATIVE MEDICAL SERVICES

**DEFENDANTS** 04 JUN -9 AM 11:59

**04 CV 1147 L (NLS)**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Trenton
New Jersey
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Wolfgang F. Hahn / Chas. E. Brumfield
7160 Caminito Pepino
La Jolla, Ca 92037
858. 535.1000

**ATTORNEYS (IF KNOWN)**

Michael J. Povell
20 North Clark Street, Suite 2450
Chicago, ILL 60602
312. 578. 9191

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- 1 U.S. Government Plaintiff
- 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)**
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | • 1 | • 1 | Incorporated or Principal Place of Business in This State | • 4 | ⊙ 4 |
| Citizen of Another State | • 2 | • 2 | Incorporated and Principal Place of Business in Another State | • 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | • 3 | • 3 | Foreign Nation | • 6 | • 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

15 USC 77a    Petition For Order Compelling Arbitration (F.A.A.)

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| • 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | • 610 Agriculture | • 422 Appeal 28 USC 158 | • 400 State Reapportionment |
| • 120 Marine | • 310 Airplane | • 362 Personal Injury - Medical Malpractice | • 620 Other Food & Drug | • 423 Withdrawal 28 USC 157 | • 410 Antitrust |
| • 130 Miller Act | • 315 Airplane Product Liability | | • 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | • 430 Banks and Banking |
| • 140 Negotiable Instrument | • 320 Assault, Libel & Slander | • 365 Personal Injury - Product Liability | | • 820 Copyrights | • 450 Commerce/ICC Rates/etc. |
| • 150 Recovery of Overpayment &Enforcement of Judgment | • 330 Federal Employers' Liability | • 368 Asbestos Personal Injury Product Liability | • 630 Liquor Laws | • 830 Patent | • 460 Deportation |
| • 151 Medicare Act | • 340 Marine | | • 640 RR & Truck | • 840 Trademark | • 470 Racketeer Influenced and Corrupt Organizations |
| • 152 Recovery of Defaulted Student Loans (Excl. Veterans) | • 345 Marine Product Liability | **PERSONAL PROPERTY** | • 650 Airline Regs | **SOCIAL SECURITY** | • 810 Selective Service |
| • 153 Recovery of Overpayment of Veterans Benefits | • 350 Motor Vehicle | • 370 Other Fraud | • 660 Occupational Safety/Health | • 861 HIA (1395ff) | • 850 Securities/Commodities Exchange |
| ⊙ 160 Stockholders Suits | • 355 Motor Vehicle Product Liability | • 371 Truth in Lending | • 690 Other | • 862 Black Lung (923) | • 875 Customer Challenge 12 USC |
| ⊙ 190 Other Contract | • 360 Other Personal Injury | • 380 Other Personal Property Damage | **LABOR** | • 863 DIWC/DIWW (405(g)) | • 891 Agricultural Acts |
| • 195 Contract Product Liability | | • 385 Property Damage Product Liability | • 710 Fair Labor Standards Act | • 864 SSID Title XVI | • 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | • 720 Labor/Mgmt. Relations | • 865 RSI (405(g)) | • 893 Environmental Matters |
| • 210 Land Condemnation | • 441 Voting | • 510 Motions to Vacate Sentence Habeas Corpus | • 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | • 894 Energy Allocation Act |
| • 220 Foreclosure | • 442 Employment | • 530 General | • 740 Railway Labor Act | • 870 Taxes (U.S. Plaintiff or Defendant) | • 895 Freedom of Information Act |
| • 230 Rent Lease & Ejectment | • 443 Housing/Accommodations | • 535 Death Penalty | • 790 Other Labor Litigation | • 871 IRS - Third Party 26 USC 7609 | • 900 Appeal of Fee Determination Under Equal Access to Justice |
| • 240 Tort to Land | • 444 Welfare | • 540 Mandamus & Other | • 791 Empl. Ret. Inc. Security Act | | • 950 Constitutionality of State |
| • 245 Tort Product Liability | • 440 Other Civil Rights | • 550 Civil Rights | | | • 890 Other Statutory Actions |
| • 290 All Other Real Property | | • 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

- ⊙ 1 Original Proceeding
- • 2 Removal from State Court
- • 3 Remanded from Appellate Court
- • 4 Reinstated or Reopened
- • 5 Transferred from another district (specify)
- • 6 Multidistrict Litigation
- • 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
- CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND: • YES ⊙ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE _____   Docket Number _____

**DATE** 8 June 2004     **SIGNATURE OF ATTORNEY OF RECORD** Wolfgang Hahn

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

10439 6/9/04 150.00 cash JG

ORIGINAL

