USDC SCAN INDEX SHEET

















RYC   1/5/05    11:08

3:04-CV-01147   PURE BIOSCIENCE V. FALKEN INDUST LTD

*45*

*O.*

FILED

05 JAN -4 AM 8: 11

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PURE BIOSCIENCE fka INNOVATIVE
MEDICAL SERVICES, INC.,

                    Petitioner,

v.

FALKEN INDUSTRIES, LTD., a New
Jersey corporation,

                    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 04cv1147-L(NLS)

**ORDER: (1) GRANTING PURE
BIOSCIENCE'S MOTION TO
COMPEL ARBITRATION; AND
(2) DENYING FALKEN'S MOTION
TO DISMISS FOR LACK OF
PERSONAL JURISDICTION**

[Docket Nos. 1, 3, 9]

        This matter came on regularly for a hearing on Petitioner Pure Bioscience fka Innovative

Medical Services, Inc.'s Motion to Compel Arbitration and Respondent Falken Industries, Ltd.'s

Motion to Dismiss for Lack of Personal Jurisdiction.  Wolfgang P. Hahn, Esq. and Charles E.

Brumfield, Esq. appeared for Pure Bioscience, and Joel S. Seidel, Esq. appeared for Falken.

        Having reviewed the record, argument of counsel, and applicable law, the Court

concludes: (1) Falken did not agree to submit the question of arbitrability to the arbitrator, and

therefore this Court will not defer to the arbitrator's decision on that issue; (2) Falken did not

assume the obligation to arbitrate disputes under the Core Settlement Agreement by its

participation in the arbitration proceedings; and (3) Falken is equitably estopped from avoiding

arbitration.  The Court further finds that Falken's motion for personal jurisdiction must be

denied.



04cv1147

# BACKGROUND

On November 15, 2001 Pure Bioscience and a non-party to this litigation, NVID International, *inter alia*, entered into a Core Settlement Agreement as a global resolution of various disputes between the parties in several litigation and arbitration matters.[1]  As part of the Core Settlement Agreement, the parties executed an "Assignment of Patent and Related Intellectual Property" under which NVID warranted that it was the sole and exclusive owner of all Axenohl patent rights and, as assignor, sold, assigned, transferred and set over to Pure Bioscience its entire right, title interest in and to all Axenohl patent rights that it possessed.[2]  As a result of the Core Settlement Agreement, Pure Bioscience became the sole and exclusive owner of all Axenohl patents, its diluted form Axen, all related technology and intellectual property, including all related trademarks.

In January 2003, Pure Bioscience and Nickel, Ltd. — a manufacturer and distributor of wet wipes in Europe — entered into a cross-marketing and licensing agreement entitled "Umbrella Agreement."[3]  Under the Umbrella Agreement, Pure Bioscience granted Nickel a license to use Axen in Europe for use in a hard surface disinfectant spray and wet wipes.[4]

In an Omnibus Agreement dated September 12, 2003, NVID transferred to Falken all of its rights, title, and interest NVID had or may have against Pure Bioscience and under the Core Settlement Agreement.[5]  NVID also transferred all of its rights to moneys due and to become due, and all claims, demands, and causes of action resulting of sales of products incorporating

---

[1]  Pure Bioscience's Mtn. to Compel Arbitration, Ex. A at Ex. 1, Core Settlement Agreement.

[2]  *Id.* at 1; Pure Bioscience's Mtn. to Compel Arbitration, Ex. A, Pure Bioscience's Statement of Claims ¶ 3; Pure Bioscience's Reply to Falken's 10/20/04 Add'l Brief, Ex. A, Assignment of Patent and Related Intellectual Property.

[3]  Pure Bioscience's Reply to Falken's 10/20/04 Add'l Brief, Ex. B, Umbrella Agreement.

[4]  *Id.*; Krall 11/01/04 Decl. ¶ 4.

[5]  Pure Bioscience's Reply Notice of Lodgment ("NOL") Ex. C, Omnibus Agreement.

1   the Axenohl patent, and any derivative therefrom.[6]  NVID additionally transferred all of its

2   rights, titles, and interests to moneys due and to become due, and all claims, demands, and

3   causes of actions in any intellectual property relating to the Axnohl patent, Axen, and all

4   derivatives thereof.[7]

5        Article 18.1 of the Core Settlement Agreement provides that the American Arbitration

6   Association ("AAA") of San Diego "shall maintain exclusive jurisdiction over any questions

7   concerning the interpretation or enforcement of this Agreement and all of its component

8   exhibits."[8]  On October 27, 2003, Pure Bioscience submitted to the AAA in San Diego a

9   Statement of Claims for arbitration against, *inter alia*, NVID and Falken Industries, Ltd.[9]  Pure

10  Bioscience alleged that it had learned through NVID's press releases that NVID had sold and

11  assigned all of its interest in the Axenohl technology and patent to Falken.[10]  Pure Bioscience

12  also alleged that NVID and Falken have disseminated a blizzard of false, misleading, and

13  disparaging statements about Pure Bioscience on Yahoo!-maintained Internet bulletin boards

14  and on a website known as "Raging Bull."[11]  Included in these remarks are statements that Pure

15  Bioscience is "hovering on the threshold of bankruptcy" and has violated several provisions in

16  the Core Settlement Agreement.[12]  Falken allegedly claimed it owns the Axenohl patent and its

17  derivatives and stated it has the right to Axen sales anywhere in Europe and the United States.[13]

18

---

19     [6] *Id.*

20     [7] *Id.*

21     [8] Pure Bioscience's Mtn. to Compel Arbitration, Ex. A at Ex. 1, Core Settlement

22  Agreement Art. 18.1.

23     [9] Pure Bioscience's Mtn. to Compel Arbitration, Ex. A, Pure Bioscience's Statement of

24  Claims.

25     [10] *Id.* ¶ 12.

26     [11] *Id.* ¶¶ 13-14.

27     [12] *Id.* ¶ 14.

28     [13] *Id.*

04cv1147

1   Pure Bioscience alleged claims against NVID and others for failure to maintain corporate

2   existence, failure to maintain sufficient asset base, and failure to maintain sufficient assets and

3   capitalization to meet ongoing duties and responsibilities imposed by the Core Settlement

4   Agreement.[14]  Pure Bioscience alleges a trade libel claim against NVID and Falken and requests

5   declaratory and emergency relief.[15]

6          On December 2, 2003, Arbitrator Jack F. Fitzmaurice conducted a preliminary hearing.[16]

7   Falken appeared specially for the limited purpose of objecting to AAA's jurisdiction over

8   Falken on the ground Falken was not a signatory to the Agreement.[17]  Arbitrator Fitzmaurice

9   and the parties reached agreement on a briefing schedule and hearing date regarding Falken's

10  obligation to arbitrate.[18]  After the hearing, Arbitrator Fitzmaurice concluded Falken was subject

11  to the arbitration clause on two separate grounds:  (1) NVID's assignment to Falken its right,

12  title, and interest in the Core Settlement Agreement; and (2) equitable estoppel.[19]  Arbitrator

13  Fitzmaurice ordered Falken to answer or otherwise respond to Pure Bioscience's demand for

14  arbitration within 10 days of the date of receipt of the decision.[20]

15         After Arbitrator Fitzmaurice issued his preliminary hearing order but before he issued his

16  decision as to Falken's obligation to arbitrate, Falken and NVID entered into a Covenant to

17

18  _____

19     [14]  *Id.* at 6-9.

20     [15]  *Id.* at 10-13.

21     [16]  Pure Bioscience's Mtn. to Compel Arbitration, Ex. B, Preliminary Hearing Order.

22     [17]  *Id.*

23     [18]  *Id.*

24
       [19]  Pure Bioscience's Mtn. to Compel Arbitration, Ex. G, Decision of Arbitrator Re:
25  Falken Indus., Ltd. Objection to Jurisdiction as to this Arbitral Process.

26
       [20]  *Id.* at 6.  Arbitrator Fitzmaurice also held that individual respondents including Steven
27  Gordon (Falken's President), Helle A. Madsö (Falken's Executive Vice President for Strategic
    Planning) and Roy Janis (a Falken Director) were not subject to the jurisdiction of the arbitration.
28  *Id.*

                                        4                                      04cv1147

1    Stand Seized.[21]  In this agreement, Falken and NVID rescinded the September 12, 2003

2    Omnibus Agreement.[22]  The parties agreed that NVID would act as Falken's fiduciary and hold

3    for the use and benefit of Falken all rights, title, and interest in claims NVID had or may have

4    against Pure Bioscience as well as NVID's claims under the Core Settlement Agreement.[23]

5    NVID also agreed to hold in trust for Falken all moneys due and to become due, and all claims,

6    demands and causes of action resulting from sales of products incorporating the Axenohl patent

7    and any derivative therefrom.[24]  Finally, NVID agreed to hold in trust for Falken all rights, titles,

8    and interests to moneys due and to become due, and all claims, demands, and causes of actions

9    in any intellectual property relating to the Axenohl patent, Axen, and all derivatives thereof.[25]

10         On February 10, 2004, Falken filed an action in the United States District Court for the

11   Southern District of New York, seeking an injunction against AAA and Pure Bioscience from

12   proceeding with the arbitration against Falken.[26]  In so doing, Falken argued that the question of

13   whether a non-signatory to an arbitration agreement can be compelled to arbitrate must be

14   decided by the court, not the arbitrator.[27]  On March 18, 2004, Pure Bioscience and Falken

15   entered into a stipulation in the AAA proceedings providing that Falken would voluntarily

16   dismiss the New York action, and default judgment would not be entered against Falken in the

17   arbitration until after a court determination was made regarding whether Falken is properly a

18   party to the arbitration and the arbitrator has jurisdiction over Falken in connection with Pure

19

20

21   ─────────────────

22      [21] Pure Bioscience's Reply NOL Ex. D, Covenant to Stand Seized.

        [22] *Id.*

23      [23] *Id.*

24      [24] *Id.*

25      [25] *Id.*

26      [26] Hahn 06/09/04 Decl. ¶ 9.

27      [27] *Id.*

28

1    Bioscience's claims.[28]  On March 23, 2004, Falken voluntarily dismissed the New York

2    action.[29]

3          On June 9, 2004, Pure Bioscience commenced this action and filed a Motion for Issuance

4    of an Order Compelling Arbitration, citing 9 U.S.C. § 4.  Pure Bioscience maintains Falken is

5    bound by the arbitration clause and must participate in the proceedings before Arbitrator

6    Fitzmaurice.  The motion was scheduled for hearing on July 26, 2004.[30]  Falken did not file a

7    response to the motion, and on July 16, 2004, Pure Bioscience filed a Notice of Non-Receipt of

8    Opposition.  On July 22, 2004, Falken filed an *Ex Parte* Application for Leave to File Motion to

9    Quash and Dismiss and Hold Motion to Compel Arbitration in Abeyance.  On August 4, 2004,

10   Falken filed a Motion to Dismiss for Lack of Personal Jurisdiction and to Quash Service.

11         The Court ruled on Falken's *ex parte* application in an order dated August 16, 2004, and

12   found that whether Pure Bioscience had properly served Falken was not clear, but also

13   concluded that even if Falken prevailed on its motion to quash it was likely that Pure Bioscience

14   would be able to effectuate proper service.  Because the parties' and the Court's resources were

15   better spent addressing the dispute over whether Falken can be required to participate in the

16   arbitration, the Court denied the motion to quash.

17         Falken's *ex parte* application requested the Court determine its motion to dismiss prior to

18   ruling on the merits of Pure Bioscience's motion to compel arbitration.  This Court found,

19   however, that under the applicable caselaw the two motions are intertwined.  That is, if this

20   Court finds Falken bound by the arbitration clause, that finding will inform the decision

21   regarding the merits of Falken's motion to dismiss.  Accordingly, the Court set a combined

22   briefing schedule for the parties' motions.

23

24         [28] *Id.* ¶ 10; Pure Bioscience's Oppo. to Falken's *Ex Parte* Application Ex. A, Joint
25   Stipulation, Ex. B, Letter from Rovell to Hahn of 03/10/04.

26         [29] Pure Bioscience's Oppo. to Falken's *Ex Parte* Application Ex. C, Ntc. of Voluntary
27   Dismissal.

28         [30] In a July 16, 2004 order, this Court took the motion under submission in accordance
     with Civil Local Rule 7.1(d)(1).

04cv1147

1    At the conclusion of the hearing on the parties' motions, the Court ordered supplemental
2   briefing. In particular, the Court ordered Pure Bioscience to file a brief regarding its argument
3   that this Court must defer to Arbitrator Fitzmaurice's decision regarding Falken's obligation to
4   arbitrate and the applicability of *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)
5   to this case. Falken in turn was required to address: (1) its position on what rights it has to the
6   Axenohl patents and from where Falken obtained those rights; and (2) its interpretation of the
7   Covenant to Stand Seized. Pure Bioscience subsequently filed an *ex parte* application requesting
8   the Court clarify its order to require Falken to provide evidentiary support to its claims in the
9   form of a sworn statement issued by an officer or authorized agent of Falken together with
10  properly authenticated documentary evidence. In an order dated October 29, 2004, this Court
11  denied Pure Bioscience's *ex parte* application and required Falken to submit a supplemental
12  brief discussing legal authority supportive of its position that it is not subject to the obligations
13  of the Core Settlement Agreement because Falken does not hold those rights directly, but rather
14  NVID holds those rights in trust for Falken. Falken filed its supplemental brief on November 8,
15  2004, and Pure Bioscience filed a response on November 15, 2004.

16    While the parties' motions were under submission, Arbitrator Fitzmaurice proceeded
17  with the arbitration as to Pure Bioscience's claims against NVID only.[31] NVID did not appear
18  in the arbitration.[32] Arbitrator Fitzmaurice granted Pure Bioscience's request to strike NVID's
19  Answer and Counterclaim and entered default against NVID.[33] After reviewing the evidence
20  presented and Pure Bioscience's claims, the arbitrator entered an award against NVID in Pure
21  Bioscience's favor in the amount of $14.6 million.[34]

22  ///

23  ///

24

---

25    [31] Falken's Ntc. Re Arbitration Award, Ex., Award at 3.

26    [32] *Id.*

27    [33] *Id.*

28    [34] *Id.* at 10.

7

04cv1147

## PURE BIOSCIENCE'S MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") permits a party "aggrieved by the alleged . . . refusal of another to arbitrate" to petition a federal district court for an order compelling arbitration. 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "The standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). "The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (*citing Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985)); *accord Chiron*, 207 F. 3d at 1130. Thus, the court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130.

Pure Bioscience asserts four arguments in support of its position that Falken is obligated to arbitrate Pure Bioscience's claims. First, Pure Bioscience argues this Court must defer to Arbitrator Fitzmaurice's decision regarding arbitrability because Falken agreed to have the arbitrator resolve that issue. Second, Pure Bioscience maintains Falken assumed the obligation to arbitrate through its participation in the arbitration proceedings. Third, Pure Bioscience argues that Falken is estopped from avoiding arbitration. Finally, Pure Bioscience contends Falken is an assignee of the Core Settlement Agreement by virtue of the Omnibus Agreement.

## I.    Standard of Review

Arbitrator Fitzmaurice held that Falken was subject to the arbitration clause by virtue of NVID's assignment to Falken all of NVID's rights in the Axenohl patent and under the principle of equitable estoppel. According to Pure Bioscience, this Court must defer to the arbitrator's decision and compel Falken to arbitrate. Falken responds this Court must decide the arbitrability issue independently because Falken did not clearly and unmistakably assent to Arbitrator Fitzmaurice's authority to decide the matter.

Generally, arbitrability is an issue for the court to resolve. *Poweragent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1191 (9th Cir. 2004). "Thus, although an arbitrator's decisions on

8

1   the merits of a dispute properly within its jurisdiction are accorded deference, no deference is

2   due an arbitrator's decision as to the scope of arbitrability unless the arbitrability question itself

3   has been submitted by the parties to the arbitrator." *Katz v. Feinberg*, 167 F. Supp. 2d 556, 564

4   (S.D.N.Y. 2001), *aff'd*, 290 F.3d 95 (2d Cir. 2002) (internal citations omitted). The question of

5   who decides arbitrability "'turns upon what the parties agreed about *that* matter.'" *Id.* (*quoting*

6   *First Options*, 514 U.S. at 943) (emphasis in *First Options*). In *First Options*, the United States

7   Supreme Court held that courts "should not assume that the parties agreed to arbitrate

8   arbitrability unless there is 'clea[r] and unmistakabl[e] evidence that they did so.'" *First*

9   *Options*, 514 U.S. at 944 (*quoting AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643,

10  649 (1986)) (alterations in *First Options*). The Court reasoned this rule is supported by the

11  different treatment the law confers on silence or ambiguity about who should decide arbitrability

12  as compared to whether a particular merits-related dispute is within the scope of an arbitration

13  agreement. *Id.* at 944-45. Although there is a presumption that a dispute is arbitrable, that

14  presumption is reversed when there is a question as to who should decide arbitrability. *Id.*

15      Falken argues that under *First Options*, it cannot be deemed to have clearly and

16  unmistakably agreed to submit the question of arbitrability to the arbitrator. Pure Bioscience

17  counters that Falken manifested its clear and unmistakable intent to permit the arbitrator to

18  determine the issue of arbitrability in three ways. First, Pure Bioscience argues "Falken

19  submitted the arbitrability issue to Fitzmaurice only after the arbitrator had in writing warned

20  Falken that he had the power to decide his own arbitrability."[35] Second, Pure Bioscience

21  contends Falken accepted the binding benefit of the arbitrator's ruling on arbitrability by

22  accepting the favorable decision regarding its principals, Mr. Gordon, Ms. Madsö, and Mr. Janis.

23  Finally, Pure Bioscience maintains Falken submitted the arbitrability matter to a AAA arbitrator,

24  who operates under known rules allowing an arbitral decision on arbitrability.

25  ///

26  ///

27

28

---

[35] Pure Bioscience's 10/25/04 Supp. Brief at 3.

1       **A.      Arbitrator's Assertion of Jurisdiction to Decide Arbitrability**

2              Pure Bioscience's first argument contends that Falken exhibited its clear and

3       unmistakable intent to permit Arbitrator Fitzmaurice to determine arbitrability because Falken

4       did not object to the arbitrator's self-proclaimed mandate in a letter dated November 26, 2003

5       that he had jurisdiction to decide the issue.  Pure Bioscience also cites Falken's participation in

6       the December 2, 2003 preliminary hearing to establish a briefing schedule regarding Falken's

7       obligation to arbitrate the dispute.  This argument implies Falken was required to object to

8       Arbitrator Fitzmaurice's November 26, 2003 letter and refuse to participate in the preliminary

9       hearing.  The Court does not find Falken's actions and omissions evidence a clear and

10      unmistakable intent to arbitrate the issue of arbitrability.

11             Rather than make *First Options* distinguishable, Pure Bioscience's argument underscores

12      the applicability of that case.  In *First Options*, the parties' disputes arose out of an agreement

13      embodied in four separate but related documents.  *First Options*, 514 U.S. at 940-41.  Only one

14      of those four documents contained an arbitration clause.  *Id.* at 941.  The Kaplans, who objected

15      to arbitration, did not sign the document containing the arbitration clause, and filed written

16      objections to arbitrability with the arbitration panel.  *Id.*  The arbitrators held they had the power

17      to rule on the merits of the parties' dispute and rendered a decision in favor of First Options and

18      adverse to the Kaplans.  *Id.*

19             In arguing that the Kaplans agreed to have the arbitrator decide arbitrability, First

20      Options relied on the Kaplans' filing of a memorandum objecting to the arbitrator's jurisdiction.

21      *Id.* at 946.  The Court rejected this as evidence of a clear willingness to arbitrate the issue of

22      arbitrability and found that to the contrary, "insofar as the Kaplans were forcefully objecting to

23      the arbitrators deciding their dispute with First Options, one naturally would think that they did

24      *not* want the arbitrators to have binding authority over them."  *Id.*

25             Falken's participation in the arbitration proceedings for the purposes of briefing and

26      arguing its objection regarding the arbitrator's jurisdiction over it is no more indicative of a

27      willingness to be bound by the arbitrator's decision than the Kaplans' actions.  The facts Pure

28      Bioscience relies upon — that Arbitrator Fitzmaurice announced in a November 26, 2003 letter

that he believed he had jurisdiction to decide arbitrability and Falken's participation at the

November 2, 2003 preliminary hearing — are not dispositive. *First Options* does not require

Falken to object after the November 26, 2003 or to refuse to even argue the arbitrability issue

before Arbitrator Fitzmaurice.  It is beyond cavil that Falken strenuously objected to Pure

Bioscience's attempt to compel Falken to arbitrate.  Arbitrator Fitzmaurice's December 2, 2003

order following the preliminary hearing on that date expressly

> acknowledges that Falken Industries, LTD. appears specially for the limited
> purpose of contesting the jurisdiction of the American Arbitration Association
> and/or the arbitrator and that nothing in this Order No. One shall constitute a
> determination that Falken Industries, LTD. has submitted to the jurisdiction of the
> Association or the arbitrator in his capacity as compliance monitor under the Core
> Settlement Agreement.[36]

The Court finds that Falken's participation in setting a briefing schedule on the issue and

then briefing the issue is similar to *First Options* where the Kaplans filed a memorandum

objecting to the arbitrators' jurisdiction.  Falken's actions therefore similarly evidence it did not

want the arbitrator to exercise jurisdiction over it.

### B.     Falken's Acceptance of the Arbitrator's Favorable Ruling

Pure Bioscience next contends that Falken is bound by Arbitrator Fitzmaurice's decision

because it accepted the arbitrator's ruling that the claims against individual respondents were not

arbitrable.  This argument is unpersuasive.  The only parties affected by that ruling are the

individuals themselves.  It strains credulity that the individuals would object to a ruling that was

favorable to them.  Nor would Falken have any basis or standing to object to the arbitrator's

decision favoring those individual parties.

### C.     The Relevance of AAA's Procedural Rules

Pure Bioscience's third argument distinguishing *First Options* is that the Supreme Court

action did not involve arbitration before the AAA.  Pure Bioscience maintains that by submitting

the jurisdiction objection to the AAA arbitrator, Falken consented to arbitration before the AAA

and to be bound by the AAA's procedural rules permitting an arbitrator to decide arbitrability.

---

[36] Pure Bioscience's Mtn. to Compel Arbitration, Ex. B, Preliminary Hearing Order at 1.

11

1    There is, as Pure Bioscience contends, case law holding that a party who consents to

2    arbitration before the AAA also consents to be bound by AAA's procedural rules unless that

3    party indicates otherwise. *See, e.g., P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th

4    Cir. 1999); *Rainwater v. Nat'l Home Ins. Co.*, 944 F.2d 190, 192-93 (4th Cir. 1991). However,

5    the Court does not find this authority requires deference to Arbitrator Fitzmaurice's decision.

6    That the arbitration in this case is proceeding under the AAA does not render *First*

7    *Options* inapposite. *First Options* requires there to be a clear and unmistakable intent to arbitrate

8    the arbitrability issue; any silence or ambiguity about whether the parties have agreed to arbitrate

9    arbitrability reverses the general presumption that disputes should be resolved in arbitration's

10   favor. *First Options*, 514 U.S. at 944-45.   To find that a non-party intended to be bound by an

11   arbitrator's decision as a result of the procedural rules applicable to the arbitration would

12   contravene the Supreme Court's holding.  The mere fortuity of the arbitration proceeding under

13   AAA, rather than the parties' intent, would dictate who has jurisdiction to decide arbitrability.

14   *First Options* does not countenance such a result.  As discussed above, there is nothing in the

15   record indicating Falken clearly and unmistakably intended Arbitrator Fitzmaurice to decide the

16   question of arbitrability.  To the contrary, its counsel indicated he was specially appearing for the

17   purpose of contesting the arbitrator's jurisdiction over Falken and therefore filed a brief

18   supporting that objection.  Under *First Options*, this does not indicate a clear willingness to be

19   bound by the arbitrator's decision on that issue.  *Id.* at 946; *see Katz*, 167 F. Supp. 2d at 564-65

20   (holding that individuals did not concede to have the arbitration panel decide arbitrability

21   because their briefs objected to the panel's jurisdiction over the dispute).

22   Cases Pure Bioscience cites do not lead to a contrary result.  One case Pure Bioscience

23   relies on is *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003).  There, the

24   Second Circuit concluded there was clear and unmistakable evidence the parties had agreed to

25   arbitrate arbitrability.  *Shaw*, 322 F.3d at 121-25.  In so holding, the court relied in part on a

26   provision in the arbitration clause incorporating the rules and procedures of the International

27   Chamber of Commerce ("ICC"), which specifically provide for the ICC to address questions of

28   ///

1 arbitrability. *Id.* at 122-23, 125. However, unlike the instant case, in *Shaw* there was no dispute

2 the parties were signatories to the agreement containing the arbitration clause. *See id.* at 120 n.2.

3       According to Pure Bioscience, the Eastern District of New York recently applied *Shaw's*

4 reliance on arbitration rules against a non-signatory in *Ryan, Beck & Co. v. Fakih*, 268 F. Supp.

5 2d 210, 221 (E.D.N.Y. 2003). A closer reading of *Ryan, Beck* reveals it is inapposite. In that

6 case, a broker-dealer sought, *inter alia*, a declaration it was not obligated to arbitrate certain

7 disputes with the investor defendants. *Ryan, Beck*, 268 F. Supp. 2d at 213. The court deferred

8 the arbitrability question to the arbitrator, finding there was clear and unmistakable evidence that

9 the parties intended the question of arbitrability to be decided by the arbitrator. *Id.* at 221-22, In

10 so doing, the court cited the portion of the arbitration clauses providing for arbitration

11 proceedings to be conducted in accordance with the National Association of Securities Dealers'

12 ("NASD") procedural rules. *Id.* at 222. Those rules, in turn, commit all issues, including those

13 of arbitrability, to the arbitrator. *Id.* Significantly, the broker-dealer in *Ryan, Beck* did not

14 dispute it had agreed to arbitrate with the investors. *Id.* at 220. Instead, the broker-dealer argued

15 it did not agree to arbitrate the claims pending in litigation that had arisen before it had assumed

16 the contracts containing the arbitration clauses. *Id.* That is, in dispute was the *scope* of the

17 arbitration clause, not whether the parties were bound by it. *Id.* In contrast, here, the issue is

18 whether Falken is subject to the arbitration clause in the first instance.

19       Another case Pure Bioscience cites is *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir.

20 1996). This case also fails to persuade this Court to defer to Arbitrator Fitzmaurice's

21 arbitrability decision. There, investors opened an investment account with PaineWebber, a

22 brokerage firm. *PaineWebber*, 81 F.3d at 1195, 1196. In connection with that account, the

23 investors executed a client agreement containing an arbitration clause. *Id.* The investors later

24 filed a statement of a claim with the NASD. *Id.* Unlike Falken here, the brokerage firm in

25 *PaineWebber* did not dispute it was a party to the client agreement containing the arbitration

26 clause. Rather, it contended certain of the investors' claims were not arbitrable. *Id.* at 1196-97.

27 Accordingly, the appellate court's holding that the arbitrator was to decide arbitrability centered

28 on its analysis of the arbitration clause. *Id.* at 1199-1201.

1        In sum, *Shaw, Ryan, Beck,* and *Bybyk* are inapposite because there was no dispute the

2  parties resisting arbitration were signatories to or had assumed the obligations of the contracts

3  containing the arbitration clauses. Thus, the question of whether arbitrability was to be decided

4  by the arbitrator or the court turned on an analysis of the parties' arbitration clauses. Here,

5  because Falken disputes whether it should be deemed to have assumed the obligations of the

6  Core Settlement Agreement, this Court cannot look to the terms of the arbitration clause

7  contained in that agreement but rather, as in *First Options*, the Court must look at Falken's

8  actions to determine whether there is evidence of clear and unmistakable intent to arbitrate

9  arbitrability. For the reasons discussed above, the Court finds it cannot. Finally, *Rainwater* and

10  *Apollo Computer, Inc. v. Berg,* 886 F.2d 469 (1st Cir. 1989) — also cited by Pure Bioscience —

11  pre-date *First Options* and therefore did not consider the test announced by the Supreme Court

12  regarding parties' intent as to whether the arbitrator has jurisdiction to determine arbitrability.

13        Accordingly, the Court concludes the record does not support a finding that Falken had a

14  clear and unmistakable intent to assume the obligation to arbitrate. The Court must therefore

15  decide the question of arbitrability independently and without deference to the arbitrator's

16  decision. *First Options*, 514 U.S. at 943; *Katz*, 167 F. Supp. 2d at 564.

17  **II.**    **Falken's Arbitrability**

18        "One of the threads running through federal arbitration jurisprudence is the notion that

19  'arbitration is a matter of contract and a party cannot be required to submit to arbitration any

20  dispute which he has not agreed so to submit.'" *Textile Unlimited, Inc. v. A..BMH & Co., Inc.*,

21  240 F.3d 781, 786 (9th Cir. 2001) (*quoting AT&T Techs.*, 475 U.S. at 648). Accordingly,

22  although there is a strong and liberal federal policy to enforce arbitration agreements, "such

23  agreements must not be so broadly construed as to encompass claims and parties that were not

24  intended by the original contract." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773,

25  776 (2d Cir. 1995). Nevertheless, nonsignatories have been found to be bound by arbitration

26  agreements under traditional contract and agency principles. *Britton v. Co-Op Banking Group*,

27  4 F.3d 742, 745 (9th Cir. 1993); *Comer v. Micor, Inc.*, 278 F. Supp. 2d 1030, 1033 (N.D. Cal.

28  2003); *Thomson-CSF*, 64 F.3d at 776. Courts have recognized six theories based on these

1   common law principles:  (1) incorporation by reference; (2) assumption; (3) agency; (4) veil

2   piercing/alter ego; (5) estoppel; and (6) third-party beneficiary.  *Bridas S.A.P.I.C. v. Gov't of*

3   *Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003), *cert. denied*, __ U.S.__, 124 S. Ct. 1660

4   (2004).  In this case, Pure Bioscience is relying on two of these theories:  assumption and

5   estoppel.

6   **A.   Assumption**

7        Under the theory of assumption, "a party may be bound by an arbitration clause if its

8   subsequent conduct indicates that it is assuming the obligation to arbitrate."  *Thomson-CSF*, 64

9   F.3d at 777.  Here, Pure Bioscience argues Falken assumed the obligation to arbitrate by

10  participating in the proceedings before Arbitrator Fitzmaurice.  According to Pure Bioscience,

11  having allowed the arbitrator to render a decision on the issue, Falken cannot now challenge the

12  arbitrator's authority.[37]  In support, Pure Bioscience cites *Fortune, Alsweet & Eldridge, Inc. v.*

13  *Daniel*, 724 F.2d 1355 (9th Cir. 1983).  Pure Bioscience argues that rather than wait until after

14  receiving an unfavorable decision, Falken's recourse should have been to apply to the

15  appropriate court for an order enjoining the arbitrator from exercising jurisdiction over it.

16        A review of the facts in *Daniel* reveals that case is inapplicable.  There, the Ninth Circuit

17  held that Richard Daniel's conduct manifested an intent to arbitrate his dispute with his union.

18  *Daniel*, 724 F.2d at 1357.  The court relied on the fact Daniel had sent a representative to the

19  arbitration who listened to the union's evidence, presented limited evidence himself, and

20  requested and received two continuances to secure witnesses and refute the union's evidence.

21  *Id.* at 1356.  Two weeks after requesting and receiving the second continuance, Daniel's

22  representative sent a letter to the arbitration board claiming Daniel was not obligated to arbitrate

23  the dispute and refusing to attend future hearings.  *Id.*  The arbitrator later rendered a decision

24  adverse to Daniel.  *Id.* at 1356-57.  The Ninth Circuit affirmed the arbitration award, and noted

25

26  ───────────

27  [37] Falken maintains that during the hearing it contended its arbitrability should be
    decided by a court and not the arbitrator.  Pure Bioscience disagrees.  The Court finds the parties'
28  dispute over whether Falken presented that argument to the arbitrator does not affect the analysis
    of this issue.

1  it had "long recognized a rule that a party may not submit a claim to arbitration and then

2  challenge the authority of the arbitrator to act after receiving an unfavorable result." *Id.* at 1357.

3  That Daniel had tried to object to the arbitrator's jurisdiction before she rendered her final

4  decision was of no moment: "[i]t would be unreasonable and unjust to allow Daniel to

5  challenge the legitimacy of the arbitration process, in which he had voluntarily participated over

6  a period of several months, shortly before the arbitrator announced her decision." *Id.*

7         Unlike *Daniel* case, Falken did not object to the arbitrator's jurisdiction after the

8  arbitrator considered the merits of Pure Bioscience's claims. Instead, Falken's participation in

9  the arbitration was limited to challenging its obligation to arbitrate. For this reason, Pure

10  Bioscience's reliance on *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1440 (9th Cir. 1994), *Int'l*

11  *Bhd. of Teamsters v. Washington Employers, Inc.*, 557 F.2d 1345 (9th Cir. 1977), *Ficek v. So.*

12  *Pac. Co.*, 338 F.2d 655, 656 (9th Cir. 1964), *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d

13  1100 (2d Cir. 1991), and *Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40 (3d

14  Cir. 1985), are also misplaced.

15         Moreover, Pure Bioscience's argument that Falken should have sought an injunction is

16  also unpersuasive. First Options asserted this same argument and the Supreme Court rejected it.

17  The Court stated that while it was true the Kaplans had other ways to get an independent court

18  decision on the question of arbitrability, their failure to seek an injunction "simply does not say

19  anything about whether the Kaplans intended to be bound by the arbitrators' decision." *First*

20  *Options*, 514 U.S. at 946. Accordingly, the Court finds Falken's conduct in the arbitration does

21  not subject it to the Core Settlement Agreement's arbitration clause.

22      **B.    Equitable estoppel**

23         "Equitable estoppel precludes a party from asserting rights 'he otherwise would have had

24  against another' when his own conduct renders assertion of those rights contrary to equity." *Int'l*

25  *Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir.

26  2000). Pure Bioscience relies on two versions of the estoppel doctrine: the "inextricably

27  intertwined claims" theory and the "direct benefits" theory.

28  ///

1              **1.**    **Inextricably Intertwined**

2         Pure Bioscience argues Falken is estopped from avoiding the arbitration clause because it

3 engaged in a pattern of interdependent and concerted misconduct with NVID, including boasting

4 that Falken had the right to manufacture and sell products based on Axenohl's patent

5 technologies.  Pure Bioscience contends its claims arise out of and are directly related to the

6 Core Settlement Agreement, and its allegations of interdependent and concerted misconduct of

7 NVID and Falken are "inextricably intertwined" and "inherently inseparable."  In support, Pure

8 Bioscience cites *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526-28 (5th Cir.

9 2000).

10         Pure Bioscience's reliance on the "inextricably intertwined" theory of estoppel is

11 misplaced.  In *Grigson*, the Second Circuit held that a nonsignatory to an arbitration agreement

12 could compel a signatory to arbitrate because the issues the nonsignatory sought to arbitrate were

13 intertwined with the underlying agreement.  *Grigson*, 210 F.3d at 526-28.  However, courts have

14 declined to apply this estoppel theory against nonsignatories.  *Legacy Wireless Servs., Inc. v.*

15 *Human Capital, L.L.C.*, 314 F. Supp. 2d 1045, 1055 (D. Or. 2004).  Indeed, the Second Circuit

16 has clarified that *Grigson*'s version of estoppel only prevents "a *signatory* from avoiding

17 arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in

18 arbitration are intertwined with the agreement that the estopped party has signed."  *Thomson-*

19 *CSF, S.A.*, at 779; *accord Bridas*, 345 F.3d at 360-61; *E.I. Dupont de Nemours & Co. v. Rhone*

20 *Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 202 (3d Cir. 2001); *MAG Portfolio*

21 *Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 62 (2d Cir. 2001); *Legacy Wireless*,

22 314 F. Supp. 2d at 1055.  Therefore, the rationale set forth in *Grigson* that Pure Bioscience

23 relies upon does not apply here because the party sought to be estopped — Falken — did not

24 sign the Core Settlement Agreement nor is it the party that is suing to enforce the agreement.

25 Accordingly, regardless of the inseparability of Falken and NVID's conduct and of Pure

26 Bioscience's claims against them, Pure Bioscience cannot require Falken to arbitrate the dispute

27 based on an "inextricably intertwined" theory of estoppel.

28 ///

04cv1147

1          **2.    Direct Benefits**

2          When a signatory seeks to force a nonsignatory to arbitrate, courts have generally

3    "required a showing that the nonsignatory obtained a 'direct benefit' from the underlying

4    contract, that is, a benefit 'flowing directly from the agreement.'" *Legacy Wireless*, 314 F. Supp.

5    2d at 1056 (*quoting MAG Portfolio*, 268 F.3d at 61); *accord Bridas*, 345 F.3d at 361-62.  Some

6    cases discussing the "direct benefits" estoppel theory have looked to whether the nonsignatory

7    asserted a claim against a signatory based on the underlying agreement.  *Legacy Wireless*, 314 F.

8    Supp. 2d at 1056; *see, e.g., Int'l Paper*, 206 F.3d at 418.  *Cf. Bridas*, 345 F.3d at 362 (holding a

9    nonsignatory could not be compelled to arbitrate because it did not sue the signatory under the

10   agreement and therefore had not exploited the agreement); *E.I. DuPont*, 269 F.3d at 200-01

11   (finding that the nonsignatory's claims against the signatory were not founded on the agreement

12   containing the arbitration clause and therefore the nonsignatory could not be compelled to

13   arbitrate its claims).  Other courts have not focused on whether the nonsignatory sued under the

14   agreement, but rather considered whether the nonsignatory otherwise "directly benefitted" from

15   the agreement.  *Legacy Wireless*, 314 F. Supp. 2d at 1057.  For example, the Second Circuit held

16   that nonsignatories — who had not brought a suit — were bound by an arbitration clause

17   contained in an agreement that resulted in the nonsignatories receiving "significantly lower

18   insurance" for their boat and an "ability to sail under the French flag."  *Am. Bureau of Shipping*

19   *v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352-53 (2d Cir. 1999).  Recently, a district court in

20   this Circuit denied a nonsignatory's motion to dismiss an action to compel arbitration because

21   the signatory may be able to show the nonsignatory received direct benefits from the underlying

22   agreement even though the nonsignatory did not sue to enforce the underlying agreement.

23   *Legacy Wireless*, 314 F. Supp. 2d at 1058.

24          Pure Bioscience contends that as a result of the Core Settlement Agreement Falken has

25   been able to:  (1) peg a value to its newly-issued stock; (2) sell its stock; and (3) increase the

26   perceived value of its stock to potential investors.[38]  According to Pure Bioscience, Falken

27

28   _____

        [38]  *See* Krall 09/20/04 Decl. ¶¶ 14-15.

1   accomplished this by openly asserting in Internet postings:  (1) its ownership of the Axenohl

2   patent and all Axen derivatives; (2) its unqualified and absolute right to Axen sales anywhere in

3   Europe and in the United States;[39] (3) its absolute right to manufacture Axenohl; (4) its intention

4   to commence manufacture of Axenohl at its Rouen, France facility and its "ramping up" for the

5   commencement of the manufacturing process; (5) its right to outsource production and its

6   intention to do so; and (6) its right to enforce the terms of the Core Settlement Agreement

7   against Pure Bioscience, its executives, officers, and agents.[40]  Pure Bioscience further argues

8   that NVID's September 23, 2003 and October 1, 2003 press releases announce that Falken paid

9   $690,000 to NVID for rights under the Axenohl patent.[41]  Pure Bioscience also relies on a

10  correspondence by Helle Madsö to shareholders of Falken stock.[42]  According to Pure

11  Bioscience, independent of the Core Settlement Agreement, none of these rights exist.

12      As an initial matter, the Court notes that Falken challenges the admissibility of the

13  evidence Pure Bioscience cites in support of its claims that Falken has improperly touted its

14  rights to the Axenohl patent.  The Court finds it unnecessary to determine whether the evidence

15  is admissible because the alleged benefits identified above do not subject Falken to arbitration.

16  As set forth in *MAG*, the equitable estoppel theory requires the benefits to the nonsignatory to be

17  direct.  *MAG*, 268 F.3d at 61.  That is, they must "flow[] directly from the agreement."  *Id.*

18  ///

19

20  [39]  In supplemental briefing submitted to the Court, Falken disclaims ownership of the

21  Axenohl patent and Axen product.  Instead, Falken argues that the only rights it has to the
    Axenohl intellectual property is:  (1) the right to use the Axenohl technology in its products,

22  which Pure Bioscience granted to Nickel in the Umbrella Agreement and Nickel thereafter
    assigned that right to Falken; and (2) an equitable interest in the royalty payments due under the

23  Core Settlement Agreement.

24  [40]  Krall 09/20/04 Decl. ¶ 6(a); Pure Bioscience's Reply NOL Ex. H, Raging Bull

25  Message Board (Sept. 21, 24, & 25 2003), Ex. I, Raging Bull Message Board (Oct. 12, 2003).

26  [41]  Krall 09/20/04 Decl. ¶ 15; Pure Bioscience's Reply NOL Ex. A, NVID Press Releases
    on Yahoo! Finance (Sept. 23, 2003 & Oct. 1, 2003).

27

28  [42]  Krall 09/20/04 Decl. ¶ 15; Pure Bioscience Reply NOL Ex. B, Letter from Madsö to
    Singer of 10/13/03.

04cv1147

1    An example of a case where the Second Circuit held a nonsignatory had not directly

2  benefitted from an underlying agreement containing an arbitration clause is *Thomson-CSF*.

3  There, Redifussion Simulation Ltd. and E&S entered into a "Working Agreement" whereby they

4  agreed to trade exclusively with each other. *Thomson-CSF*, 64 F.3d at 775.  Subsequent to

5  entering into this agreement, Redifussion was sold to Hughes Aircraft Company. *Id*.  Hughes

6  amended and extended the agreement between Rediffusion and E&S. *Id*.  Hughes later sold

7  Redifussion to Thomson-CSF, S.A. *Id*.  E&S later filed a demand for arbitration under the

8  Working Agreement against both Rediffusion and Thomson, asserting a breach of their

9  obligations arising out of the contract. *Id*. at 776.  Thomson refused to answer E&S's demand

10  for arbitration, and then filed an action in the Southern District of New York seeking a

11  declaration it was not bound by the arbitration clause of the Working Agreement and an

12  injunction prohibiting further proceedings against it under the Working Agreement. *Id*.  E&S

13  filed a cross-motion to compel Thomson to arbitrate. *Id*.  The district court granted E&S's cross-

14  motion to compel arbitration. *Id*.  The Second Circuit reversed.  In so doing, the court held E&S

15  could not be bound to arbitrate under an estoppel theory as Thomson did not receive a direct

16  benefit from the Working Agreement. *Id*. at 778-80.  The Second Circuit in *MAG* succinctly

17  explained the indirect nature of the benefit in *Thomson-CSF*:

18      While the agreement was crucial to the benefit [Thomson] gained by shutting its
        competitor [E&S] out of the market, the agreement was not the direct source of the
19      benefit. [citation]  Rather, the benefit flowed from [Thomson's] exploitation of
        the contractual relation created through the agreement by acquiring one of the
20      signatories to the agreement.

21  *MAG*, 268 F.3d at 62.

22    Guided by this authority, the Court finds the purported benefits Pure Bioscience claims

23  Falken received are not derived from the Core Settlement Agreement.  As between Pure

24  Bioscience and NVID, the Core Settlement Agreement obligates NVID to transfer all its right,

25  title and interest in the Axenohl patent to Pure Bioscience.[43]  In return, NVID received:  700,000

26  shares of Pure Bioscience common stock, the right to royalty payments from sales of Axenohl,

27

28    [43] Pure Bioscience's Mtn. to Compel Arbitration, Ex. A at Ex. 1, Core Settlement
     Agreement Art. 3.

04cv1147

1   and the right to audit Pure Bioscience's records and accounts.[44]  Because the Core Settlement

2   Agreement transfers the Axenohl patent *to* Pure Bioscience *from* NVID, Falken's ability to raise

3   money as a result of its statements touting its ownership, usage, and overall utilization of the

4   Axenohl patents could not have been based upon NVID's assignment to Falken its rights under

5   the Core Settlement Agreement.  Pure Bioscience's Statement of Claims filed in the arbitration

6   and Motion to Compel Arbitration filed in this action confirm that Falken's assertion of

7   ownership of the Axenhol intellectual property and Axen products could not have derived from

8   the Core Settlement Agreement.  In both of those briefs, Pure Bioscience contends Falken's

9   statements it owned all intellectual property rights in the Axenohl patent and Axen derivatives

10  were false, misleading, and disparaged Pure Bioscience.[45]  Indeed, Pure Bioscience's trade libel

11  claim against Falken is premised on the argument that Falken's statements are false and tortious

12  because they are not supported by the Core Settlement Agreement.  Accordingly, the benefits

13  Pure Bioscience claims Falken received — the ability to claim an asset and permit a value to be

14  attached to Falken's stock — are not direct benefits under the Core Settlement Agreement, and

15  therefore do not subject Falken to arbitration.

16          Pure Bioscience also argues that Falken has exploited the Core Settlement Agreement by

17  having NVID file a counterclaim in the arbitration proceedings on February 20, 2004 on

18  Falken's behalf.  According to Pure Bioscience, Falken is the real party in interest as to the

19  Counterclaim.  Falken responds that the Covenant to Stand Seized expressly provides that NVID

20  holds title to the claims.  Citing Federal Rule of Civil Procedure 17(a) and the caselaw regarding

21  trusts, Falken maintains NVID is the real party in interest and is the only one with standing to

22  assert the claims.  Falken also notes that NVID is defunct, did not prosecute the Counterclaim

23  and the Counterclaim was stricken.  A review of the Covenant to Stand Seized and NVID's

24  Counterclaim supports Pure Bioscience's argument.

25

26

27      [44] *Id.* Art. 4.

28      [45] Pure Bioscience's Mtn. to Compel Arbitration at 9-11; *Id.* Ex. A, Pure Bioscience's
    Statement of Claims at 11-12.

1    Under the terms of the Core Settlement Agreement, Pure Bioscience is obligated to pay

2  NVID certain annual royalty payments for use of the Axenohl patent, and in the event Pure

3  Bioscience transfers the patent, it must pay a 5% transfer fee.[46]  The Preamble to the Covenant to

4  Stand Seized states Pure Bioscience has taken the position that its indebtedness under the Core

5  Settlement Agreement can be limited to the 5% transfer fee in the event of a transfer.[47]  It further

6  states that a material consideration for Falken in entering into the Omnibus Assignment with

7  NVID is that it would receive minimum royalty payments of 1 million dollars per year beginning

8  in 2004.[48]  Significantly, the Preamble provides that NVID will "aggressively defend" the

9  arbitration pending before Arbitrator Fitzmaurice and pursue a counterclaim in those

10 proceedings for rescission or in the alternative for reformation of the Core Settlement

11 Agreement.[49]  The Covenant to Stand Seized further provides that NVID would act as Falken's

12 fiduciary and hold for the use and benefit of Falken all rights, title, and interest in claims and

13 moneys due under the Core Settlement Agreement, the Axenohl patent, its derivatives, and

14 related intellectual property, and any claims NVID has against Pure Bioscience.

15    The Counterclaim NVID filed conforms with the Preamble of the Covenant to Stand

16 Seized.  In particular, it alleges Pure Bioscience contends that if it transfers the patent, it only has

17

18 ───────────────

19  [46] Pure Bioscience's Mtn. to Compel Arbitration, Ex. A at Ex. 1, Core Settlement
    Agreement ¶¶ 4.2 - 4.4.
20

21  [47] Pure Bioscience's Reply NOL Ex. D, Covenant to Stand Seized at 3.

22  [48] *Id.*

23  [49] *Id.* The agreement states:
          WHEREAS, NVID has agreed to aggressively defend the Core Settlement
24  Litigation, and to formulate and prosecute a counter-claim for rescission and in
    the alternative reformation, such that the Core Settlement Agreement is either
25  nullified and the Axenohl patent reverted to NVID, or in the case of reformation
    such that IMS [Pure Bioscience] would be obligated to the payment of past
26  accrued royalties and in the event of any sale, a further payment of 5%, and a
    continuing obligation for the purchaser to make payment of all future royalties,
27  including the minimum thereof as set forth in the Core Settlement Agreement.
    *Id.*
28

1   to pay a 5% transfer fee and it has no further royalty payment obligations.[50]  The Counterclaim

2   maintains NVID's position is that should Pure Bioscience transfer the patent, not only is the 5%

3   transfer fee due, but that Pure Bioscience and its assignee would also be responsible for the

4   minimum royalty payments due under the Core Settlement Agreement.[51]  In accordance with the

5   Covenant to Stand Seized, the Counterclaim requests the arbitrator rescind the Core Settlement

6   Agreement should he conclude Pure Bioscience is not liable for the payment of the minimum

7   royalties in the event of a transfer or, in the alternative, that the arbitrator reform the Core

8   Settlement Agreement to so provide.[52]  To support this request, NVID asserts that the primary

9   consideration for NVID entering into the Core Settlement Agreement was that it would receive a

10  minimum royalty for the life of the patent.[53]

11          Although Falken itself did not file the Counterclaim and the pleading does not explicitly

12  state that it was filed on Falken's behalf, the express language of the Preamble of the Covenant

13  to Stand Seized coupled with the other provisions in the contract establishing NVID as a

14  fiduciary for Falken indicates Falken negotiated for NVID to file that Counterclaim.  Even

15  assuming NVID is the only party who can legally pursue claims against Pure Bioscience

16  regarding the Core Settlement Agreement, there is no dispute that Falken would have benefitted

17  from a ruling favorable to NVID.  If NVID had prevailed on its claim for rescission, the patent

18  would have reverted back to NVID who would hold it in trust for Falken.  Under these

19  circumstances, it would be inequitable to allow Falken to avoid the Core Settlement

20  Agreement's arbitration clause.  That NVID later became defunct and failed to prosecute the

21  Counterclaim resulting in the Counterclaim being stricken does not persuade this Court that

22  Falken should not be equitably estopped from denying its obligation to arbitrate.  Rather, those

23  facts speak to NVID's liability to Falken for breaching its duties under the Covenant to Stand

24  _____

25      [50] Pure Bioscience's Reply NOL Ex. G, NVID's Answer and Counterclaim at 14.

26      [51] *Id.*

27      [52] *Id.*

28      [53] *Id.*

1   Seized.  Accordingly, the Court concludes Falken is equitably estopped from resisting the

2   arbitrator's jurisdiction because it directly benefitted from the Core Settlement Agreement by

3   contracting with NVID to pursue a counterclaim against Pure Bioscience for Falken's benefit.[54]

4   **III.   The Procedural Posture of the Arbitration**

5          In addition to arguing it should not be compelled to arbitrate because it is not a signatory

6   to the Core Settlement Agreement, Falken also contends that consideration of the procedural

7   posture of the arbitration proceedings militate against requiring it to arbitrate.  As noted above,

8   Falken's suit for injunctive relief in the Southern District of New York was voluntarily

9   dismissed based on Falken and Pure Bioscience's stipulation that Pure Bioscience would not

10  enter default judgment against Falken in the arbitration proceedings until after a court

11  determination is made regarding whether Falken is properly a party to the arbitration and the

12  arbitrator has jurisdiction over Falken in connection with Pure Bioscience's claims.[55]

13  Notwithstanding this stipulation, the arbitration proceeded and has concluded as to NVID.[56]

14  Arbitrator Fitzmaurice entered an award against NVID and in Pure Bioscience's favor in the

15  amount of $14.6 million.[57]

16         Falken argues that because Pure Bioscience has maintained, and Arbitrator Fitzmaurice

17  previously agreed, that Falken is liable for NVID's obligations under the Core Settlement

18  Agreement, Falken is concerned that an award against Falken "will be a foregone conclusion."[58]

19  Falken cites in support the arbitrator's finding that NVID had engaged in a de facto merger with

20

21         [54] Having concluded Falken is equitably estopped from avoiding the Core Settlement

22  Agreement's arbitration clause, the Court declines to analyze Pure Bioscience's argument Falken
    is bound to arbitrate because NVID assigned Falken all of its rights and liabilities under the Core

23  Settlement Agreement.

24         [55] Pure Bioscience's Oppo. to Falken's *Ex Parte* Application Ex. A, Joint Stipulation,

25  Ex. B, Letter from Rovell to Hahn of 03/10/04.

26         [56] *See* Falken's Ntc. Re Arbitration Award, Ex., Award at 3.

27         [57] *Id.* at 10.

28         [58] *See* Falken's Ntc. Re Arbitration Award at 2.

04cv1147

1   Falken, with Falken being a surviving entity.[59]  Thus, Falken argues it may be irreparably

2   prejudiced because it chose to challenge the arbitrator's jurisdiction.

3          Falken's reliance on the procedural posture of the arbitration proceedings is not a legally

4   cognizable basis for denying Pure Bioscience's motion to compel arbitration.  This action is

5   based on 9 U.S.C. § 4.  Having concluded that Falken is subject to the arbitration clause, this

6   Court does not have discretion to deny Pure Bioscience's motion.  *See Simula*, 175 F.3d at 719;

7   *Chiron*, 207 F.3d at 1130.  The FAA "mandates that district courts direct the parties to proceed

8   to arbitration on issues as to which an arbitration agreement has been signed." *Simula*, 175 F.3d

9   at 719 (*citing Dean Witter Reynolds*, 470 U.S. at 218); *accord Chiron*, 207 F. 3d at 1130.

10         Further, denial of Pure Bioscience's motion because of the procedural posture of the

11  arbitration proceedings would be premature and speculative.  The arbitration award specifically

12  notes the arbitration proceeded only as to NVID and the arbitrator only addressed Pure

13  Bioscience's claims against NVID given the pendency of the instant action.[60]  Although

14  Arbitrator Fitzmaurice concluded NVID engaged in a de facto merger with Falken,[61] this Court

15  cannot presume Falken's liability is a "foregone conclusion."  How Arbitrator Fitzmaurice

16  chooses to proceed on Pure Bioscience's claims against Falken is a matter this Court must defer

17  to the arbitrator to decide in the first instance.

18  **FALKEN'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

19         This Court may exercise personal jurisdiction over Falken "if jurisdiction is proper under

20  California's long-arm statute and if that exercise of jurisdiction accords with federal

21  constitutional due process principles." *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103

22  F.3d 888, 893 (9th Cir. 1996).  California's long-arm statute provides that jurisdiction may be

23  exercised over nonresident defendants "on any basis not inconsistent with the Constitution of

24  this state or of the United States." Cal. Civ. Proc. Code § 410.10; *Fireman's Fund*, 103 F.3d at

25  

26      [59] *See* Falken's Ntc. Re Arbitration Award, Ex., Award at 9.

27      [60] Falken's Ntc. Re Arbitration Award, Ex., Award at 3.

28      [61] *Id.* at 9.

1   893; *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

2   Because "California's jurisdictional statute is coextensive with federal due process requirements,

3   the jurisdictional inquiries under state law and federal due process merge into one analysis."

4   *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991); *accord Dole Food Co. v. Watts*, 303

5   F.3d 1104, 1110 (9th Cir. 2002). "[D]ue process requires only that . . . [the defendant] have

6   certain minimum contacts with [the forum state] such that the maintenance of the suit does not

7   offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*,

8   326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1941)); *accord Dole*

9   *Food*, 303 F.3d at 1110-11.

10         The Ninth Circuit has interpreted *International Shoe* as allowing two types of personal

11   jurisdiction: general and specific. "General personal jurisdiction, which enables a court to hear

12   cases unrelated to the defendant's forum activities, exists if the defendant has 'substantial' or

13   'continuous and systematic' contacts with the forum state." *Fields v. Sedgwick Associated Risks,*

14   *Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986); *accord Bancroft & Masters*, 223 F.3d at 1086. "The

15   standard for establishing general jurisdiction is fairly high, and requires that the defendant's

16   contacts be of the sort that approximate physical presence." *Bancroft & Masters*, 223 F.3d at

17   1086 (internal citation and quotations omitted). Specific jurisdiction allows the court to exercise

18   jurisdiction over a defendant whose forum-related acts gave rise to the action before the court.

19   *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). When the court

20   makes its determination regarding personal jurisdiction solely on affidavits or affidavits and

21   discovery documents, the plaintiff need only make a *prima facie* showing of jurisdictional facts

22   to defeat a motion to dismiss. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1319 (9th Cir.

23   1998); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

24         At issue here is whether this Court can exercise specific jurisdiction over Falken. The

25   Ninth Circuit applies a three-part test for determining whether specific personal jurisdiction

26   comports with due process:

27         (1) The non-resident defendant must purposefully direct his activities or
            consummate some transaction with the forum or resident thereof; or perform some
28         act by which he purposefully avails himself of the privilege of conducting

1  activities in the forum, thereby invoking the benefits and protections of its laws;
   (2) the claim must be one which arises out of or relates to the defendant's forum-
2  related activities; and (3) the exercise of jurisdiction must comport with fair play
   and substantial justice, i.e. it must be reasonable.
3

4  *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 127 (9th Cir. 1995) (internal quotations

5  omitted); *accord Dole Food*, 303 F.3d at 1111.

6  **I.    Purposeful Direction or Availment**

7         The first prong of the test requires Pure Bioscience to show that Falken's activities were

8  purposefully directed at residents of California. *See Shute v. Carnival Cruise Lines*, 897 F.2d

9  377, 381 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991). This requirement

10 prevents defendants from being haled into a jurisdiction through "random" "fortuitous," or

11 "attenuated" contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Terracom v.*

12 *Valley Nat'l Bank*, 49 F.3d 555, 560 (9th Cir. 1995).

13        Falken argues it did not enter into a contract with Pure Bioscience and therefore it has no

14 contacts with California. This Court, however, has already concluded Falken is equitably

15 estopped from avoiding the Core Settlement Agreement's arbitration clause. In the Ninth

16 Circuit, an agreement to arbitrate locally is a factor supporting purposeful availment. *Fireman's*

17 *Fund*, 103 F.3d at 894. Accordingly, Falken's obligation to arbitrate in San Diego favors a

18 finding of purposeful availment.

19        In addition, one of the claims Pure Bioscience has alleged against Falken is for trade libel.

20 In intentional tort cases, the purposeful availment requirement is analyzed under the "effects

21 test" first announced in *Calder v. Jones*, 465 U.S. 783 (1984). *Dole Food*, 303 F.3d at 1111. In

22 *Calder*, the Supreme Court held that California courts could exercise jurisdiction over an editor

23 and a reporter who caused a defamatory article about a California resident to be published in

24 Florida and circulated in California. *Calder*, 465 U.S. at 788-89; *Dole Food*, 303 F.3d at 1111.

25 The Court found that the defendants' tortious conduct was expressly aimed at the forum state

26 and had its harmful effect there. *Calder*, 465 U.S. at 788-89; *Dole Food*, 303 F.3d at 1111. The

27 Ninth Circuit has recognized that "*Calder* stands for the proposition that purposeful availment is

28 satisfied even by a defendant whose only contact with the forum state is the purposeful direction

1  of a foreign act having effect in the forum state." *Dole Food*, 303 F.3d at 1111 (internal

2  quotations omitted).  To meet *Calder*'s "effects" test, the defendant must allegedly have

3  "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that

4  the defendant knows is likely to be suffered in the forum state." *Dole Food*, 303 F.3d at 1111;

5  *accord Harris Rutsky & Co. Ins. Serv., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131 (9th

6  Cir. 2003); *Bancroft & Masters*, 223 F.3d at 1087.  It is "[t]he presence of individualized

7  targeting" that satisfies the effects test. *Bancroft & Masters*, 223 F.3d at 1088.

8       The Court finds the "effects test" is met in this case.  The allegedly disparaging

9  statements were made intentionally and regarding a California citizen.  The statements impugn

10  Pure Bioscience's ownership of the Axenohl patent and trademark and claim the company is

11  about to file for bankruptcy.  The harm Pure Bioscience has suffered from the statements was

12  felt in California.  Accordingly, for this additional reason, the Court finds Falken has

13  purposefully availed itself of this jurisdiction.

14  **II.   Claims Arising Out of Falken's Forum-Related Activities**

15       The Ninth Circuit relies on a "but for" test to determine whether a particular claim arises

16  out of forum-related activities and thereby satisfies the second requirement for specific

17  jurisdiction. *Harris Rutsky*, 328 F.3d at 1131-32; *Shute*, 897 F.2d at 385-86.  Here, Pure

18  Bioscience seeks to compel Falken to participate in arbitration proceedings in San Diego,

19  California.  One of the claims in the proceedings arises out of Falken's allegedly false,

20  misleading, and disparaging statements about Pure Bioscience.  But for Falken's alleged trade

21  libel, Pure Bioscience's injuries would not have occurred.  Accordingly, Pure Bioscience's

22  claims arise out of Falken's California-related activities.

23  **III.   Reasonableness**

24       "Once purposeful availment has been established, the forum's exercise of jurisdiction is

25  *presumptively reasonable*.  To rebut that presumption, a defendant must present a *compelling*

26  case that the exercise of jurisdiction would, in fact, be unreasonable." *Roth*, 942 F.2d at 625

27  (internal quotations omitted); *accord Dole Food*, 303 F.3d at 1114.  To determine whether the

28  exercise of jurisdiction comports with "fair play and substantial justice," the court considers

seven factors: "(1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Dole Food*, 303 F.3d at 1114; *Harris Rutsky*, 328 F.3d at 1132; *Bancroft & Masters*, 223 F.3d at 1088.

A detailed analysis of each factor is not necessary in this case. Falken has not presented any facts or argument indicating litigation in California would be gravely inconvenient and difficult. Accordingly, the Court finds that exercise of jurisdiction over Falken is reasonable.

**CONCLUSION**

Having carefully considered the parties' briefs, applicable law, and argument of counsel, **IT IS HEREBY ORDERED**:

1. Pure Bioscience's motion to compel arbitration is **GRANTED**.

2. Falken's motion to dismiss for lack of personal jurisdiction is **DENIED**.

The Clerk of the Court is directed to enter judgment in accordance with this order.

**IT IS SO ORDERED**.

Dated: 1/3/05

M/JAMES LORENZ
UNITED STATES DISTRICT JUDGE

COPY TO:

HON. NITA L. STORMES
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

29                                                                    04cv1147